IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

| | | |
|---|---|---|
| KENTUCKY COAL ASSOCIATION, INC., JAMES ROGERS, III, J.L. ROGERS FAMILY, LLC, TALMAGE ROGERS, TALMAR OF FL, LLC, PAT EARLY, KIRSTINE EARLY, BUCKINGHAM HOLLOW, LLC, KEVIN LAWRENCE AND BIG BUCKS, LLC<br>　　　　　　　　Plaintiffs<br>v.<br><br>TENNESSEE VALLEY AUTHORITY<br>　　　　　　　　Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 4:14-CV-00073-JHM |

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Fed. R. Civ. P. 65, Plaintiffs Kentucky Coal Association, Inc., James Rogers, III, J.L. Rogers Family, LLC, Talmage Rogers, Talmar of FL, LLC, Pat Early, Kirstine Early, Buckingham Hollow, LLC, Kevin Lawrence and Big Bucks, LLC (referred to collectively herein as "Plaintiffs"), submit this memorandum in support of their Motion for Preliminary Injunction against Defendant Tennessee Valley Authority ("TVA"), by which they seek to preliminarily enjoin TVA from carrying out any activities that will implement its decision to retire Paradise Units 1 and 2 and construct a new natural gas-powered generating facility and accompanying gas transport infrastructure. Plaintiffs also respectfully request that the Court, in its equitable discretion, dispense with the security requirement of Fed. R. Civ. P. 65(c).

**INTRODUCTION**

As detailed in the Complaint, TVA has failed to undertake required environmental analysis under the National Environmental Policy Act ("NEPA") and failed to engage in least-cost planning per the TVA Act in connection with its decision to retire two coal-fueled

generating units at the Paradise Fossil Plant ("Paradise") and construct and operate a new combustion turbine/combined cycle ("CT/CC") natural gas plant with a summer generating capacity of up to approximately 1,025 MW when operated in CC mode.

Rather than conduct an Environmental Impact Statement ("EIS") for this federal project related to a major power-generating facility - as directed by NEPA itself, the implementing regulations established by the Council on Environmental Quality ("CEQ") at 40 CFR 1500-1508, and TVA's own NEPA implementing regulations - TVA conducted only a more limited Environmental Assessment ("EA")[1] to inform a decision with a significant effect on the quality of the human environment, unmistakable potential for controversy, and a cost of over a billion dollars. To avoid the required EIS, TVA characterized the construction of a new 1,025 MW gas-fueled facility and its related infrastructure as an "upgrade" or "maintenance" of the existing coal-fueled facilities when in fact the existing coal-fueled units will be decommissioned, demolished, and replaced by a separate and distinct gas-fueled facility.

The proposed action – wastefully abandoning TVA's previous investment in emission controls on Paradise Units 1 and 2 (two of TVA's most efficient coal-fired units), demolition and removal of those two units, and building a brand new facility with necessary infrastructure installations – was a sudden change of course for TVA's Board of Directors, who less than a year earlier had committed to infrastructure upgrades at Paradise Units 1 and 2 that would have brought those Units into compliance with all extant regulations. It also sets a precedent to construct new gas-fueled facilities and infrastructure rather than implementing less expensive and less environmentally impactful emission

---

[1] The EA can be found online at
http://www.tva.com/environment/reports/pafmats/pdf/final/ParadiseFEA.pdf.

control upgrades, by segmenting and deferring analysis of the environmental impacts of <u>all</u> aspects of the decision.

Not only did TVA's rushed analysis violate its own NEPA procedures, it is also inconsistent with CEQ regulations. CEQ's NEPA regulations require TVA to consider the full environmental impact of each proposed alternative. Relative to TVA's preferred option – the new natural gas facility – TVA failed to comply with NEPA regulations by failing to consider reasonably foreseeable connected and cumulative actions and improperly segmenting certain project components and related actions, including the retirement and decommissioning of Units 1 and 2 and the construction and operation of one or more natural gas pipelines and back-up aboveground fuel storage tanks with 5 million gallons of capacity.

By not fully evaluating the segmented actions, the EA does not provide the level of detail and breath of analysis commensurate with the potential for a significant effect on the human environment, as would the EIS required by TVA's NEPA procedures. In addition, TVA's resource-specific and cumulative impact analyses do not properly support a Finding Of No Significant Impact ("FONSI").[2] These analytical deficiencies, along with an unnecessarily broad scoping process, enabled TVA to select an entirely new major generating facility based solely on an EA while deferring a more detailed evaluation of the impacts of important components of that alternative into the future.

NEPA regulations demand that TVA should have considered a range of reasonable alternatives against a baseline "no action" alternative. TVA did not establish a legitimate baseline, although TVA itself admits that continuing the status quo is not legal or practical.

---

[2] The FONSI can be found online at
http://www.tva.com/environment/reports/pafmats/pdf/final/PAF_MATS_EA%20FONSI.pdf.

If TVA had established the no-action baseline as contemplated by idling the units which could not comply with MATS, the environmental effects of TVA's proposed action would have been more significant, evidencing the need for an EIS level of review. As a result, the comparison of alternatives understates the potential impacts compared to a legitimate No Action Alternative in several technical areas, including water withdrawals and discharges and air emissions.

The decision is certain to result in higher prices for electricity, an undeniably significant effect on the human environment particularly among low-income communities. TVA's NEPA analysis of the effects on the human environment is deficient because access to electricity in the United States is directly responsible for increased health and increased life expectancy, and affordable electricity is a critical component to the "human environment."[3] The EA does not consider the possibility that its failure to choose the least-cost option could deprive certain of its ratepayers access to affordable electricity, and in heavy peak-demand periods could result in brown-outs or blackouts. Instead the EA merely gives lip service to these considerations, concluding that minorities and low income families will benefit from lower emissions from its preferred alternative, even though TVA's choice might mean they could not afford the electricity produced by the proposed gas plant. The effect on the human environment potentially caused by the deprivation of reliable and affordable electricity should have been considered in TVA's analysis. Furthermore, there is no indication that the TVA Board of Directors considered the proposal from the "least cost planning" perspective demanded by the TVA Act.

---

[3]Frank Clemente & Roger A. Babb, *Comments on Tennessee Valley Authority (TVA) Integrated Resource Plan – Scoping: Eliminating Coal Is Adverse to Human Health and Welfare* (Nov. 22, 2013) ("Clemente Report," attached hereto as **Exhibit A**).

Plaintiffs believe that TVA prejudged its environmental analysis to achieve political objectives, not on valid examination of all environmental factors and not on the statutorily mandated least-cost planning approach. Plaintiffs believe that a full EIS analysis will show that the proposed action, when considered in full and proper context, has far more significant environmental impacts than upgrading emission controls on the existing units. But regardless of whether TVA ultimately reaches the same conclusion, federal law requires TVA to carry out a thorough environmental analysis and to engage in least-cost planning. And until TVA has done so, Plaintiffs have the right and this Court has the responsibility to hold it to account.

Plaintiffs are seeking relief in four forms:

(1) a declaratory judgment that TVA has violated NEPA and its implementing regulations, and an associated order setting aside the EA and FONSI;

(2) a declaratory judgment that TVA has violated the TVA Act by failing to engage in least –cost planning;

(3) a permanent injunction that requires TVA to comply with NEPA by preparing an EIS and engaging in appropriate analysis of what, if any, actions to take at the Paradise facility; and

(4) preliminary and permanent injunctive relief prohibiting TVA from taking any further action related to Paradise Units 1 and 2, the construction of a gas-powered facility at Paradise, or the construction of any infrastructure supportive of a gas-powered facility until TVA has complied with all NEPA requirements.

This motion addresses the last, critically important piece of the relief sought. Without preliminary injunctive relief, the declaratory and permanent injunctive relief Plaintiffs are pursuing will be a pyrrhic victory. TVA must not continue to expend ratepayer and taxpayer funds in pursuit of its plan to construct a new natural gas-powered generating facility and to decommission and demolish the existing, fully-functioning coal-

powered Paradise Units 1 and 2 before the Plaintiffs have had the opportunity to gather discovery and this Court has had the opportunity to review the evidence.

As the Sixth Circuit has recognized, one purpose of a preliminary injunction "under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996). And environmental matters like this one are particularly appropriate for preliminary injunctive relief given the inherent dangers of irreparable harm. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545, 107 S.Ct. 1396 (1987). A preliminary injunction serves the public's interest in NEPA compliance, and is well justified here.

## FACTUAL BACKGROUND

The decision to decommission and demolish two coal-fueled generating units at Paradise and construct an entirely new natural-gas CT/CC plant to replace them came as a sudden turn-around after years of investment into emissions controls for the coal-fueled units. Through 2011 TVA spent $5.4 billion – paid for by ratepayers in the Tennessee Valley, including these Plaintiffs – to control emissions at its coal-fueled generating units. This included significant investments at Paradise in SCR systems to reduce nitrogen oxide emissions by about 90% and scrubbers to reduce sulfur dioxide emissions by about 94%. In 2009, TVA started the process for preparing its Integrated Resource Plan (IRP) and related EIS to assess potential environmental effects of the plan's resource strategies. TVA completed its IRP process in the spring of 2011, when the IRP and its EIS were approved by the TVA Board of Directors. The IRP contemplated the continued operation of Paradise Units 1 and 2.

The U.S. Environmental Protection Agency finalized the Mercury and Air Toxics Standards (MATS) at the end of 2011, and in August 2012, the TVA Board of Directors approved a budget that included the funding to upgrade the existing emission controls at Paradise Units 1 and 2 by installing pulse jet fabric filter systems to comply with MATS emission mandates. In April 2013, TVA again stated its plan to install pulse jet fabric filters on Paradise Units 1 and 2 to comply with MATS.

In August 2013, TVA released a Draft EA that, as a purported MATS compliance measure, proposed to retire Paradise Units 1 and 2 and replace these units with a separate and new natural gas-fueled CT/CC plant. TVA offered a minimal 30-day comment period on the sudden change in direction, denying the public a meaningful opportunity to engage in the process. The Draft EA considered three alternatives: (1) the No Action Alternative, under which TVA would allow the facility to operate out of compliance with the governing laws and regulations ("Alternative A"); (2) construction and operation of pulse jet fabric filter systems for emission control on Paradise Units 1 and 2 ("Alternative B"); and (C) retirement of Paradise Units 1 and 2 and construction and operation of a new natural gas-fueled power generating CT/CC plant ("Alternative C").

During this short comment period, TVA received 304 comments on the draft EA, most of which supported Alternative B, the installation of the emission controls on Paradise Units 1 and 2 as a MATS compliance measure, and opposed Alternative C due to its significant environmental impacts. Like the TVA Board of Directors in 2012, the public supported the continued long-term coal-fueled operation as an environmentally sound approach to MATS compliance at Paradise Units 1 and 2.

Notwithstanding the overwhelming public sentiment concerning the controversial environmental and economic impacts of its proposed change of course, TVA issued a final EA/FONSI on November 13, 2013 and selected Alternative C as its preferred alternative. The TVA Board of Directors approved this course of action that very same day, reversing its 2012 decision to upgrade Paradise Units 1 and 2 and abandoning its significant investments of ratepayer funds in those units due to "[s]ignificant changes in TVA's business environment [that] required TVA to re-evaluate that decision."[4] Yet between August 2012 and August 2013, the MATS standards had not changed, the stated purpose and need for the proposed action as set out in the EA had not changed,[5] and the 2011 IRP had not changed.

The proposed action would be adverse to the human environment, health and welfare and place the TVA service area, region and nation at risk for higher electric rates, higher and more volatile natural gas prices, job loss and increased unemployment, potential outmigration of industry, lower income levels, higher poverty rates, particular adverse impacts on minorities, the elderly, children and women. Among other harm, TVA's preferred alternative will admittedly increase the cost of electricity, likely having a disparate impact on the poor and elderly populations. Inaccessibility to the power provided by the Paradise Facility to customers who depend on it will have a tremendous impact on the health and life-expectancy of those customers. Finally, the TVA employees who will lose their job and their families will be critically affected by TVA's decision, and a significant percentage of the surrounding community will be economically affected by a move from

---

[4] Presentation to TVA Board of Directors in Oxford, Mississippi, available at http://www.tva.com/abouttva/board/Nov_14_2013_Public_Board.pdf, at 51 (Nov. 13, 2013).
[5] The purpose and need is for TVA to "...determine how to comply with MATS while maintaining reliable generating capacity in the [Paradise Fossil Plant] service area." [EA §1.2.]

coal generation to gas generation at this facility. By performing only an EA and not an EIS, TVA failed to adequately consider these and other effects on the human environment, as NEPA demands. TVA also failed to conduct the lowest cost planning demanded by the TVA Act.

## ARGUMENT

The purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can be held. Accordingly, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). When considering a motion for preliminary injunction, under Fed. R. Civ. P. 65, the Sixth Circuit directs this Court to balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest will be served by issuance of the injunction. *See, e.g., Summit Cty. Democratic Central and Exec. Comm. v. Blackwell,* 388 F.3d 547, 522 (6th Cir. 2004); *Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Productions*, 134 F.3d 749, 53 (6th Cir. 1998).

A district court is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are determinative of the issue. *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 717 (6th Cir. 2003). The four factors "are not prerequisites to be met, but rather must be balanced as part of a decision to grant or deny injunctive relief."

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995). The Sixth Circuit has explained the nature of the balancing act in question by stating: "The [movants] must demonstrate a likelihood of success on the merits to a degree inversely proportional to the amount of irreparable harm that will be suffered…" *Anglers of the AU Sable v. U. S. Forest Service*, 402 F. Supp. 2d 826, 831 (E.D. Mich. 2005), *quoting Family Trust Foundation of Kentucky, Inc. v. Kentucky Judicial Conduct Comm'n*, 388 F.3d 224, 227 (6th Cir. 2004).

An agency decision requiring or waiving an EIS is reviewable under the Administrative Procedures Act, *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377, 109 S. Ct. 1851 (1989); 5 U.S.C. § 706 governs the review of agency decisions by federal courts. The decision in question here is the TVA's decision to construct a new and costly natural gas facility and to do so by issuing a FONSI after performing an EA, rather than conducting an EIS. Decisions by administrative agencies regarding the performance of EAs and EISs are governed by Section 102(2) of NEPA, 42 U.S.C. § 4332.

When interpreting the APA and NEPA, courts have held that in accordance with the aims of NEPA, a court reviewing an agency's FONSI should focus on two factors. First, the court should decide whether the agency's decision was "arbitrary and capricious." 5 U.S.C. § 706; *Neighbors' Organized to Insure a Sound Environment, Inc. v. McArtor*, 878 F.2d 174, 178 (6th Cir.1989). Second, the court should determine whether the agency took a "hard look" at the environmental consequences of the project in question, pursuant to the CEQ regulations, 40 C.F.R. § 1508. *Charter Township of Huron, Michigan v. Richards*, 997 F.2d 1168, 1175 (6th Cir.1993).

Although a federal district court reviewing the decision of an administrative agency plays a limited role, *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 555, 558, 98 S.Ct. 1197 (1978), nevertheless this Court has an important role to play "to make sure that federal agencies act according to the letter and spirit of the Act." 40 C.F.R. § 1500.1(a). "The President, the federal agencies, and the courts share responsibility for enforcing the Act ...." *Id.* Since neither the President nor TVA have forced compliance with NEPA, Plaintiffs come to this Court seeking relief in the form of required NEPA compliance by TVA.

I.     **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THE DISPUTE, AND EASILY MEET THE BURDEN OF SHOWING A SERIOUS AND SUBSTANTIAL QUESTION EXISTS.**

Plaintiffs must demonstrate more than a possibility of success, but a fully convincing presentation is not required. "[T]he [movants] must demonstrate at least serious questions going to the merits and irreparable harm that decidedly outweighs the harm that will be inflicted on others if a stay is granted...." *Anglers of the AU Sable* 402 F. Supp. 2d at 831, *quoting Family Trust Foundation,* 388 F.3d at 227. Plaintiffs meet their required showing by raising questions going to the merits that are "so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997). Plaintiffs here have done so, raising serious and substantial questions on the merits with their claims under both NEPA and the TVA Act.

A.     **Plaintiffs have raised substantial questions as to TVA's failure to perform an EIS in violation of NEPA.**

As detailed in the Complaint, NEPA mandates that all agencies of the federal government prepare an EIS when they undertake or fund "major Federal actions

11

significantly affecting the quality of the human environment." 42 U.S.C. § 4332 (C). Rather than mandating particular results to accomplish its ends, NEPA imposes procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349-50 (1989). An EIS is not mere paperwork: rather, it is the very heart of NEPA, a statute that "establishes a 'national policy [to] encourage productive and enjoyable harmony between man and his environment,' and was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." *Buckeye Forest Council v. U.S. Forest Serv.*, 337 F. Supp. 2d 1030, 1032 (S.D. Ohio 2004) (quoting 42 U.S.C. § 4321).

A federal agency like TVA may address environmental impact through an EA if, and only if, the proposed action is one that normally does not require an EIS or is one that requires neither an EIS nor an EA. *See* 40 C.F.R. § 1501.4(b). TVA's own NEPA procedures identify the types of actions that "normally require an environmental impact statement" to include (1) actions involving "[m]ajor power generating facilities"; (2) "any major action, the environmental impact of which is expected to be highly controversial"; and (3) "any other major action which will have a significant effect on the quality of the human environment." TVA NEPA Procedures § 5.4.1. The decision at issue qualifies under all three alternatives. An EIS was undoubtedly called for here.

## 1. **The TVA's decision involves a major power generating facility.**

Given that the preferred alternative (Alternative C) is the construction of a new 1,025 MW CT/CC gas plant and its associated high-pressure gas pipeline system and back-

up fuel oil system, the appropriate level of NEPA review is an EIS, not an EA.[6] TVA's defense of its decision to prepare an EA is that the EIS requirement for "major power generating facilities" refers to the "construction of such facilities, not their continued operation."  [EA Appendix A.] Similarly, in response to a public comment about the need to prepare an EIS in accordance with TVA's own procedures [EA Appendix C, Comment #27], TVA responded as follows:

> TVA agrees that the Paradise Fossil Plant is a "Major power generating facility," or in Clean Air Act terminology, a major emitting facility or major stationary source. Since the issuance of its NEPA Procedures, TVA has interpreted the cited statement about an EIS normally being required [§ 5.4.1] as applying to construction of a new major power generating facility and not to maintenance and upgrades of existing major power generating facilities. TVA carefully evaluates proposed actions at its power generating facilities to determining the appropriate type of NEPA review based on criteria in the TVA NEPA Procedures and the CEQ NEPA Regulations. (Emphasis added.)

The very description of the preferred Alternative C in the EA refers to the "construction and operation of a new CT/CC plant on 50-acre plant site with a summer generating capacity of up to 1,025 MW when operated in combined cycle mode." [EA § 2.1.3.] Major project components of Alternative C include up to four natural gas fired CT generators each with a capacity of 200 MW, three heat recovery steam generators, and one steam turbine generator to utilize waste heat from three of the combustion turbines; construction of 500-kV transmission line(s); construction of one or two natural gas pipelines (up to twenty miles in length in new right-of-way) to connect the plant site to interstate gas pipeline(s); and numerous other elements involving major new construction activities, such as a mechanical-draft cooling tower, storm water holding pond, and primary

---

[6] Potomac-Hudson Engineering letter report ("PHE Report," attached hereto as **Exhibit B**), at 2.

and secondary water intake structures. A full project description is provided in EA Sections 2.1.3 and 2.2.2; and a discussion of construction activities in Section 2.2.2.4.

These descriptions are <u>not</u> consistent with TVA's interpretation in Appendix A, or response to public comment in Appendix C, that Alternative C is somehow an upgrade to the coal-fueled units or some sort of maintenance project. [PHE Report at 3.] Nowhere does the EA make any reference to maintenance and upgrading activities when describing any of the alternatives. Moreover, the preferred Alternative C is wholly inconsistent with "the continued operation" of the existing facility. Paradise Unit 1 and 2 are to be decommissioned and dismantled. It is simply beyond debate that the preferred Alternative is consistent with a major new power plant, requiring an EIS and not an EA. TVA's statements to the contrary and its failure to follow its own NEPA Procedures are arbitrary and capricious. At a minimum, there is a serious question on the merits as to whether TVA's decision not to conduct an EIS for the proposed project violates its own internal policy of conducting an EIS for actions involving a major power generating facility.[7]

**2.   <u>The TVA's decision is highly controversial.</u>**

As Plaintiffs have alleged, the TVA's chosen new gas plant alternative is highly controversial. The vast majority of public comment on the EA protested the significant environmental impacts of the new construction and championed the installation of emission controls at the existing units. As the Complaint details, Alternative C represents a significant change of course for TVA, on short notice and with little explanation as to the asserted "changes in TVA's business environment" that prompted it and with no

---

[7] While Plaintiffs believe this is a ruling the Court can make as a matter of law, Plaintiffs seek expedited discovery to investigate TVA's practices in regards to past construction projects to determine whether TVA's characterization is inconsistent with its historical interpretation of Section 5.4.1.

explanation on how it is the least cost option. Here too, Plaintiffs seek expedited discovery that will indicate TVA's historical practices in terms of gauging the likely controversy to expect from a decision in order to determine whether it is sufficient to prompt an EIS.

The decision for TVA to abandon functional, highly efficient and low cost coal-fueled units,[8] which are able to supply their coal needs cheaply due to their location in the Illinois Basin, is sure to be controversial among TVA ratepayers and property owners who enjoy low energy costs, among those directly employed or whose friends, neighbors, and customers are employed in the coal industry and affiliated industries or at the Paradise plant, and among those who believe that the push to convert from coal to natural gas presents more environmental challenges than it solves. While the EA discussed the number of jobs that will be eliminated at the Paradise plant, it failed to recognize and analyze the impact of the closure of Units 1 and 2 on the jobs and economy in the surrounding community in Western Kentucky. The closure would reduce direct employment in Western Kentucky by about 400 jobs. [EVA Report at 12.] TVA must have been aware of this potential for controversy; indeed, these concerns and others were raised in the shortened public comment period allowed for the EA, and the majority of the 304 public comments TVA received were opposed to Alternative C. As one example, Plaintiff Kentucky Coal Association organized 59 comments that supported the continued use of coal.

What is more, in October 2013, all but one of the members of Kentucky's federal legislative delegation signed a letter to TVA which called on TVA to adopt Alternative B and

---

[8] Paradise Units 1 and 2 had two of the highest capacity factors in the entire TVA system for the 12 months ending August 2013. This indicates these two units are the most economic coal-fueled units to operate on the TVA system and operate more economically than some or all of TVA's natural gas units.  [Energy Ventures Analysis, Inc., *Flawed Decision by TVA: Economic Analysis of Closing the Paradise Units* (August 2014) ("EVA Report," attached hereto as **Exhibit C**), at 2-4].

continue the use of coal at the Paradise facility. Per the letter, the elected representatives and their constituents feared the consequences of Alternative C for the coal industry and Kentucky industry generally, noting that heavily electricity-dependent industries like aluminum smelting and automobile parts manufacturing would suffer in the event that electricity prices increase with the move away from coal.[9]

After TVA adopted Alternative C, in December 2013 Kentucky Attorney General Jack Conway wrote to TVA complaining about the lack of transparency in TVA's decision-making process "given the drastic effects these resource planning decisions will have on ratepayers in the TVA service area, including ratepayers in Kentucky that are my constituents." Attorney General Conway raised concerns regarding impacts of "electricity costs, reliability and other issues," and requested the production of all studies, analyses, and documents related to modeling/ forecasting, replacement capacity, and rate and economic impact.[10] [*Id.*]

Plaintiffs have shown a serious question on the merits as to whether TVA's decision not to conduct an EIS for the proposed project violates its own internal policy of conducting an EIS for actions that are likely to have a highly controversial environmental impact.

### 3.  **The TVA's decision is a major federal action that will significantly affect the quality of the human environment.**

The TVA's decision to abandon its previous investment in emission controls on Paradise Units 1 and 2, completely demolish and remove those two units, and build a brand new facility with necessary infrastructure installations will have significant environmental impacts on the quality of the human environment. Regardless of whether TVA failed to

---

[9] The Congressional letter is attached hereto as **Exhibit D**.
[10] The Conway letter and TVA's response, merely directing the Attorney General to the 2011 IRP and the EA posted on its website, are attached hereto as **Exhibit E**.

analyze these impacts or purposefully ignored them in issuing the FONSI, either course of conduct violates a tenet of NEPA – the "hard look" doctrine, i.e. every federal actor's duty to take a "hard look at environmental consequences" of a proposed action. *Natural Resources Defense Council, Inc. v. C. B. Morton*, 458 F.2d 827, 838 (D. C. Cir. 1972).

Among other impacts on the human environment, TVA ignored the importance of electricity, in particular the availability of an adequate supply at a reasonable price. There are environmental and socioeconomic consequences of more expensive electricity – and Alternative C, as TVA concedes in the EA, will result in more expensive electricity. The EA analysis completely avoids the impact of higher prices for electricity on TVA rate-payers, some of whom could be denied access to electricity altogether by rate increases and many of whom will be significantly affected. Rate increases will disparately impact the poor, and more than 1 in 4 Kentucky children already live in poverty. [Clemente Report at 24.] Rate increases will mean that struggling families must decrease their use of electricity even though access to electricity is directly responsible for increased health and longer life expectancies in the United States. Since 1935, the time period in which TVA has produced power from coal, infant mortality has decreased by 85 percent. [Clemente Report at 8.] Rather than receiving a hard look, the  significant impacts on the human environment engendered by the increased cost of electric generation and the possible scarcity of this critical resource was utterly overlooked by TVA.

For many decades, the United Stated in general and the region served by TVA in particular have greatly benefited from the development and availability of low-cost, reliable electricity from coal-fueled generation. Affordable, reliable electricity is essential to maintaining and improving the human environment in TVA's service area. In the 26

17

counties TVA serves in Kentucky, families survive on an average weekly wage of only $612. [Clemente Report at 25.] States that primarily rely upon coal to generate electricity have markedly lower electric rates that those which do not. [EVA Report at 13.] Furthermore, the EA never mentions or analyzes the effects of increased demand in the context of fuel switching. The potential negative effects of increasing demand for natural gas are discussed further *infra* at Part I.B; here, suffice it to say that an increase in demand for natural gas will certainly result in price increases, and may result in brown-outs or black-outs during peak load periods should natural gas be unavailable in sufficient quantities to meet the demand for electricity. [Clemente Report at 3, 36-37.] Whether electricity is unavailable because its generation is rendered unreliable or unaffordable, the result will be a serious and negative impact on the human environment – one the EA never considers, and as to which an EIS is essential.

Beyond the effect of switching to natural gas on affordability and reliability of electricity generation, the EA utterly failed to conduct an appropriate socioeconomic analysis of the Alternatives. The EA concluded that there would be no significant job loss at the Paradise facility itself, and moved on – without taking into account the very significant effect on the working population of Muhlenberg County, where an estimated ten percent of coal mining jobs – 251 out of 12,485 total jobs in the county – will be lost if TVA stops burning coal in Paradise Units 1 and 2. [EVA Report at 11.] Most of the coal burned at Paradise is mined locally, and in addition to the mining jobs lost, there will be job loss in other related industries like trucking, engineering, and surveying. What is more, Muhlenberg County itself – an impoverished area even by comparison to the rest of an economically struggling state - will lose approximately $2.2 million in annual coal

severance funds returned from the Commonwealth of Kentucky. [11] [EVA Report at 12.] Local owners of coal-producing property like Plaintiffs James Rogers, III, J. L. Rogers Family, LLC, Talmage Rogers, and Talmar of FL, LLC, will lose revenue. None of these considerations are analyzed or even mentioned by the EA.

As the Plaintiffs have detailed in their attached declarations,[12] TVA's decision to demolish Paradise Units 1 and 2 to build a new gas-powered facility and construct the necessary infrastructure to deliver and store that natural gas will significantly affect their environment. At the least, there is a serious question on the merits as to whether TVA's decision not to conduct an EIS for the proposed project violates its own internal policy of conducting an EIS for major actions that significantly affect the quality of the human environment.

4. **The EA improperly relies upon factors inconsistent with its stated purpose and needs, which are not consistent with NEPA.**

CEQ regulations direct that the evaluation of whether a proposed action will have a significant impact requires analysis of both context and intensity, 40 C.F.R. § 1508.27, analyzed nationally, regionally, and locally. 40 C.F.R. § 1508.27(a). An action's intensity must be analyzed on the basis of at least 10 factors, any one of which can indicate that an EIS is required. 40 C.F.R. § 1508.27(b). Among these factors, an EIS is called for when the action "may establish a precedent for future actions with significant effects." 40 C.F.R. § 1508.27(b)(6).

---

[11] These mines pay a state severance tax of 4.5%, of which 50% is shared with the counties. TVA reported an average cost of coal about $50.00 per ton for these mines in 2013. The state severance tax at this price would be $2.25 per ton. The loss of 3.8 million tons per year of Kentucky production would be a loss of $8.5 million annually in severance taxes. The loss of tax revenue to Muhlenberg County would be about $2.2 million annually.

[12] The Declarations of James Rogers III, Talmage Rogers, and Kirstine Early are attached hereto as **Exhibits F-H.**

TVA's selection of Alternative C without adequate environmental analysis, rather than abiding by its own procedures, sets a precedent to sidestep less expensive and environmentally impactful emission control upgrades and instead construct new gas-fueled facilities and infrastructure for reasons that are politically motivated. Plaintiffs believe that discovery will reveal that TVA prejudged the outcome of the NEPA process in an attempt to "comply" with President Obama's Climate Action Plan, which lacks force of law. Although TVA's decision is purportedly made in order to render Paradise compliant with MATS, the EA is replete with extensive discussion of reducing carbon dioxide ($CO_2$) emissions; MATS does not regulate $CO_2$. As further described in the Complaint, TVA has inappropriately elevated $CO_2$ emissions and related air quality issues above all other environmental impacts, a priority scheme that has no legal basis under NEPA or its implementing regulations and provides no justification for failing to complete an EIS.[13] This action by TVA will have a significant effect on future TVA decisions if it is allowed to stand as a precedent.

TVA has set another troubling precedent by relying on "portfolio diversity" as a basis for its decision, rather than on measuring the environmental impacts of the particular alternatives before it. In its Paradise EA, TVA stated: "The selection of CT/CC as the preferred alternative is also influenced by TVA's recent decision to install controls at its Gallatin Plant. Having preserved coal-fueled generation capacity at Gallatin, TVA now has greater latitude to shift from coal to gas at Paradise in the interest of maintaining a diverse

---

[13] TVA does not comply with Executive Order 13514 (Federal Leadership in Environmental, Energy and Economic Performance), and fails to consider methane and N2O emissions (defined along with $CO_2$ as greenhouse gases) in the analysis of impacts, as well as not considering indirect emissions, such as the methane emissions from gas extraction and transportation to the plant, under Alternative C.  [PHE Report at 8.]

portfolio." EA § 2.5 (emphasis added). Plaintiffs believe that discovery will show that TVA predetermined the outcome of the Paradise NEPA process by allowing portfolio diversity considerations rather than analysis of environmental impacts to dictate the preferred alternative in the EA. Using the outcome of a separate NEPA process to dictate the result in this NEPA process violates the letter and spirit of NEPA, which demands comprehensive evaluation of the environmental impacts of the specific proposed action at issue. Allowing TVA to press forward in this course of action by the TVA, if allowed, would constitute another precedent threatening the directives of NEPA and TVA's own internal procedures. Plaintiffs show at least a substantial question on the merits as to the precedent-setting nature of TVA's decision, such that an EIS should have been conducted.

5. **The EA is fundamentally flawed as it fails to consider potential connected and cumulative actions and thus improperly segments certain project components.**

Pursuant to 40 CFR 1508.25(a), an agency must consider "[c]umulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement."[14]  To determine whether the action is "significant", TVA is required to consider:

> Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

40 CFR 1508.27(b)(7) (emphasis added).

---

[14] The phrase "cumulative impact" is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 CFR 1508.7.

While the CEQ regulations only refer to cumulative impacts in the context of preparing an EIS, numerous circuits have extended the cumulative impact analysis to EAs. "[I]f the cumulative impact of a given project and other planned projects is significant, an applicant cannot simply prepare an EA for its project, issue a FONSI, and ignore the overall impact of the project...." *Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 180 (3rd Cir. 2000); *see also Kern v. U.S. Bureau of Land Management*, 284 F.3d 1062, 1076 (9th Cir. 2002) ("We have held that an EA may be deficient if it fails to include a cumulative impact analysis or to tier to an EIS that has conducted such an analysis."). Furthermore, as noted in the *Kern* decision, the CEQ explained in *Considering Cumulative Effects Under the National Environmental Policy Act,* at p. 4 (Jan. 1997), that "[g]iven that so many more EAs are prepared than EISs, adequate consideration of cumulative effects requires that EAs address them fully."

Despite this mandate, TVA did not consider the reasonably foreseeable connected or cumulative actions and resulting environmental impacts associated with its selected Alternative C. Specifically, the EA failed to analyze the significance of the retirement of Units 1 and 2, stating instead: "Long-term actions related to retirement, such as potential demolition of the units, are outside the scope of this EA and will be addressed by TVA in the future should Alternative C be implemented." [EA § 2.1.3.] Further, more construction of the new gas generating facility requires the construction of a new 500-kV transmission line. Yet, in response to a comment, TVA stated: "The construction and operation of this transmission line is outside the scope of this EA and will be the subject of a separate future

EA or EIS." [Appendix C: Response to Comment 3.][15]  Both the retirement of Units 1 and 2 and the construction of a 500-kV transmission line are reasonably foreseeable connected or cumulative actions as defined in 40 CFR 1508.25(a) that would result in impacts that must be considered in the same NEPA document to adequately assess the full range of impacts. [PHE Report at 4.]

In addition to failing to properly consider the cumulative actions and impacts, the EA improperly segments various component parts and related actions, in violation of CEQ regulations. For example, TVA admits it must construct and operate two new 161-kV transmission lines and a 161-kV substation as part of the new CT/CC plant. Yet the EA omits any analysis of those components, stating: "If this alternative is selected, TVA will conduct any additional level environmental review necessary to assess the impacts of the transmission system components after the final TL routes are identified." [EA § 2.2.1.3.]

Similarly, TVA improperly segments the analysis of the construction and operation of new natural gas pipelines and/or an on-site fuel oil storage facility. The EA includes, as it must, a discussion and preliminary review of the natural gas pipeline(s) but it impermissibly refuses to conduct any hard look analysis, saying merely: "The final route of the pipeline(s) will be undertaken by... FERC." [EA § 1.6.][16] And while it improperly defers analysis of the pipelines, the EA provides <u>no</u> analysis of the potential on-site fuel oil storage and handling facilities. It simply notes the possible construction and ignores any impacts.

---

[15] Even if the analysis is not ripe for consideration as a direct or indirect impact in the EA, by deferring any analysis, TVA has failed to consider or evaluate the potential cumulative impacts.
[16] Through its proposed gas supplier, Texas Gas Transmission, LLC, TVA has admitted that it has not conducted the "engineering design, archeological, and environmental surveys" necessary to evaluate the pipeline infrastructure. [Complaint, ¶¶ 22, 24, 26, 28.]

Plaintiffs fear that once TVA has constructed the new natural gas facility, the environmental effects of building the pipelines will be downplayed by TVA out of economic necessity. To prevent that possibility, these actions should have been evaluated in the same NEPA document to fully describe the potential project impacts. [PHE Report at 3.] By stacking the deck in favor of its politically preferred alternative, and only considering the environmental effects of Alternative C on a piecemeal and limited basis, TVA has violated the NEPA implementing regulations and established a dangerous precedent for minimizing the effects of its future actions. Plaintiffs have raised a substantial question on the merits as to whether TVA's improper segmentation violates NEPA and renders the subsequent decision arbitrary and capricious. At a minimum, TVA has failed to take a hard look at the impacts preferring instead to delay the analysis until after the new facility is constructed.

6.  **The EA and its resource-specific cumulative impact analyses do not support a finding of no significant impact.**

Many of the EA's findings of no significant impact are unsubstantiated or are not supported because not all project components, site- and resource-specific impacts, and connected actions have been identified and fully evaluated, especially with respect to Alternative C. Even though TVA specifically states throughout the document that field studies required to evaluate impacts to Threatened and Endangered Species and Cultural Resources in the pipeline corridors have not been completed, the EA concludes within the document that no significant impacts should occur – and further qualifies its conclusion by stating that future studies, consultation, agreements and permitting processes would likely mitigate adverse impact concerns. However, many of the mitigation measures, which are only broadly referenced, are not included or committed to within the FONSI. [PHE Report at 5.] As the Ninth Circuit explained in *Kern*, "'Consideration of cumulative impacts requires

'some quantified or detailed information; ... [g]eneral statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided.'" 284 F.3d at 1075 (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.,* 137 F.3d 1372, 1379-80 (9th Cir. 1988)).

The flawed and superficial analysis provided in the EA are clearly demonstrated by the "preliminary" evaluation of the potential pipeline corridors which identified sensitive/protected environmental resources with a potential for significant impact. The current analysis of the pipelines under Alternative C is insufficient, and the current finding of no significant impact is unsubstantiated because the specific pipeline route(s) have not been identified and fully evaluated (as discussed *supra* in re improper segmentation). [PHE Report at 6.] Examples of the inconclusive and unsupported analyses range from archeological sites to wetlands, for instance:

- Federally protected terrestrial and aquatic species have been identified in the project area and along the potential gas pipeline routes that could be adversely impacted under Alternative C. The US FWS indicates that pipeline construction may result in the removal of potential Indiana bat summer habitat and operation and maintenance of the pipeline ROW may interfere with roosting bats and bat activity. The FEA has indicated the action would be consistent with Section 7 of the Endangered Species Act (ESA), and impact conclusions are based on assurances that protected species and habitat can be avoided or mitigated or, in the case of protected aquatic species, through special construction (directional boring) techniques. Thus there is insufficient information and analysis for TVA to conclude that there is no potential for significant impact. Site-specific impacts along the gas corridor routes cannot be fully addressed until T&E surveys have been conducted, the USFWS has been consulted, and appropriate mitigation measures have been identified where required.

- Pipeline Corridors C1 and C2 both contain wetlands that could be adversely affected by pipeline construction. The EA provides no evidence that consultation with the U.S. Army Corps of Engineers, as required by Section 401 and 404 of the Clean Water Act, is complete with respect to construction of the intake and outtake structures in the Green River and

with respect to potential impacts to wetlands from construction of the gas pipeline(s). Nor does it include a discussion of, and commitments to, mitigation measures. In addition, TVA appears to be in violation of its own guidance by not selecting the alternative with the least impact to wetlands. Of the two action alternatives, Alternative B would impact far fewer wetlands than Alternative C, for which potential impacts to wetland areas would be expected to be significantly higher.

- With respect to historic and cultural resources and compliance with the National Historic Preservation Act, the majority of the area of potential effect to the plant site under Alternative C has not been surveyed; therefore, the presence or absence of archaeological resources cannot be confirmed. The EA acknowledges the potential for direct, indirect and cumulative impacts to cultural resources under Alternative C, the greatest of which would be associated with the construction of the natural gas pipeline(s), and indicates that mitigation measures would be implemented to avoid or mitigate adverse impacts rendering them insignificant. However, a conclusion that no significant impact would occur cannot be made without evaluating the site-specific impacts of the pipelines and determining appropriate mitigation measures if required.

- The EA fails to consider whether potential significant impacts could occur as a result of accidents related to plant operation and pipeline operation under Alternative C. These types of analysis are typical for large industrial facilities that store, transport, and use large quantities of hazardous materials.

- The potential impact on the local economy resulting from an estimated 49% reduction in plant workforce under Alternative C was not adequately evaluated in the EA. The EA did not provide a threshold against which significance could be measured. So, although the EA described the impact as adverse, it did not provide a sufficient basis to determine whether the degree of impact could support the FONSI. However, such a large reduction in workforce could be considered significant to the local economy; and public sentiment included in Appendix C seemed to be in support of continued operation of all three coal-fired units.

[PHE Report at 6-8.]

Moreover, the limited analysis which was conducted in many instances is inconsistent with TVA's own NEPA Procedures. For example:

- TVA did not comply with either EO 11988 (Floodplain Management) or 11990 (Protection of Wetlands). The EA does not comply with EO 11988

or 11990 because TVA selected Alternative C as the preferred alternative without demonstrating or concluding that Alternative B is not a practicable alternative (Section 5.7.2.2). See further discussions in 3.b.iii below

- TVA did not provide a commitment to mitigation measures with estimated costs in the EA (Section 5.5).

- Potential adverse impacts related to Alternative C are not addressed by tiering from the IRP EIS (Section 5.8.6), as site-specific project components of Alternative C are outside the bounds of the alternatives analyzed and impacts considered in the IRP EIS.

- TVA did not provide a complete listing of required permits (Section 5.3.3), since it is not stated whether the proposed wetland disturbances would be accomplished by Nationwide Permits, or through an Individual Permit from the USACE.

- As we document in this letter, TVA has deviated substantially from their procedures, and have NOT achieved substantial compliance. Section 5.8.11 requires substantial compliance, and states that "Minor deviations from these procedures will be permitted, but in all respects substantial compliance must be achieved."

[PHE Report at 3.]

TVA's superficial and unsupported findings of no significant impact fail to take the necessary hard look at the environmental consequences. Plaintiffs have shown at least a serious question on the merits as to whether the conclusion, drawn without appropriate supporting studies and analyses, is arbitrary and capricious.

**7.  TVA failed to consider a legitimate No Action Alternative.**

In addition to meeting their burden to show a serious question on the merits question of whether TVA should have conducted an EIS, Plaintiffs also demonstrate likely success on the question of whether TVA's NEPA analysis in the EA is deficient because it failed to consider a legitimate No Action Alternative. The EA prepared by TVA contemplates a No Action Alternative with "the continued operation of Units 1 and 2 without installing

the additional emissions controls as the No Action Alternative in order to provide a benchmark...." [EA § 2.1.1.] The EA itself specifically notes that TVA "would not operate a facility out of compliance" yet it considers a No Action Alternative premised on exactly that scenario.

The No Action Alternative serves as the baseline for the related evaluation of the impacts of other alternatives under NEPA, and NEPA demands a full and fair analysis of the No Action Alternative. *See* 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1502.14(d), 1508.9(b). The FONSI issued by TVA states that Alternative A (the No Action Alternative) "is not considered viable or reasonable." FONSI at 1. This is a clear violation of NEPA procedures, which demand a legitimate No Action Alternative. *See* 40 C.F.R. § 1508.9(a)(1). A properly constructed No Action Alternative would look at a scenario where TVA upgraded emission controls to achieve minimum MATS compliance and evaluate all other reasonable alternatives against this baseline.

By not considering minimal emission controls that could be implemented to achieve MATS compliance, the EA began with a false premise. CEQ has addressed a parallel situation that illustrates why TVA's No Action Alternative is faulty, in its "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations." CEQ poses a hypothetical federal agency's land management plan where "'no action' is 'no change' from current management direction or level of management intensity," and concludes, "To construct an alternative that is based on no management at all would be a useless academic exercise." CEQ, *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 44 Fed. Reg. 18026 (Mar. 23, 1981). Here, TVA has constructed an alternative where TVA operates the Paradise Units 1 and 2 as an uncontrolled and

28

noncompliant facility. By making the No Action Alternative a noncompliant course of action, TVA has, in the words of CEQ, engaged in "a useless academic exercise."[17]  In addition, by comparing Alternative C to a No Action baseline that involves the continued operation of Units 1 and 2 out of compliance, versus a baseline where these units are not operating, understates the potential impacts of Alternative C. Specifically, air emissions, water withdrawals, and water discharges would all substantially increase when compared to the more likely scenario of Units 1 and 2 ceasing to operate due to non-compliance. [PHE Report at 8.]  Plaintiffs have shown a serious question on the merits of whether TVA's refusal to establish a valid No Action baseline renders its ultimate conclusion arbitrary and capricious.

For all the reasons discussed here, Plaintiffs are likely to succeed on their NEPA claim. Plaintiffs have amply demonstrated a serious question on the merits so as to justify a preliminary injunction.

**B. Plaintiffs Also Raise Substantial Questions On the Merits of the TVA Act Claim.**

Plaintiffs also demonstrate a likely success on the merits of their claim under the TVA Act, raising substantial and serious questions as to whether TVA's decision to abandon Paradise Units 1 and 2 for a newly constructed natural gas CC/CT facility demonstrates the least-cost-planning that is required by statute. Under the TVA Act, TVA is obliged to provide adequate and reliable service at the lowest system cost to its customers. As shown by the Energy Ventures Analysis Report, retiring Paradise Units 1 and 2 and replacing them with a gas-powered CC/CT unit will <u>increase</u> costs for TVA customers by about $174

---

[17] Plaintiffs suggest that this Court can rule as a matter of law that TVA violated NEPA, 42 U.S.C. § 4332(2)(C), and its implementing regulations, 40 C.F.R. §§ 1502.14(d), 1508.9(a)(1), and 1508.9(b), by constructing a No Action Alternative pursuant to which TVA would violate federal regulations.

million over the next ten years, at approximately $19.33 per year for each TVA electric customer. [EVA Report at 9.]

The Energy Ventures Analysis Report points to several factors that contribute to this increased cost to customers. First, Paradise Units 1 and 2 are extremely cost-efficient. In fact, they are two of the three most economical coal units out of all TVA's 41 operating coal-fueled facilities. Paradise Units 1 and 2 already comply with existing emissions regulations, and adding the advanced particulate controls for MATS compliance is relatively inexpensive. Even using current fuel prices for coal and natural gas, the cost in dollars per megawatt to retrofit Paradise Units 1 and 2 is approximately $31.76/MWh. This compares quite favorably to the $52.58/MWh cost of constructing the proposed CC/CT gas-powered facility. [EVA Report at 7.]

Of course, current energy prices are not fixed in stone: the average cost of natural gas is forecast to rise much more quickly than the average cost of coal over the next decade, further increasing the price differential for TVA customers. Even at the prevailing natural gas prices in 2013, relying on gas generation to supply the electricity generated at Paradise Units 1 and 2 would have cost TVA's customers $84 million in extra fuel costs. [Clemente Report at 32.] TVA is one of many power-generating entities that is presently engaged in a rush to gas generation, which circumstance will quite naturally lead to increased gas prices in the face of increased demand. [Clemente Report at 14, 17.] Furthermore, significant LNG (liquified natural gas) pipeline terminal construction is underway across the nation that will result in much of the domestic natural gas production becoming available for export internationally, where prices have been substantially higher than in the U.S. [Clemente Report at 19.] The growth in demand could easily overwhelm supply, and significant price

30

volatility is to be expected in the natural gas markets over the next decade. [Clemente Report at 35-36.] In addition, pressure on natural gas supplies during peak demand periods could render the necessary volumes unavailable for power generation at the Paradise Facility. [Clemente Report at 36-37.]

Meanwhile, coal remains a stable, low-cost alternative. And Paradise has the benefit of exceptionally low coal costs, with minimal transport expense, because 81 percent of its coal needs are supplied locally from western Kentucky mines. [EVA Report at 11.] By TVA's 2012 reported plant costs and operation data, Paradise has the lowest fuel expense and lowest total production expense of any coal units TVA operates. [Clemente Report at 38.] Even the Sierra Club's economic consultant concluded in 2012 that Paradise Units 1 and 2 are more economically suited to emission controls than to retirement. [EVA Report at 9.] Some of TVA's other, less efficient coal plants are not suitable to being upgraded to meet MATS requirements, and may be retired accordingly. Voluntarily opting to retire Paradise Units 1 and 2 from the system will heavily slant TVA towards reliance on natural gas over coal, with concomitant effects on the cost and reliability of the power that TVA is able to provide to its customers. [Clemente Report at 34-35.]

It is wholly unclear how or whether TVA addressed these considerations of customer cost in opting to retire Paradise Units 1 and 2 and replace them with a gas-powered facility. Plaintiffs are seeking expedited discovery that will shed light on what, if any, analysis TVA conducted as to the likely effect of Alternative B and C on the costs to be incurred by TVA rate-payers. At this juncture, it is clear that Plaintiffs have raised substantial questions on the merits of their TVA Act claim to merit preliminary injunctive relief.

## II.     __THE HARM PLAINTIFFS FACE IS IRREPARABLE.__

A "plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban County Gov't,* 305 F.3d 566, 578 (6th Cir. 2002). Environmental injury, like that alleged here, is particularly appropriate for preliminary injunctive relief. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545, 107 S.Ct. 1396 (1987).

If TVA is permitted to continue with its proposed course of action without evaluating its effects on the environment, the effects on all the plaintiffs will be life-altering. The individual Plaintiffs could lose their venues to hike, fish, hunt, and experience the beauty of Kentucky's countryside. The landowner Plaintiffs Buckingham Hollow, LLC and Big Bucks, LLC will experience irrevocable damage to the wildlife habitats on their properties, which is a critical component of the use of those properties by the owners, their families and friends, and their clients. The Rogers family landowner Plaintiffs will see pipelines constructed on family land designated for the mining of coal, which could rob them of the value of their coal reserves and, just as importantly, rob them of the source of family pride in supporting many of their family members, friends, and neighbors employed in the coal industry. As discussed above, the job loss effects on the Kentucky coal industry and associated industries in the area of the Paradise facility – whose interests are represented by Plaintiff Kentucky Coal Association - will be dramatic and significant. None of these harms can be remedied at law.

In *Buckeye Forest Council v. U.S. Forest Service*, the court addressed the importance of a preliminary injunction to prevent the Forest Service from proceeding with a plan that plaintiffs alleged (among other things) should have required an EIS:

> Were the Court to deny Plaintiffs' motions for preliminary injunction, the Forest Service would proceed with the timber sales and would follow the Projects' plans for tree cutting, thinning, logging, and prescribed burning. When this occurs, the Court will be powerless to further examine the merits of Plaintiffs' claims because the trees will have already been cut down. Plaintiffs claim the Defendants have performed insufficient scientific analysis with faulty data and have arrived at incompatible results. Although Plaintiffs may not ultimately prevail on the merits, if an injunction does not issue and the trees are cut down, Plaintiffs will not have an opportunity to even argue the case on the merits because the alleged harm will have already occurred. The balance of equities therefore weighs heavily in favor of preserving the status quo.

337 F. Supp. 2d 1030, 1039 (S.D. Ohio 2004). This case presents a similar scenario. If preliminary injunctive relief is not granted, and the construction process continues unchecked, Plaintiffs will run the very real risk of losing their day in court. *See, e.g., Neighbors Organized to Insure a Sound Env't, Inc. v. McArtor*, 878 F.2d 174, 175 (6th Cir. 1989) (litigation over agency failure to perform EIS declared moot on appeal, as challenged construction was already complete). This factor weighs strongly in favor of issuing a preliminary injunction.

### III.   A PRELIMINARY INJUNCTION POSES NO SUBSTANTIAL HARM TO OTHERS, AND A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST.

The harm posed to others by delaying the implementation of the TVA's chosen alternative is minimal. Plaintiffs are aware of no potential harm to TVA other than the delay in launching construction, and speculative costs associated with that delay. As the Ninth Circuit has observed, "increased cost from delay … is alone not sufficient to establish prejudice," because NEPA contemplates just such a delay. *Preservation Coalition, Inc. v.*

*Pierce*, 667 F.2d 851, 855 (9th Cir. 1982). Moreover, TVA admits in the EA that construction of a new gas facility is more costly than upgrading Paradise Units 1 and 2, such that a delay to properly analyze all alternative proposals may end up saving money.  And any delay to complete the required analyses will certainly benefit those members of the public who will bear the socio-economic costs of TVAs proposed action.

If TVA has not undertaken the necessary environmental analysis, as Plaintiffs allege and will prove, then delay is not a harm but a necessity. "As to the public interest, Congress's determination in enacting NEPA was that the public interest requires careful consideration of environmental impacts before major federal projects may go forward. Suspending a project until that consideration has occurred thus comports with the public interest." *S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009).

IV.    **THE COURT SHOULD EXERCISE ITS DISCRETION AND REQUIRE NO BOND.**

Fed. R. Civ. P. 65(c) generally requires a bond as security before the issuance of a preliminary injunction, but the Court has "wide discretion in the matter of requiring security." *National Resources Defense Council v. Morton*, 337 F. Supp. 167, 168 (D. D. C. 1971). Morton is a leading case propounding a well-established "NEPA exception" to Rule 65(c)'s bond provision. "[S]pecial precautions to ensure access to the courts must be taken where Congress has provided for private enforcement of a statute." P*eople of State of Cal. Ex rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325–26 (citing *Friends of the Earth v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975) and *Morton*, 337 F. Supp. at 168–69, both discussing NEPA). *Morton* noted that "it would be a mistake to treat a

revenue loss to the Government the same as pecuniary damage to a private party." 337 F. Supp. at 169.

As a Western District of Kentucky judge held only last year, "the exception is designed to facilitate private enforcement of public rights." *Kentuckians for the Commonwealth v. U.S. Army Corps of Engineers*, 2013 WL 5278236 (W.D. Ky. Sept. 18, 2013) (ordering no bond would be required for injunction pending appeal of NEPA challenge). Plaintiffs here seek to vindicate the public interest served by NEPA. Accordingly, Plaintiffs request that this Court exercise its discretion and order that the preliminary injunction will issue without requiring a bond.

<u>**CONCLUSION**</u>

Plaintiffs have established the prerequisites for a preliminary injunction. They have demonstrated by TVA's own procedures and documents that a serious question on the merits exists as to whether TVA ought to have conducted an EIS before selecting and implementing Alternative C, the construction of an entirely new gas-fueled power-generating facility and its associated infrastructure and demolition of two coal-fueled generating units. Plaintiffs face irreparable harm if TVA is allowed to proceed with its construction during the course of the necessary discovery and litigation to resolve this dispute. TVA will not be substantially harmed by the issuance of an injunction, and the public interest favors such relief. Plaintiffs respectfully request that the Court issue the proposed preliminary injunction, without requiring a bond.

Respectfully submitted,

*/s/ Donald J. Kelly*

WYATT, TARRANT & COMBS, LLP

Donald J. Kelly dkelly@wyattfirm.com
Lisa C. DeJaco ldejaco@wyattfirm.com
500 West Jefferson Street, Suite 2800
Louisville, KY  40202-2898
502.589.5235

G. Brian Wells bwells@wyattfirm.com
Courtney Ross Samford
 csamford@wyattfirm.com
250 W. Main Street, Suite 1600
Lexington, Kentucky 40507-1746
859.233.2012

***Counsel for Plaintiffs***

61171648.5

INDEX OF EXHIBITS

A.  Frank Clemente & Roger A. Babb, *Comments on Tennessee Valley Authority (TVA) Integrated Resource Plan – Scoping: Eliminating Coal Is Adverse to Human Health and Welfare* (Nov. 22, 2013)

B.  Potomac-Hudson Engineering letter report

C.  Energy Ventures Analysis, Inc., *Flawed Decision by TVA: Economic Analysis of Closing the Paradise Coal Units* (August 2014)

D.  Congressional letter

E.  Conway letter and TVA's response

F.  Declaration of James Rogers

G.  Declaration of Talmage Rogers

H.  Declaration of Kirstine Early