UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

KENTUCKY COAL ASSOCIATION, INC.,
JAMES ROGERS, III, J.L. ROGERS FAMILY,
LLC, TALMAGE ROGERS, TALMAR OF FL,
LLC, PAT EARLY, KIRSTINE EARLY,
BUCKINGHAM HOLLOW, LLC, KEVIN
LAWRENCE AND BIG BUCKS, LLC,
Plaintiffs,

        v.                           No. 4:14-cv-00073-JHM-HBB

TENNESSEE VALLEY AUTHORITY,
Defendant.

---

## TENNESSEE VALLEY AUTHORITY'S BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

---

Edwin W. Small, *Deputy General Counsel*
Maria V. Gillen, *Senior Attorney*
Frances Regina Koho, *Attorney*
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7741

Attorneys for Tennessee Valley Authority

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................1

ARGUMENT .......................................................................................................5

I.    Plaintiffs' Challenge to TVA's Implementation of the Energy Policy Act is not Subject to Judicial Review and Fails on the Merits. ...........................5

    A.    TVA's implementation of its least-cost planning program pursuant to 16 U.S.C. § 831m-1 is a decision that is committed to agency discretion and thus not subject to judicial review. .......................7

    B.    TVA's application of 16 U.S.C. § 831m-1 is not arbitrary or capricious. .............................................................................11

II.    TVA's NEPA Review of the Paradise Project Was Proper. .................16

    A.    Statutory framework and standard of review. ............................16

    B.    Plaintiffs are foreclosed from raising several of their challenges. .............18

    C.    TVA considered the correct No Action Alternative. .................20

    D.    TVA analyzed all reasonable alternatives. ...............................22

    E.    TVA did not predetermine its decision. ....................................24

    F.    TVA gave the public ample opportunity to comment on the draft Environmental Assessment and the Finding of No Significant Impact. .............................................................................26

    G.    TVA did not impermissibly segment its analysis. .....................28

        1.    Decommissioning and demolition of Units 1 and 2 are not connected actions. ....................................................29

        2.    TVA analyzed the potential impacts of a natural gas pipeline. .....31

    H.    Another Environmental Impact Statement was not required. ....................33

CONCLUSION ...................................................................................................39

## INTRODUCTION

Plaintiffs, a state coal association and individuals, most of whom own coal-producing property in Kentucky, allege that TVA's decision to replace the generation of two coal-fired units at its three-unit Paradise Fossil Plant in Muhlenberg County, Kentucky, with generation from natural gas violated the National Environmental Policy Act (NEPA) and the Energy Policy Act of 1992.  Neither the facts nor the law supports these allegations; Plaintiffs' complaint should be dismissed.  TVA took a hard look at the potential environmental impacts of its proposed action and its decision not to prepare an Environmental Impact Statement (EIS) was neither arbitrary nor capricious.

## BACKGROUND

On February 16, 2012, the U.S. Environmental Protection Agency (EPA) issued regulations, known as the Mercury and Air Toxics Standards (MATS), requiring operators of coal-fired power plants, including TVA, to reduce hazardous pollutants emitted from their plants by April 16, 2015, or by April 16, 2016, if an extension is granted.  77 Fed. Reg. 9304.  TVA determined that the 1,150-megawatt (MW) Unit 3 at Paradise was sufficiently controlled to comply with MATS, but that emissions from the two older 704 MW units would have to be reduced to comply with MATS.[1]  (AR Doc. 3 at 34; Doc. 4 at 163.)[2]

Accordingly, TVA proposed in August 2013 to reduce emissions from Units 1 and 2 either by installing additional emission controls or retiring the two coal-fired units and replacing them with natural gas.  In addition to complying with MATS, TVA identified delivering reliable,

---

[1]  TVA plans to continue to operate Unit 3 and will continue to buy coal for that unit.

[2]  Citations to "AR Doc. __ at __" refer to the numbered documents in the Administrative Record on file with the Court.  Page number citations refer to the AR page number, not the original page number in the document.

cost-effective electricity; minimizing overall costs; maximizing use of existing TVA facilities; minimizing construction of new transmission system components and upgrades of existing transmission system components; and maintaining a balanced portfolio of energy sources as needs to be addressed by the proposed action.  (AR Doc. 3 at 34.)

TVA issued a 153-page Environmental Assessment (EA) in November 2013 that analyzed the potential impacts of its proposed action.  (AR Doc. 4 at 151.)  Although not required, TVA provided the public 30 days to comment on the draft EA.  (AR Doc. 1 at 1.)  TVA issued the EA after analyzing and responding to the substantive comments that it received.  (AR Doc. 4 at 151.)  Based on this EA, TVA determined the proposed action would not significantly impact the environment and issued a Finding of No Significant Impact (FONSI).  (AR Doc. 5 at 316-19.)

The Paradise EA builds on or "tiers" from EISs that TVA issued for its 1995 and 2011 Integrated Resource Plans.[3]  These IRPs implement § 113 of the Energy Policy Act of 1992.  *See* Pub. L. No. 102-486, § 113, 106 Stat. 2776, 2798 (1992).[4]  An IRP is the culmination of a comprehensive utility planning process that evaluates the merits of using different kinds of energy resources to meet forecasted future demand for electricity with the goal of meeting demand reliably and cost effectively.  (*See* AR Doc. 14 at 381.)  Both the IRP EIS processes provided the public with multiple opportunities for comment and input.  (*See* AR Doc. 14 at 390-93; AR Doc. 21 at 1715-32.)

---

[3]     "Tiering" is a process that allows an agency to go from a broader NEPA review to a more site-specific NEPA review without readdressing issues or repeating information and analyses in the broader review.  40 C.F.R. § 1508.28.

[4]     Section 113 was codified as part of the TVA Act at 16 U.S.C. § 831m-1.

The Energy Policy Act requires TVA to employ a least-cost planning process "which evaluates the full range of existing and incremental resources (including new power supplies, energy conservation and efficiency, and renewable energy resources) in order to provide adequate and reliable service to electric customers of the Tennessee Valley Authority at the lowest system cost."  16 U.S.C. § 831m-1(b)(1).  TVA is directed to take into account various features of system operation including energy resource diversity, reliability, and other factors of risk to determine the "system cost" of energy resources.  *Id.* § 831m-1(b)(2).  System cost includes all costs of the energy resource over its life, including production costs, waste management, and environmental compliance.  *Id.* § 831m-1(b)(3).

TVA's 2011 IRP fulfills these directives.  It expressly recognizes:  "Consistent with Section 113 of the Energy Policy Act of 1992, the IRP planning process evaluated a range of existing and incremental resources, including new power supplies, energy conservation and efficiency, and renewable energy resources in order to provide TVA's customers adequate and reliable service at the lowest system cost."  (AR Doc. 24 at 2353.)[5]  TVA's IRPs and related EISs are system-wide programmatic analyses.  Specific energy resource decisions are then further analyzed in site-specific NEPA analyses, which tier from this programmatic IRP EIS. (AR Doc. 24 at 2355.)

The EA for the Paradise MATS proposal was such a tiered NEPA analysis.  The EA evaluated three alternatives in some detail:  the No Action Alternative (a baseline of current conditions to which other alternatives are compared), Alternative B (installing additional air emission controls on Units 1 and 2), and Alternative C (replacing Units 1 and 2 with natural gas

---

[5] TVA continues its least-cost planning efforts with the current update to the IRP. *See* Integrated Resource Plan, *available at* http://www.tva.gov/environment/reports/irp/.

generation).  (*See* AR Doc. 4 at 187-89 (summarizing alternatives and their effects).)  TVA also considered six other emission reduction alternatives, including installing wet or dry electrostatic precipitators, burning biomass, replacing Units 1 and 2 with renewable energy generation or energy efficiency programs, but eliminated them from detailed analysis because they were determined not to be technically or economically practical or feasible.  (AR Doc. 4 at 183-86.)

TVA analyzed the potential impact of the alternatives on a number of different environmental resources and summarized those analyses in the EA.  These included air quality (AR Doc. 4 at 192-97), climate change (AR Doc. 4 at 197-99), vegetation (AR Doc. 4 at 199-203), wildlife (AR Doc. 4 at 203-05), threatened and endangered species (AR Doc. 4 at 205-13), aquatic ecology (AR Doc. 4 at 213-15), wetlands (AR Doc. 4 at 215-17), natural areas, parks, and recreation (AR Doc. 4 at 217-19), groundwater and geology (AR Doc. 4 at 219-21), surface water (AR Doc. 4 at 221-37), floodplains (AR Doc. 4 at 237-42), cultural and historic resources (AR Doc. 4 at 242-43), hazardous waste (AR Doc. 4 at 243-45), solid waste (AR Doc. 4 at 245-47), land use and prime farmland (AR Doc. 4 at 248-49), transportation (AR Doc. 4 at 249-54), noise (AR Doc. 4 at 254-60), and visual resources (AR Doc. 4 at 260-62). The EA also summarizes TVA analyses of potential socioeconomic and environmental justice effects (AR Doc. 4 at 262-69)  Of particular note in TVA's analysis is that the natural gas alternative will:

- Significantly decrease all air pollutant emissions and more significantly reduce greenhouse gas emissions than other alternatives, which accelerates the fleet-wide greenhouse gas reductions forecast in TVA's IRP (AR Doc. 4 at 187, 192-99);

- Significantly reduce current water withdrawals from and thermal and wastewater discharges to the Green River, which will improve water quality as well aquatic ecology (AR Doc. 4 at 187, 219-21); and

- Greatly reduce solid waste by decreasing coal combustion residuals. (AR Doc. 4 at 188, 245-47.)

4

For the natural gas alternative, TVA also evaluated the potential impacts of constructing a pipeline to get natural gas to the plant along two potential pipeline routes. (*See* AR Doc. 4 at 180-82.) A natural gas supplier, rather than TVA, would construct and operate the pipeline. (AR Doc. 4 at 179.) This pipeline would have to be licensed by the Federal Energy Regulatory Commission (FERC). (AR Doc. 4 at 168.) FERC will prepare its own NEPA review for the pipeline based on information and analyses submitted by the gas supplier. (AR Doc. 4 at 168.)

TVA identified the natural gas alternative as its preferred alternative. (AR Doc. 4 at 189-90.) Compared to the alternative of installing additional air emission controls on Units 1 and 2, TVA determined that replacing their generation with natural gas would have substantially less environmental impacts. TVA also determined that while the initial capital cost of installing controls on the two coal units would be less than the cost of a new gas plant, the environmental compliance costs for the coal units would be greater than that for the gas plant over time. (AR Doc. 4 at 89-90.) TVA also concluded that replacing the two coal units with natural gas would promote a more balanced and diversified portfolio of energy resources on the TVA system as required by its 2011 IRP. (AR Doc. 4 at 190.)

Accordingly, TVA determined that this proposed action would not significantly impact the quality of the human environment and issued a FONSI in accordance with Council on Environmental Quality's regulations and TVA's procedures. (AR Doc. 5 at 316.)

## ARGUMENT

I.     **Plaintiffs' Challenge to TVA's Implementation of the Energy Policy Act is not Subject to Judicial Review and Fails on the Merits.**

Plaintiffs argue that TVA failed to comply with the Energy Policy Act (they refer to the codification of this Act's requirements in the TVA Act) when it decided to replace Paradise Units 1 and 2 with natural gas generation in response to the MATS rule. They characterize the

Act's least-cost planning directive as requiring a simple comparison between the cost of installing more controls on those units with the costs of installing natural gas. (*See* Pls.' Prelim. Inj. Mem., Doc. 17-1 at PageID 97-99.) Plaintiffs misunderstand the goals of the Energy Policy Act, the comprehensive definition of "system cost" under that Act, and the role that TVA's IRP processes play in complying with the Act's requirements.

The Energy Policy Act of 1992 "was designed to create a 'comprehensive national energy policy that [would] gradually and steadily increase[] U.S. energy security in cost-effective and environmentally beneficial ways.'" *Ctr. For Biological Diversity v. Abraham*, 218 F. Supp. 2d 1143, 1149 (N.D. Cal. 2002) (quoting H.R. Rep. No. 102–474(I), at 132, *reprinted in* 1992 U.S.C.C.A.N. 1954, 1955). Section 113 of that Act requires TVA to "conduct a least-cost planning program," Pub. L. No. 102-486, § 113, 106 Stat. 2776, 2798 (1992). Least-cost planning programs are integrated resource plans.[6]

The "focus of a least-cost plan is to provide energy services to customers at the lowest price over the long run" (AR Doc. 14 at 432) by evaluating comprehensive system cost, which includes "net costs for an energy resource over its available life," including "the cost of production, transportation, utilization, waste management, [and] environmental compliance." 16 U.S.C. § 831m-1(b)(3). TVA must "employ and implement a planning and selection process for new energy resources which evaluates the full range of existing and incremental resources," *id*. § 831m-1(b)(1), and addresses "necessary features for system operation, including diversity, reliability, dispatchability, and other factors of risk," *id*. § 831m-1(b)(2)(A)–(C). Significantly,

---

[6]    "Least-cost planning programs" and "integrated resource plans" refer to the same thing and are used interchangeably. *See, e.g.*, James W. Moeller, *Electric Demand-Side Management Under Federal Law*, 13 Va. Envtl. L.J. 57, 81 (1993) ("The Energy Policy Act also requires all electric utilities to adopt least-cost or integrated resource plans.").

the purpose of this planning process is to provide adequate and reliable service to electric customers of the Tennessee Valley Authority at the lowest *system* cost, not the lowest cost of individual energy resources.

> **A.    TVA's implementation of its least-cost planning program pursuant to 16 U.S.C. § 831m-1 is a decision that is committed to agency discretion and thus not subject to judicial review.**

The planning program mandated by the Energy Policy Act requires TVA to account for a host of factors on a *system-wide* basis using its discretion and technical expertise.[7] As such, TVA's implementation of this requirement is not subject to judicial review.

"[B]efore any review [of agency action] at all may be had, a party must first clear the hurdle of [5 U.S.C.] § 701(a)," *Heckler v. Chaney*, 470 U.S. 821, 828 (1985), which renders action "committed to agency discretion by law" not subject to judicial review.  5 U.S.C. § 701(a).  Section 701(a) precludes review if a statute is "drawn in such broad terms that in a given case there is no law to apply," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), or "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler*, 470 U.S. at 830; *see also Madison-Hughes v. Shalala*, 80 F.3d 1121, 1127 (6th Cir. 1996).  "In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely."  *Heckler*, 470 U.S. at 828.  "[A] complaint seeking review of agency action 'committed to agency discretion by law' has failed to state a claim under the APA, and therefore should be dismissed under Rule 12(b)(6)."  *Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir.

---

[7]    The TVA power system provides electricity to nine million people in parts of seven southeastern states.  It uses a variety of energy resources located across the region to generate this electricity, including nuclear plants, coal-fired plants, natural gas plants, wind turbines, solar installations, and hydroelectric dams.  The TVA Act requires TVA's power system to be self-funding and to operate on a non-profit basis.  (AR Doc. 21 at 1697.)

2011) (quoting 5 U.S.C. § 701(a)(2)); *see also Jama v. Dep't of Homeland Sec.*, __ F.3d __, 2014 WL 3673441, at *3 (6th Cir. July 25, 2014) (clarifying that dismissal of claim under § 701(a) is not for lack of subject-matter jurisdiction under Rule 12(b)(1), but is for failure to state a claim under Rule 12(b)(6)).

There are a wide variety of actions that are "committed to agency discretion." *See, e.g.*, *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 & n.6 (D.C. Cir. 2006) (listing, as examples, decisions not to institute enforcement proceedings; agency's allocation of funds from appropriations; FAA's non-renewal of aircraft examiner's authority; agency's decision to reach a settlement; and federal prosecutor's certification of substantial federal interest in case). In evaluating such claims, the Sixth Circuit has noted that the discretionary function exception to tort liability, although "much broader than th[e committed-to-agency-discretion exception] of the APA," can be instructive in determining whether agency action should be subject to judicial review. *Gillis v. U.S. Dep't of Health & Human Servs.*, 759 F.2d 565, 576 (6th Cir. 1985).

In *Gillis*, the Sixth Circuit evaluated whether the Department of Health and Human Services (HHS) "failed to carry out its 'monitoring' as well as its 'enforcement' function" under the Hill-Burton Act to confirm whether medical providers receiving federal funds were providing uncompensated or reduced services to certain eligible patients. 759 F.2d at 567, 575. In determining whether HHS's action (or inaction) was judicially reviewable, the court discussed *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984), which construed the Federal Tort Claims Act's discretionary-function exception. *Gillis*, 759 F.2d at 576-77. In *Varig Airlines*, the Court held that the Federal Aviation Administration's (FAA) "spot-check system of monitoring manufacturers' compliance with minimum safety standards fell within" the exception because

8

> [d]ecisions as to the manner of enforcing regulations directly affect the feasibility
> and practicality of the Government's regulatory program; such decisions require
> the agency to establish priorities for the accomplishment of its policy objectives
> by balancing the objectives sought to be obtained against such practical
> considerations as staffing and funding.  Here, the FAA has determined that a
> program of "spot-checking" manufacturers' compliance with minimum safety
> standards best accommodates the goal of air transportation safety and the reality
> of finite agency resources.  Judicial intervention in such decisionmaking through
> private tort suits would require the courts to "second-guess" the political, social,
> and economic judgments of an agency exercising its regulatory function.  It was
> precisely this sort of judicial intervention in policymaking that the discretionary
> function exception was designed to prevent.

*Varig Airlines*, 467 U.S. at 820.  The *Gillis* court concluded that "[s]imilar deference to

administrative discretion" was appropriate because (in pertinent part) regulations governing

investigation and enforcement "specifically incorporate[d] the weighing process postulated by

the Court in *Varig Airlines*"—they allowed the Secretary to "dismiss a complaint without a

finding as to compliance, 'based on priorities for the disposition of complaints that are

established to promote the most efficient use of enforcement resources.'"  *Gillis*, 759 F.2d at 577

(quoting 42 C.F.R. §§ 124.511(a)(4), 126.606(b)(4)).

The reasoning articulated in these cases—balancing myriad factors to achieve broad

statutory directives—has led courts to conclude that TVA's electric rate-making, another

decision-making process that must balance numerous factors in the exercise of agency discretion,

is not subject to judicial review.

Section 831n-4(f) of the TVA Act, which governs rate-making, states that TVA

> shall charge rates for power which will produce gross revenues sufficient to
> provide funds for operation, maintenance, and administration of its power system;
> payments to States and counties in lieu of taxes; debt service on outstanding
> bonds, including provision and maintenance of reserve funds and other funds
> established in connection therewith; payments to the Treasury as a return on the
> appropriation investment pursuant to subsection (e) of this section; . . . and such
> additional margin as the Board may consider desirable for investment in power
> system assets, retirement of outstanding bonds in advance of maturity, additional
> reduction of appropriation investment, and other purposes connected with the
> Corporation's power business, having due regard for the primary objectives of the

9

chapter, including the objective that power shall be sold at rates as low as are feasible. . . .

16 U.S.C. § 831n-4(f).  Congress requires TVA to consider numerous factors and objectives in determining the appropriate rates to set.  "The fixing of rates which will balance and achieve all of these different objectives is a matter which Congress has entrusted to the judgment of the TVA Board, and which involves the clearest sort of commitment to agency discretion."  *Mobil Oil Corp. v. TVA*, 387 F. Supp. 498, 506 (N.D. Ala. 1974).  The Sixth Circuit and other courts have long held that these activities are not judicially reviewable.  *See, e.g.*, *McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 405 (6th Cir. 2006) (citation omitted) (internal quotation marks omitted) ("A long line of precedent exists establishing that TVA rates are not judicially reviewable."); *see also Carborundum Co. v. TVA*, 521 F. Supp. 590, 593 (E.D. Tenn. 1981) (noting the "well established legal principal that the setting of power rates under the [TVA] Act is not subject to judicial review").

TVA's implementation of a least-cost planning program under the Energy Policy Act requires the same complex balancing of "political, social, and economic judgments," *Varig Airlines*, 467 U.S. at 820, that the APA's "committed to agency discretion" exception was designed to protect from judicial scrutiny.  As in the TVA Act's rate-setting provision, Congress provided broad factors for TVA's consideration in least-cost planning, but 16 U.S.C. § 831m-1 does not require that these factors be given any particular weight or that TVA reach any particular substantive outcome in deciding what sort of least-cost planning program to implement.  In other words, the statute provides no guidance to a reviewing court for evaluating this decision because 16 U.S.C. § 831m-1 does not provide "substantive priorities against which to measure [TVA's] discretion."  *See Madison-Hughes v. Shalala*, 80 F.3d 1121, 1127 (6th Cir. 1996); *cf. Sierra Club v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011) (holding EPA's actions

under the Clean Air Act not subject to judicial review because the provision at issue "d[id] not indicate that one enforcement measure should be chosen over another or otherwise provide guidelines that define the limits of the Administrator's discretion").  A court is no more equipped to determine whether TVA's least-cost planning program has correctly "evaluate[d] the full range of existing and incremental resources" while "provid[ing] adequate and reliable service to electric customers . . . at the lowest system cost," 16 U.S.C. § 831m-1(b)(1), than it is to determine whether the rates set by TVA are "as low as . . . feasible" while still providing sufficient revenue to fund TVA's power system, pay down its debt, and provide tax-equivalent payments to states and counties.  16 U.S.C. § 831n-4(f).  How TVA chooses to conduct its least-cost system planning program and the discretion it exercises in doing so are not subject to judicial review.

### B. TVA's application of 16 U.S.C. § 831m-1 is not arbitrary or capricious.

If there were some cognizable standard against which to review TVA's broad-based least-cost planning program, that judicial review would be highly deferential.  When an agency balances multiple factors to make a complex, policy-based decision, particularly a predictive one "'within its special expertise, at the frontiers of science,' [a court] must be at [its] most deferential."  *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003) (quoting *Cent. Ariz. Water Conservation Dist. v. EPA*, 900 F.2d 1531, 1539-40 (9th Cir. 1993)); *see also Nuclear Energy Institute, Inc. v. EPA*, 373 F.3d 1251, 1289 (D.C. Cir. 2004) (internal quotation marks omitted) (noting that courts "are extreme[ly] deferential . . . to an agency evaluating scientific data within its technical expertise"); *United States v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989) ("Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving engineering and scientific matters."); *accord Crounse Corp. v. ICC*, 781 F.2d 1176, 1188 (6th Cir.1986) ("It is

with respect to . . . questions intimately entwined with the nature of the [transportation] industry, that we owe the [Interstate Commerce] Commission the greatest deference.").  A court "must consider whether there was a 'rational connection between the facts found and the choice made,'" and if "it is possible to offer a reasoned, evidence-based explanation for a particular outcome," an agency's decision is not arbitrary, capricious, or an abuse of discretion.  *R.R. Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 548 (6th Cir. 2002) (citation omitted).

TVA responded to the Energy Policy Act's directive by initiating an evolving integrated resource planning process in February 1994 that culminated in its 1995 IRP, Energy Vision 2020.  Energy Vision 2020 "evaluate[d] the effects of resource options on the Tennessee Valley's environment and its economy, as well as on TVA's future prices of electric energy and future level of debt."  (AR Doc. 14 at 432.)  In 2011, TVA issued an updated integrated resource plan after an extensive public process.  The 2011 IRP's "Recommended Planning Direction" was determined to be "the most balanced in terms of cost, financial risk, and other strategic considerations" compared to the other alternative plans considered.  (AR Doc. 21 at 1691, 1835.)

TVA's IRP processes employ complex computer models and require a large number of technical determinations.  Forecasting the demand for power requires the use of mathematical models that link electricity sales to the price of electricity and natural gas; economic growth; and other factors that impact demand in the residential, commercial and industrial electricity-user sectors.  (AR Doc. 22 at 1897.)  TVA developed different sets of future conditions that could occur (labeled "scenarios") that addressed a range of economic, financial, regulatory, and legislative uncertainties, as well as social and technological trends.[8]  (AR Doc. 22 at 1899.)  In

---

[8]    The requirement that TVA consider "other factors of risk," 16 U.S.C. § 831m-1(b)(2)(A), as well as environmental compliance, *id.* § 831m-1(b)(3), lays bare the absurdity of Plaintiffs' claim that TVA was wrong to consider pending regulation of $CO_2$ emissions.  TVA was required

order to address uncertainty, TVA developed a range of demand forecasts, each of which corresponded to a different scenario bounded by "high-load" and "low-load" endpoints. (AR Doc. 21 at 1733-52; AR Doc. 22 at 1897-98.) This analytical model provided "a high level of confidence that the true outcome [would] fall within this range" and "ensured that TVA's resource planning took into account the variability that is the hallmark of year-to-year peak demand and energy sales." (AR Doc. 21 at 1737, 1768-75; AR Doc. 22 at 1900-01.) The scenarios were analyzed using industry standard capacity expansion planning and production cost models to develop cost estimates, near-term rate impacts, risks, and environmental footprints of each scenario. (*See* AR Doc. 21 at 1712.) This analytical approach allowed TVA's consideration of "a wide range of supply-side generating resources as well as energy efficiency and other demand-side resource options," (AR Doc. 21 at 1756, 1757-62; AR Doc. 22 at 2059) to "treat demand and supply resources on a consistent and integrated basis." 16 U.S.C. § 831m-1(b)(2)(C). A "preferred alternative strategy" was identified and adopted based on its positive performance across the range of scenarios. (AR Doc. 22 at 1908; AR Doc. 21 at 1833-40.)

---

(. . . continued)

to make predictive judgments based on this regulatory initiative. "Predictive judgment," so long as it is rational, "is entitled to deference," because "'[i]t is not infrequent that the available data do not settle a regulatory issue, and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion.'" *New York v. EPA*, 413 F.3d 3, 31 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 52 (1983)); *accord Consol. Aluminum Corp. v. TVA*, 462 F. Supp. 464, 471-72, 474-75 (M.D. Tenn. 1978). Considering the typically limited time period for complying with new environmental regulations (the initial compliance date for the MATS rule is only three years after the regulation was promulgated), TVA and other regulated entities cannot wait to plan for and decide upon compliance projects until the final promulgation of a regulation, much less the conclusion of any judicial challenges, as Plaintiffs seem to suggest. TVA's vast experience in a heavily regulated industry, and the reality that regulation of pollutants (including carbon dioxide) is becoming increasingly stringent, render its consideration of future regulation "predictive judgment" that is inherently rational and well within its discretion. *New York v. EPA*, 413 F.3d at 31.

And, in accordance with the Energy Policy Act, one of the cornerstones of TVA's IRP was an increased focus on "energy savings achieved through energy conservation and efficiency." 16 U.S.C. § 831m-1(b)(2)(B). The 2011 IRP included an energy efficiency and demand response (EEDR) program that "reduces required energy and capacity needs by approximately 14,000 GWh and 4,700 MW, respectively, by 2029." (AR Doc. 21 at 1762.) The IRP identified challenges in assuring the "projected durability of [EEDR] savings measured over time," 16 U.S.C. § 831m-1(b)(2)(B), and proposed numerous strategies to address them. (AR Doc. 21 at 1829-31, 1863-70.)

As required by the Energy Policy Act, TVA employed the results of its 2011 IRP process in the decision-making process leading to the replacement of the Paradise units with natural gas:

> TVA's 2011 IRP and associated EIS evaluated a wide range of strategies and actions for meeting demand for electricity from the TVA system in the future. TVA adopted a planning direction to achieve a more balanced, diverse portfolio of energy resources on the TVA system. This includes relying more on energy resources that are cleaner than coal generation: nuclear and natural gas generation, renewable energy and energy efficiency. Alternative C [the replacement of two coal-fired units with natural gas] advances this planning goal of achieving a more balanced and diversified portfolio. The selection of [Alternative C] as the preferred alternative is also influenced by TVA's recent decision to install controls at its Gallatin Plant. Having preserved coal-fired generation capacity at Gallatin, TVA now has greater latitude to shift from coal to gas at [Paradise] in the interest of maintaining a diverse portfolio.

(AR Doc. 4 at 190.) Thus, Plaintiffs are wrong to argue that TVA acted arbitrarily in considering energy resource diversity generally and its earlier decision to install controls at its Gallatin coal plant in Tennessee specifically. (Pls.' Prelim. Inj. Mem., Doc. 17-1 at PageID 88-89.) 16 U.S.C. § 831m-1 **requires** TVA to consider energy resource diversity in its least-cost energy resource planning processes. It would have been arbitrary or capricious **not** to do this.

A court's review in this setting is further cabined by the deference that must be shown to an agency's application of its governing statute. The agency's application "can be rejected only

if [a court] find[s] no substantial evidence supporting the conclusion or if [a court] find[s] the conclusion to be so out of touch with the reality revealed by the whole record as to be arbitrary and capricious." *Crounse Corp.*, 781 F.2d at 1187.  Even if there is evidence in the record to support a different decision, the Sixth Circuit has instructed that the ultimate decision should be left to the expertise of the agency.  *Id.* at 1190 ("When evidence exists to support more than one conclusion, it is best to leave the determination with the [Interstate Commerce] Commission, in deference to its familiarity with the [transportation] industry.").  Similarly, the Supreme Court has instructed that when an agency is granted broad authority under its governing statute, it may make any decision that is within "a 'zone of reasonableness.'"  *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 767 (1968) (quoting *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585 (1942)); *see also In re Permian Basin Area Rate Cases*, 390 U.S. at 767 (observing that, based on "the broad responsibilities given to the [Federal Power] Commission by Congress[,] it must be free, within the limitations imposed by pertinent constitutional and statutory commands, to devise methods of regulation capable of equitably reconciling diverse and conflicting interests").  A court need only "assure itself that the [agency] has given reasoned consideration to each of the pertinent factors" in reaching a particular decision.  *In re Permian Basin Area Rate Cases*, 390 U.S. at 792.

Consideration of TVA's IRP processes and their application to the decision TVA made for Paradise Units 1 and 2 demonstrates that TVA's application of § 831m-1 is not "so out of touch with the reality revealed by the whole record as to be arbitrary and capricious."  *Crounse*, 781 F.2d at 1187.  Based on TVA's expertise in the areas of energy production, consumption, and regulation; the broad nature of the applicable statutory factors; and TVA's careful consideration of them, the ultimate planning program devised is clearly within the permissible

"zone of reasonableness."  *In re Permian Basin Area Rate Cases*, 390 U.S. at 767 (internal

quotation marks omitted).  Plaintiffs' allegation that TVA violated the Energy Policy Act fails.

## II.     TVA's NEPA Review of the Paradise Project Was Proper.

TVA's decision to replace two coal-fired units with natural gas generation at its Paradise

plant is supported by two linked environmental reviews.  The first is the 442-page programmatic

2011 IRP EIS that addresses TVA's least-cost energy resource system plan, including the

retirement of coal units and the cumulative effects of TVA's energy resource decisions.  The

second is a 153-page EA of the specific replacement decision at Paradise.

Plaintiffs ignore the first review.  They base their allegation that TVA acted arbitrarily

and capriciously in determining not to prepare an EIS for the Paradise decision entirely on

alleged flaws in the EA.  Plaintiffs argue that TVA considered an incorrect "no action"

alternative; failed to consider all reasonable alternatives; predetermined the result of its analysis;

insufficiently involved the public; improperly segmented associated activities; and erroneously

prepared an EA, not an EIS.  None of these arguments has merit; Plaintiffs fail to demonstrate

that TVA's two comprehensive environmental reviews did not constitute the hard look that

NEPA requires.

### A.     Statutory framework and standard of review.

NEPA sets forth broad environmental goals, but "its mandate . . . is essentially

procedural."  *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519,

558 (1978); *accord Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)

("NEPA itself does not mandate particular results" and "[i]f the adverse environmental effects of

the proposed action are adequately identified and evaluated, the agency is not constrained by

NEPA from deciding that other values outweigh the environmental costs.").

Agencies' internal NEPA procedures and Council on Environmental Quality (CEQ) regulations, 40 C.F.R. §§ 1500.1 to 1508.28 (2012), identify the levels of environmental review for a proposed action.  TVA adopted its NEPA procedures with CEQ's approval after publication and public comment.[9]  (AR Doc. 13 at 363-78.)

EISs are the most detailed and comprehensive level of review; they are required for major actions that significantly impact the quality of the human environment.  40 C.F.R. §§ 1502.1, 1508.11 (2012).  In contrast, EAs should be more concise public documents that provide evidence and analysis sufficient to determine whether to issue a FONSI or prepare an EIS. 40 C.F.R. § 1508.9 (2012).

Judicial review of an agency's NEPA actions is governed by the Administrative Procedure Act, *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 339 (6th Cir. 2006) ("*SOCM*"), and is confined to the administrative record that was before the agency at the time of the action, 5 U.S.C. § 706 (2012); *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam). An agency's NEPA decision is unlawful only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *SOCM*, 453 F.3d at 339.

"The arbitrary and capricious standard is the least demanding review of an administrative action, and requires the party challenging the agency's action to show that the action had no rational basis or that it involved a clear and prejudicial violation of applicable statutes or regulations."  *Coal. for the Advancement of Reg'l Transp. v. Fed. Highway Admin.*, __ Fed. App'x __, 2014 WL 3882677, at *7 (6th Cir. Aug. 7, 2014) (internal quotation marks omitted) ("*CART*").  Under this standard, a court may not substitute its judgment for that of the agency.

---

[9]      Federal agencies are required to comply with regulations promulgated by CEQ. *Andrus v. Sierra Club*, 442 U.S. 347, 357 (1979).

*Kleppe v. Sierra Club,* 427 U.S. 390, 410 n.21 (1976). "'A presumption of validity attaches to

the agency action and the burden of proof rests with the [party] who challenge[s] such action.'"

*Citizen's Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008)

(quoting *Colo. Health Care Ass'n v. Colo. Dep't of Soc. Servs.*, 842 F.2d 1158, 1164 (10th Cir.

1988)). "[E]ven agency action with adverse environmental effects can be NEPA-compliant so

long as the agency has considered those effects and determined that competing policy values

outweigh those costs." *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746

F.3d 698, 706 (6th Cir. 2014) (internal quotation marks omitted) (affirming district court's

decision that Army Corps' EA for a dredge and fill permit for coal mining operation was proper).

### B.     Plaintiffs are foreclosed from raising several of their challenges.

As an initial matter, Plaintiffs are foreclosed from raising several of their challenges in

this lawsuit because those issues were not meaningfully raised in the public comment period.[10]

It is vital that concerned persons clearly enunciate their criticisms of an agency's NEPA review

so that the agency can give a "hard look" to all issues and viewpoints before the proposed action

becomes final. *See, e.g.*, *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (challengers

to agency action must structure participation to alert the agency to their position and contentions

to allow the agency to give the issue meaningful consideration); *Vt. Yankee*, 435 U.S. at 553

("[I]ntervenors who wish to participate [in NEPA review must] structure their participation so

that it . . . alerts the agency to the intervenors' position and contentions."). "[A]dministrative

---

[10]     Plaintiffs also waived certain of the arguments they make in support of their motion for a preliminary injunction. That waiver is fully addressed in TVA's opposition to Plaintiffs' Preliminary Injunction Motion; however, in brief, none of the information argued at pages 24-27 of Plaintiffs' brief concerning "resource-specific cumulative impact analyses" was raised during the comment period for the Paradise EA. Regardless, TVA addressed cumulative impacts throughout Chapter 3 of the EA. (AR Doc. 4 at 197, 199, 203, 205, 212, 214, 217, 218, 221, 236, 243, 244, 247, 249, 253, 259, 262, 268.)

proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'" *Id.* at 553-54.

No commenter asserted with sufficient clarity during the comment period that TVA predetermined the outcome of its NEPA review process or that TVA failed to adequately consider cumulative impacts. Nor did any commenter argue that TVA's analyses of the impacts from the natural gas pipeline and storage tanks or that deferring consideration of the possible demolition of the two retired units in the future constituted "segmentation" of the potential impacts of its proposed action.[11] Accordingly, Plaintiffs should be foreclosed from raising these claims in this litigation. *See, e.g.*, *Pub. Citizen*, 541 U.S. at 764-65 (Public Citizen could not sue the Department of Transportation for failing to consider other regulatory alternatives because no one "identified in their comments any rulemaking alternatives beyond those evaluated in the EA"); *Grand Canyon Trust v. U.S. Bureau of Reclamation*, 623 F. Supp. 2d. 1015, 1030 (D. Ariz. 2009) (Trust waived two arguments by failing to raise those issues during the comment period). In any event, as discussed below, these claims fail on the merits.

---

[11]    Environmental group commenters did assert "segmentation of connected actions," but in an entirely different context. They commented that TVA failed to analyze potential actions that could be required to comply with new and emerging EPA regulations. (AR Doc. 157 at 10181-85.) These were the only "connected action" or "segmentation" comments that TVA received. These are not the "connected" actions about which Plaintiffs complain in this lawsuit. Plaintiffs also allege that TVA ignored the need to construct a new 500-kV transmission line to support the natural gas plant. (Pls.' Prelim. Inj. Mem., Doc. 17-1 at PageID 90-91.) No commenter raised this concern in their comments. Plaintiffs also mischaracterize TVA's statements about the need for this transmission line. TVA determined the line would be needed to meet North American Electric Reliability Corporation standards and said in the EA that it will construct such a line in the future regardless of which alternative was chosen for Paradise. (AR Doc. 4 at 293.) No commenter raised this concern in their comments.

### C.      TVA considered the correct No Action Alternative.

Plaintiffs allege that TVA's EA "is deficient because it failed to consider a legitimate No

Action Alternative."  (Compl. ¶ 106.)  They argue that TVA used a "materially flawed starting

point" by delineating the status quo of continued operation of Units 1 and 2 without measures to

control emissions of particulate matter as the benchmark "No Action Alternative" because such

an action would not comply with EPA's MATS.  (Compl. ¶ 109; Pls.' Prelim. Inj. Mem.,

Doc. 17-1 at PageID 95-97.)  Plaintiffs allege that TVA should have *assumed* MATS-compliant

emission controls *had already been installed* and evaluated other alternatives against that

hypothetical baseline.  The No Action Alternative that TVA used in the EA conforms to CEQ

guidance and is proper.

> CEQ instructs agencies that:
>
> "No action" in [instances involving federal decisions on proposals for projects]
> would mean the proposed activity would not take place, and the resulting
> environmental effects from taking no action would be compared with the effects
> of permitting the proposed activity or an alternative activity to go forward.
>
> . . . .
>
> . . . [T]he regulations require the analysis of the no action alternative even if the
> agency is under a court order or legislative command to act.  This analysis
> provides a benchmark, enabling decisionmakers to compare the magnitude of
> environmental effects of the action alternatives.

Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act

Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981) ("Forty Questions"); *see also Latin*

*Ams. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 858 F. Supp. 2d 839, 853-54

(E.D. Mich. 2012) (citation omitted) (internal quotation marks omitted) ("In requiring

consideration of a no-action alternative, the [CEQ] intended that agencies compare the potential

impacts of the proposed major federal action to the known impacts of maintaining the status quo.

The [FHA] did exactly that [by] defin[ing] the [no-action alternative] as the benchmark for

comparison of the alternatives."), *aff'd*, 756 F.3d 447 (6th Cir. 2014); *Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng'rs*, 509 F. Supp. 2d 1288, 1293 (S.D. Fla. 2007) (same); *see also San Juan Citizens' Alliance v. Salazar*, No. 00-cv-379, 2009 WL 824410, at *17-18 (D. Colo. Mar. 30, 2009) (same).

That TVA could not operate the two Paradise units legally without reducing emissions through either controls or by retiring the units under MATS does not alter the analysis. The no action alternative must reflect the ***current*** status quo. The Ninth Circuit's discussion in *American Rivers v. Federal Energy Regulatory Commission*, 201 F.3d 1186, 1999-2001 (9th Cir. 2000), is illustrative. There, although the result of a relicensing proceeding had to lead to *some* change to the existing license, the Ninth Circuit found that FERC defined the no-action alternative properly as continued operation of a hydroelectric plant under the current license because "without establishing baseline conditions there is simply no way to determine what effect an action will have on the environment and, consequently, no way to comply with NEPA." *Id*. at 1195 n.15 (internal quotation marks and alterations omitted). The court rejected petitioner's argument that nonissuance of a renewed license and nonoperation of the plant was the correct no-action alternative because that did not reflect current conditions. *Id*. at 1200; *see also Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001) (rejecting argument that a no-action alternative should only reflect impacts from lawful activities because CEQ "intended that agencies compare the potential impacts . . . to the known impacts of maintaining the status quo"); *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1067 (9th Cir. 1998) (Forest Service's "no-action alternative" was proper even though it did not meet the project's purpose and need—marketable timber—because the no-action alternative serves "to provide a baseline against which the action alternatives are evaluated").

This identical argument was made in a recent challenge to TVA's NEPA review of the installation of pollution controls at its Gallatin Fossil Plant and was decisively rejected by the district court. *See Tenn. Envtl. Council v. TVA*, __ F. Supp. 2d __, 2014 WL 3810740 (E.D. Tenn. Aug. 1, 2014) ("*TEC v. TVA*"). There, plaintiffs argued TVA incorrectly used a "no-action alternative" that assumed the continued operation of Gallatin without pollution controls required to be installed under a consent decree by 2017. *Id*. at *7. The court held that plaintiffs' argument "fails to address the CEQ's directive [quoted above] on what constitutes a proper 'no-action' alternative [which] requires [TVA] to employ a "no action" alternative of the status quo, as opposed to the future consequences of the consent decree." *Id*. at *7–8. "[TVA's] use of the [current] status quo . . . as the 'no-action' alternative, coupled with the acknowledgement of the consequence of the 'no action' alternative [plant closure because of non-compliance] comports with the CEQ's requirement under NEPA." *Id*.

### D.    TVA analyzed all reasonable alternatives.

Plaintiffs allege that TVA's analysis was deficient because "TVA considered only one alternative for adding emission controls to Paradise Units 1 and 2 (Alternative B) against one alternative to construct a major new generating facility that uses natural gas instead of coal (Alternative C)." (Compl. ¶ 115.) This argument lacks factual and legal merit.

"As a general matter, the range of alternatives that must be discussed under [NEPA] is a matter within an agency's discretion [and the] reviewing court only determines whether the agency's range of alternatives is outside the 'rule of reason,' based on the needs the proposed action is designed to address." *CART*, 2014 WL 3882677, at *11 (internal quotation marks and citation omitted). "'Agencies enjoy considerable discretion in defining the purposes and needs for their proposed actions, provided that they are reasonable.'" *CART*, 2014 WL 3882677, at *9 (quoting *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 422 (4th Cir. 2012)). "[A]n agency's

obligation to consider alternatives under an EA is a lesser one than under an EIS." *Native*

*Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005); *see also SOCM*,

453 F.3d at 342-43; *Mt. Lookout-Mt. Nebo Prop. Prot. Ass'n v. FERC*, 143 F.3d 165, 172 (4th

Cir. 1998); *Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994); *Friends of Ompompanoosuc v.*

*FERC*, 968 F.2d 1549, 1558 (2d Cir. 1992); *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938,

960 (7th Cir. 1992); *Olmsted Citizens for a Better Cmty. v. United States*, 793 F.2d 201, 208 (8th

Cir. 1986).  Courts uphold an agency's definition of objectives if the objectives are not so narrow

that only one alternative can accomplish the goals of the action so that the environmental review

is a "foreordained formality."  *CART*, 2014 WL 3882677, at *9; *see also Citizens Against*

*Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).

　　　　In its EA, TVA identified the needs to be addressed by its proposed action (AR Doc. 4 at

163; *see also infra* at 1) and discussed a total of nine alternatives.  Six of these were eliminated

from detailed consideration.  (AR Doc. 4 at 183-87.)  This is entirely proper.  The extent to

which alternatives are to be discussed is also within the discretion of the agency.  *Citizens*

*Against Burlington*, 938 F.2d at 196; *SOCM*, 453 F.3d at 342.  Alternatives that do not fulfill the

project's objectives are *per se* unreasonable.  *See CART*, 2014 WL 3882677, at *12 (affirming

Highway Administration's rejection of alternatives preferred by plaintiffs "because [they] would

not satisfy the regionally-focused Purpose and Need Statement"); *Concerned Citizens Alliance,*

*Inc. v. Slater*, 176 F.3d 686, 706 (3d Cir. 1999) ("[W]here the agency has examined a breadth of

alternatives but has excluded from consideration alternatives that would not meet the goals of the

project, the agency has satisfied NEPA.").[12]

---

[12]　　　Plaintiffs fault TVA for not analyzing "idling one of the Paradise units and retrofitting the
other unit [or] retrofitting one unit and demolishing and decommissioning the other unit."

TVA focused its analytical resources on the no-action, emission controls, and natural gas alternatives, and briefly discussed other possible alternatives.  This type of focused approach has been repeatedly upheld by the courts.  *See, e.g.*, *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1016 (9th Cir. 2006) (Forest Service "fulfilled its obligations under NEPA to evaluate reasonable alternatives" for timber sale in EA that considered a no action alternative and two primary alternatives in depth as well as six additional alternatives briefly); *TEC v. TVA*, 2014 WL 3810740, at *9 (affirming TVA's NEPA analysis of two alternatives for installing pollution controls at its Gallatin Plant, a no action alternative, and several other alternatives that were briefly discussed but eliminated from more detailed analysis); *Buck Mountain Cmty. Org. v. TVA*, 629 F. Supp. 2d 785, 798 (M.D. Tenn. 2009) (affirming TVA's analysis of new transmission line siting because it considered a number of alternatives, briefly discussed each and articulated why each was "not feasible based on considerations including cost, reliability, efficiency, timeliness, environmental risk, impact on residential and business areas, or failure to meet the supply needs identified by TVA").  TVA's consideration of nine alternatives in varying levels of detail in the EA was proper.

### E.      TVA did not predetermine its decision.

The Complaint's fourth count is labeled "pre-determination of decision," but the listed allegations supporting this count identify only that TVA based its decision on "resource portfolio diversity, not the required NEPA analysis of environmental impacts," and made its decision without public participation.  (Compl. ¶¶ 120, 122.)  Plaintiffs' Preliminary Injunction brief does not better explain how any of their allegations constitute predetermination or prejudgment.  (Pls.'

---

(. . . continued)
(Compl. ¶ 115.)  TVA addressed this alternative in response to a comment on the EA.  (AR Doc. 4 at 293.)

Prelim. Inj. Mem., Doc. 17-1 at PageID 88-89 (identifying consideration of TVA's portfolio analyses and evaluation of $CO_2$ emissions and climate change as constituting prejudgment of the NEPA process).)[13]  Plaintiffs' perception of what could constitute predetermination or prejudgment in the NEPA context is fundamentally wrong.

"[P]redetermination occurs only when an agency *irreversibly and irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, before the agency has completed that environmental analysis[.]" *Forest Guardians v. U.S. Fish and Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010).  The fact that TVA took into account the results of its energy resource portfolio analyses was not only required by the dictates of the Energy Policy Act, *infra* at § I, but also appropriate under CEQ regulations. CEQ regulations provide that "an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision."  40 C.F.R. § 1502.23;[14] *see also* 40 C.F.R. § 1505.2(b) ("An agency may discuss preferences among alternatives based on relevant factors including economic and social considerations and agency statutory mission.").

One need look no further than the TVA Board's conditional approval of emission reduction projects for Paradise Units 1 and 2 to conclude that TVA did not predetermine the EA

---

[13]    Agencies are obligated to evaluate the potential impacts associated with proposed actions, including potential climate change impacts.  *See, e.g.*, *WildEarth Guardians v. Jewell*, 738 F.3d 298, 311 (D.C. Cir. 2013) ("We therefore agree . . . that the BLM satisfied its obligations under NEPA to consider climate change.").  Doing that cannot constitute prejudging the outcome of a NEPA review process.

[14]    CEQ's guidance respecting EISs also guides EA-level reviews.  *See* Final Guidance on Improving the Process for Preparing Efficient and Timely Environmental Reviews under the National Environmental Policy Act, 77 Fed. Reg. 14473, 14475 (Mar. 12, 2012).

review process here.  In August 2012, the TVA Board approved a budget for installation of additional emission controls at Paradise Units 1 and 2 in order to meet EPA's MATS rule.  (AR Doc. 9 at 324, 326, 330.)  The Board conditioned its budget approval on satisfactory environmental review of the project.  (AR Doc. 9 at 324.)  Upon conducting that further environmental review and reassessing the relative abilities of the emission control and natural gas alternatives, the Board determined that natural gas was the better alternative.  The Board then withdrew its prior approval for the emission controls and issued a resolution for the construction of the natural gas alternative.  (AR Doc. 10 at 332-35.)

### F.   TVA gave the public ample opportunity to comment on the draft Environmental Assessment and the Finding of No Significant Impact.

Plaintiffs allege that TVA violated CEQ regulations and TVA's own NEPA Procedures by failing to make the Paradise FONSI available for public comment.  (Compl. ¶¶ 126, 127.) Plaintiffs also assert, in passing, that TVA provided only "a minimal" 30-day comment period on the EA, "denying the public a meaningful opportunity to engage in the process."  (Pls.' Prelim. Inj. Mem., Doc. 17-1 at PageID 75.)  CEQ regulations do not require public comment on EAs, but instruct agencies to involve the public "to the extent practicable."  40 C.F.R. § 1501.4(b); *TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006); *Amigos Bravos v. U.S. Bureau of Land Mgmt.*, Nos. 6:09-cv-37, 6:09-cv-414, 2011 WL 7701433, at *27 (D.N.M Aug 3, 2011); *TEC v. TVA*, 2014 WL 3810740, at *12.  The 33-day period that TVA provided for public comment on the Paradise MATS EA was not required and it was not "minimal."

Plaintiffs' criticism also ignores that the public had ample opportunities to comment on and was involved extensively in the two predicate EISs associated with TVA's least-cost planning programs.  The 2011 IRP EIS, for example, provided extensive opportunities for public participation, including comment opportunities, public meetings, and regular stakeholder

meetings to exchange information about analyses, analytic methods, and analysis results.

(AR Doc. 22 at 1896-97.)

Given extensive opportunity for public participation in the IRP EIS and the Paradise EA

process, TVA did not believe giving the public a further opportunity to comment on the Paradise

FONSI was necessary.  A FONSI is essentially a summary of the results of the environmental

analyses in an EA, and here, TVA already solicited, considered, and analyzed comments from

the public.  Other courts have held that the procedural requirement of publicizing a FONSI where

the action "is, or is closely similar to, one which normally requires the preparation of an

environmental impact statement" is satisfied when the draft EA is circulated for public comment

before the FONSI is issued.  *Sierra Club v. Wagner*, 555 F.3d 21, 31 (1st Cir. 2009) ("[H]ere

both EAs were circulated in draft form and comments solicited even before any FONSI was

finally adopted.  Why this does not satisfy the purpose of the thirty day [FONSI comment] rule

[plaintiff] does not explain.").

In an abundance of caution, however, TVA decided to make the Paradise FONSI

available for public comment for 30 days on July 30, 2014.  (AR Doc. 7 at 321-22.)  In response,

TVA received only two comments, both of which expressed support for TVA's decision.  (AR

Docs. 174, 175 at 10291, 10292.)  Because none of the FONSI comments casts doubt on TVA's

determinations of insignificance, TVA confirmed its original FONSI. (AR Doc. 8 at 323.)  Thus,

to the extent that there was any procedural oversight in TVA's handling of public commentary

here, it was cured.  *See, e.g.*, *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 561 (9th Cir.

2000) (denying injunction where Forest Service cured procedural violation of NEPA such that "it

would serve no useful purpose" to order additional studies); *Citizens Advisory Comm. on Private

Prisons v. U.S. Dep't of Justice*, 197 F. Supp. 2d 266, 270 (W.D. Pa. 2001) (holding that Bureau

of Prisons cured its initial NEPA violation and that final EA was in "complete compliance with NEPA").

### G.   TVA did not impermissibly segment its analysis.

Plaintiffs allege that TVA impermissibly segmented its analysis by deferring consideration of the environmental effects of decommissioning and demolishing Paradise Fossil Units 1 and 2, and "the impacts associated with the construction and operation of the gas pipelines and/or above ground fuel storage tanks" associated with the natural gas alternative. (Compl. ¶¶ 138-41, 142-46.)  It was entirely appropriate for TVA to defer analysis of the potential environmental impacts associated with decommissioning and demolition of Paradise Fossil Units 1 and 2, and TVA did address the potential impacts of the natural gas pipeline and oil storage tanks.[15]

"Segmentation" may occur when an agency breaks one project into smaller projects in order to avoid NEPA review.  *See, e.g.*, *Hirt v. Richardson*, 127 F. Supp. 2d 833, 842 (W.D. Mich. 1999); 40 C.F.R. § 1508.25.  Actions are "connected" if they automatically trigger other actions or are interdependent parts of a larger action and depend on the larger action for their justification.  40 C.F.R. § 1508.25(a)(1).  But "not all agency decisions to break a project into stages are impermissible segmentation.  To the contrary, agencies must often undertake multi-faceted actions that have complex, interdependent environmental impacts; the agency must make reasonable judgments about what actions should be analyzed together and what should be analyzed separately."  *Coal. on W. Valley Nuclear Wastes v. Chu*, 592 F.3d 306, 311 (2d Cir. 2009).

---

[15]     The two resources that could be impacted by the aboveground storage tanks—surface water and transportation—were discussed in the EA.  (AR Doc. 4 at 23, 236, 253.)

The Supreme Court has made clear that NEPA "speaks solely in terms of Proposed actions; it does not require an agency to consider the possible environmental effects of less imminent actions." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.20 (1976).  Nor does NEPA require the government to do the impossible by assessing effects of actions whose details are as yet unknown.  *See CART*, 2014 WL 3882677, at *14.  This is logical because an analysis of possible future projects would necessarily rest on speculation and be of little use in assessing environmental impacts.  *See, e.g.*, *City of Riverview v. Surface Transp. Bd.*, 398 F.3d 434, 442 (6th Cir. 2005) (NEPA did not require Transportation Board to assess environmental impacts of adding river barge service to terminal or the possible purchase of additional land for expansion of facility because such possibilities were "too speculative at present" resulting in environmental analyses "based solely on conjecture"); *TEC v. TVA*, 2014 WL 3810740, at *11-12 (TVA's decision to defer analysis of a second landfill was permissible because landfill's construction was "a less imminent action that may or may not occur" and because TVA would "conduct the appropriate environmental analysis if it becomes necessary to construct the landfill in the future"); *Bullwinkel v. U.S. Dep't of Energy*, 899 F. Supp. 2d 712, 729-30 (W.D. Tenn. 2012) (TVA did not impermissibly segment its analysis of the certification and marketing of megasite because there was no proposal to purchase and develop the site; "NEPA does not require the TVA to perform a speculative environmental analysis of actions that are not imminent.").[16]

1.     **Decommissioning and demolition of Units 1 and 2 are not connected actions.**

TVA's decision to retire Paradise Units 1 and 2 does not "automatically trigger" the "decommissioning and demolition" of those units as Plaintiffs allege.  (Compl. ¶ 138.)  Because

---

[16]     Plaintiffs also argue that by segmenting its review TVA failed to properly consider cumulative impacts.  (Pls.' Prelim. Inj. Mem., Doc. 17-1 at PageID 91.)  TVA did not segment its review and it carefully considered cumulative impacts throughout its EA.  *See infra* n.10.

the timing and manner of decommissioning/demolition of the coal units are indefinite, it was proper for TVA to analyze retirement of the units separately from their possible decommission/demolition at some time in the future.

There are no rules governing the timing or manner of decommissioning and demolishing retired fossil units. For example, TVA shut down its Watts Bar Fossil Plant in Tennessee in 1983, but it did not propose to demolish the plant until 2011, more than 25 years later. *See* Environmental Assessment, Watts Bar Fossil Plant Deconstruction, *available at*, http://www.tva.gov/environment/reports/wbf_deconstruction/ea.pdf. TVA does not have immediate plans to demolish Paradise Fossil Units 1 and 2, there is no regulatory deadline for TVA to do so, and the construction of the gas generation is not dependent upon the demolition of the fossil units; thus, it was entirely appropriate for TVA to separate the two actions for consideration.

Courts have rejected claims of impermissible segmentation in similar circumstances. For example, in *Coalition on West Valley Nuclear Wastes v. Chu*, the Second Circuit affirmed the Department of Energy's (DOE) decision to separate short-term nuclear waste management activities at a former nuclear fuel reprocessing plant from the long-term closure and management of the site. 592 F.3d at 311. After the reprocessing plant was closed for improvements in 1972, it never reopened as a commercial enterprise. After first issuing a notice of intent to prepare an EIS to evaluate a waste management demonstration project at the site together with the closure of the site, DOE changed its approach and announced that it would bifurcate the two actions and analyze them in separate NEPA reviews. *Id*. at 309-10. Opponents sued, alleging that this constituted impermissible segmentation. The Second Circuit disagreed, holding that plaintiffs had not identified any way that the waste management activities "automatically triggered" the closure of the facility, nor that the management activities could not proceed without closure. *Id*.

30

at 311; *see also Coal. on W. Valley Nuclear Wastes v. Bodman*, 625 F. Supp. 2d. 109, 118-19

(W.D.N.Y. 2007) (rejecting argument that nuclear waste management and closure actions were

improperly segmented because actions were distinct in timing and geography and the removal of

waste had independent utility); *Benton Cnty. v. U.S. Dep't of Energy*, 256 F. Supp. 2d. 1195,

1201 (E.D. Wash. 2003) ("[I]t is not 'unwise' or 'irrational' to undertake deactivation without

decommissioning until five, ten, or thirty years later, or never, given the financial savings of

deactivating the [facility].").

### 2.     TVA analyzed the potential impacts of a natural gas pipeline.

A new lateral natural gas line would have to be connected to an existing natural gas

pipeline in the area to supply Paradise with fuel.  The natural gas supplier is responsible for the

lateral pipeline.  (AR Doc. 4 at 167, 180-81.)  TVA would not own this pipeline nor be

responsible for its licensing, siting, construction, or operation.  Because the pipeline would be

necessary for Paradise's operation, TVA considered this to be a connected action.  Accordingly,

TVA analyzed, to the extent possible, the potential impacts of constructing and operating the

connecting pipeline along two alternative pipeline routes.[17]  Its pipeline impact analyses can be

found throughout the EA in various affected environment sections.  (AR Doc. 4 at 168, 173, 180-

82, 186, 194-95, 196, 199, 201-03, 204-05, 209, 212, 214, 217, 218, 219, 221, 229-30, 236, 238,

243, 249, 261.)[18]  This is proper under CEQ regulations that require "integrat[ing] the NEPA

---

[17]     TVA considered several other gas pipeline routes, but eliminated these from more
detailed consideration in the EA based on several factors, including potential environmental
impacts and physical constraints.  (AR Doc. 4 at 186.)

[18]     Plaintiffs assert that TVA did not consider installation of storage tanks for on-site fuel oil
storage facilities.  (Compl. ¶¶ 142-45, 147; Pls.' Prelim. Inj. Mem., Doc. 17-1 at PageID 91-92.)
Plaintiffs are wrong.  TVA addressed these facilities in the EA.  (AR Doc. 4 at 182, 231, 236,
253.)  TVA also noted that it was uncertain whether it would install these tanks, but if the tanks
were determined to be necessary, TVA would "implement necessary measures to comply with

process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2.

TVA acknowledged in the EA that its review was "preliminary" because a final pipeline route had yet to be selected by the natural gas supplier and additional environmental review of pipeline impacts would be conducted by FERC before it certified the pipeline. (AR Doc. 4 at 168.) FERC will refine TVA's analysis using information on the exact pipeline route. CEQ instructs agencies to "bear in mind that more than one agency may make decisions about partial aspects of a major action." 40 C.F.R. § 1508.26(b). Plaintiffs characterize this as "deferring" analysis of the pipeline. (Pls.' Prelim. Inj. Mem., Doc. 17-1 at PageID 91.) The facts prove otherwise, and legally, NEPA does not require agencies to predict the future. *See Envtl. Prot. Info. Ctr.*, 451 F.3d at 1015 (affirming Forest Service's decision to defer analysis of the "Meteor" timber sale in cumulative analysis because "the parameters of the Meteor project were unknown at the time of the EA" and noting the Service did provide a "general discussion of effects . . . based on the information known about the proposed project at that time"); *Hart & Miller Islands Area Envtl. Grp., Inc. v. Corps of Eng'rs*, 505 F. Supp. 732, 753 (D. Md. 1980) (Army Corps' brief description of approach channel in EIS was "reasonable and adequate under the circumstances" because "various methods of disposing of dredged material were still being contemplated when the Impact Statement was completed").[19]

_____

(. . . continued)
applicable regulations [and] adhere to containment, certification, and licens[ing] requirements."
(AR Doc. 4 at 231.)

[19]    Similarly, Plaintiffs assert that TVA omitted any analysis of two transmission lines that would connect the gas plant to the substation that is already located on the Paradise plant site. (Pls.' Prelim. Inj. Mem., Doc. 17-1 at PageID 91.) This assertion is also wrong. These

Even if TVA had deferred analysis of potential pipeline impacts, that would have been acceptable here.  The Sixth Circuit recently affirmed this in *Coalition for Advancement of Regional Transportation v. Federal Highway Administration*.  There, the Highway Administration deferred analysis of environmental impacts related to disposal of excess excavation material resulting from the proposed bridge project until precise locations for the "spoil" were identified.  *CART*, 2014 WL 3882677, at *14.  The Sixth Circuit found the Highway Administration "rationally deferred" this analysis because the Administration could not practically assess the environmental effects of actions whose details were not yet certain.  *Id.*; *see also TEC v. TVA*, 2014 WL 3810740, at *12 (TVA's decision to analyze effects of landfill in subsequent NEPA analysis was permissible).  Here, TVA did more than the Highway Administration in *CART* because TVA analyzed the potential environmental impacts of a pipeline in two gas pipeline routes.  TVA did as much as it could with the information that existed at the time of its decision.

### H.     Another Environmental Impact Statement was not required.

TVA's FONSI was predicated on an EA that was thorough and supported by an expansive record.  The EA tiered from TVA's 2011 IRP EIS and that EIS tiered from TVA's 1995 IRP EIS.  TVA's decision to rely on an EA instead of preparing an EIS is entitled to deference.  *See Providence Rd. Cmty. Ass'n v. EPA,* 683 F.2d 80, 82 (4th Cir.1982).  This is because "[a]n agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise."  *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1274 (10th Cir. 2004) (citation omitted) (internal quotation marks omitted).  "The

---

(. . . continued)
transmission lines would be located entirely on the Paradise plant site and were addressed throughout the EA.  (AR Doc. 4 at 182, 199, 204, 212, 216, 221, 229.)

regulations make it clear that full-scale environmental impact statements—statements that are 'very costly and time-consuming to prepare and [have] been the kiss of death to many a federal project'—need not be prepared for every major Federal action that might conceivably have a significant effect on the quality of the human environment." *Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 504 (6th Cir. 1995) (citation omitted).  Very recently, the Sixth Circuit affirmed DOE's decision to prepare an EA, not an EIS, to assess the effects of constructing a *new* biorefinery plant that would harvest 1.1 million green tons of hardwood per year because "the Department took a 'hard look' at the environmental impacts the . . . plant w[ould] cause and decided that those impacts did not call for a full environmental impact study." *Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 582 (6th Cir. 2014).

Determination of "significance" is made by considering context and intensity.   40 C.F.R. § 1508.27(a), (b).  Intensity is assessed by considering possible impacts in ten areas that include public health or safety, unique characteristics of the geographic area, the uncertainty of effects, the degree of controversy over the effects on the quality of the human environment, effects on historical or culturally significant resources, and the effects on endangered or threatened species. *Id*.  "Presence of enumerated intensity factors does not mandate a finding of significance; rather, the agency must establish only that it addressed and evaluated the factors." *Del. Audubon Soc'y v. Salazar*, 829 F. Supp. 2d 273, 284 (D. Del. 2011).  In its EA, TVA considered the intensity factors and determined that the natural gas alternative would not have a significant adverse effect on the human environment but would, in fact, produce significant benefits to regional air quality, result in a significant reduction in $CO_2$ emissions, greatly reduce water withdrawal and heated discharge into the Green River, and significantly reduce the production of coal combustion waste.  (AR Doc. 4 at 189-90.)  TVA's determination that the natural gas alternative would not

result in significant adverse impacts such that preparation of an EIS was unnecessary was not arbitrary or capricious.

Plaintiffs allege that TVA violated its own NEPA Procedures by failing to prepare an EIS because those procedures list "major power generating facilities" as one of the "actions [that] ***normally*** will require and Environmental Impact Statement."  (AR Doc. 13 at 370, emphasis added.)  "Normally" obviously connotes that an EIS is not always required for major power generating facilities.  TVA has discretion to determine that the specifics of a situation are sufficiently different to allow use of an EA rather than an EIS.  *See, e.g.*, *City of Dallas v. Hall*, 562 F.3d 712, 722 (5th Cir. 2009) ("[B]y their own terms, the regulations 'normally' require preparation of an EIS but do not dictate preparation in each case. . . . the regulations clearly envision that when, pursuant to an EA, the agency determines that an action will have no major environmental impacts, an EIS is not required[.]"); *Comm. to Preserve Boomer Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1555 (10th Cir. 1993) ("[A]ctions which an agency determines will normally require an EIS, do not always require an EIS."); *Citizens Advisory Comm. on Private Prisons v. Dep't of Justice*, 197 F. Supp. 2d 226, 260-61 (W.D. Penn. 2001) (same).

Such is the situation at Paradise and TVA's proposed response to the MATS rule.  TVA determined that replacing two existing coal units with natural gas would have important environmental benefits.[20]  Rather than a negative loss to the environment that normally would result from the construction of a new power generating facility divorced from the retirement of

---

[20]    The Sixth Circuit has made clear that an EIS is not required when an agency determines that a proposed action will benefit the environment and not have significant adverse impacts. *Friends of Fiery Gizzard*, 61 F.3d at 505 ("It would be anomalous to conclude that an environmental impact statement is necessitated by an assessment which identifies beneficial impacts while forecasting no significant adverse impacts, when the same assessment would not require the preparation of an impact statement if the assessment predicted no significant beneficial effect.")

existing generating facilities, TVA's action would improve the environment.  This distinguishes

the Paradise situation from the normal proposal to construct a new power plant on a green field

site.

Plaintiffs further allege that "the decision to decommission and demolish Paradise Fossil

Units 1 and 2," the construction of "an extensive new gas pipeline infrastructure," and the

construction of "a redundant fuel supply consisting of either a second gas pipeline or above-

ground fuel oil tanks" require the preparation of an EIS.  (Compl. ¶¶ 97-101; Pls.' Prelim. Inj.

Mem., Doc. 17-1 at PageID 81.)  As discussed above, neither the decision to decommission the

units nor the decision to build "a redundant fuel supply" has been made or is imminent; thus,

analysis of the effects of such actions would be premature.  As for the connecting gas pipelines,

TVA analyzed the potential impacts using two different routes to the extent that it could at the

time.  NEPA requires nothing more.

Plaintiffs also allege that an EIS was necessary because the EA "fails to identify or

adequately quantify the environmental impacts of the action . . . among them the impact of the

full life cycle of producing and using natural gas that will be burned in a new gas-fired

generating facility, including greenhouse effects caused by methane emissions that occur at

every level of natural gas usage from drilling, storage, transportation, and burning."  (Compl.

¶ 94.)  This allegation is incorrect.

The EA acknowledges that "[o]peration of the of the proposed pipeline(s) would result in

emissions of $CO_2$ from increased operation of compressor plants and emissions of small

quantities of methane during gas extraction, processing, storage, and transport," but found that

because "these emissions are expected to be relatively small" their cumulative effect was

insignificant.  (AR Doc. 4 at 199.)  TVA also addressed the greenhouse gas emissions of

installing emission controls compared to installing natural gas in a response to a comment:

TVA agrees that the relative heat-trapping ability or global warming potential of methane is much higher than that of $CO_2$. Both Alternative B and Alternative C would result in the emission of methane from actions associated with providing fuel to the facilities. Under Alternative B, methane would be emitted during the mining of coal. Under Alternative C, methane would be emitted during the extraction, processing, storage, and transportation of natural gas. The volumes of these methane emissions vary depending on the type of fuel, extraction method, and other factors, and calculating them for a particular facility is difficult. Available life cycle analyses show lower overall greenhouse gas emissions, standardized to account for differing global warming potentials, for natural gas-fueled power plants than for coal-fired plants. For natural gas-fueled combined cycle plants, this difference is significant.

(AR Doc. 4 at 292.) The "life cycle analyses" upon which this response was based are included in the Administrative Record. (AR Docs. 115-20.) TVA's comparative analysis between the greenhouse gas life-cycles of coal and gas is in line with a similar analysis by the Department of Energy in its Environmental Assessment of an ethanol plant, which was recently affirmed by the Sixth Circuit. *See Klein*, 753 F.3d at 583 (holding that the EA's calculation of point source emissions of greenhouse gases from ethanol plant and its conclusion that there would be a net reduction in greenhouse gases over the life-cycle of the plant provided the "brief discussion" required by CEQ's regulations). It is ironic that Plaintiffs claim both that TVA's climate change analysis was inadequate and that TVA's "extensive discussion" of this issue constituted prejudgment of the outcome of the review process. (Pls.' Prelim. Inj. Mem., Doc. 17-1 at PageID 88.)

Plaintiffs also allege that an EIS was necessary because TVA's decision would have a significant impact on an economically depressed area of the country by reducing job opportunities and increasing the price of electricity. (Compl. ¶ 98; Pls.' Prelim. Inj. Mem., Doc. 17-1 at PageID 82-86.) Here, contrary to Plaintiffs' suggestion, the EA did look at employment impacts on the labor market in Muhlenberg County and all adjacent counties. (AR Doc. 4 at 262-69.) TVA concluded that there would be adverse impacts to employment under the gas

alternative from the reduction of positions at Paradise and from the decreased demand for coal mined in western Kentucky; however, TVA's tax equivalent payments to the state would increase because the value of the CC/CT units would be higher than the existing fossil unit.  (AR Doc. 4 at 268.)

Such socioeconomic impacts cannot alone drive an agency to preparation of an EIS.  *E.g.*, 40 C.F.R. § 1508.14 ("[E]conomic or social effects are not intended by themselves to require preparation of an environmental impact statement."); *Breckinridge v. Rumsfeld*, 537 F.2d 864, 867 (6th Cir. 1976) (communities' economic and social problems resulting from Army's base closure did not require an EIS because injuries were too attenuated from impacts to the physical environmental); *Image of Greater San Antonio v. Brown*, 570 F.2d 517, 522-23 (5th Cir. 1978) (Air Force's decision to eliminate jobs at base did not trigger requirement for EIS because a threshold impact on the physical environment was absent); *James v.TVA*, 538 F. Supp. 704, 709 (E.D. Tenn. 1982) ("[W]hen there is no significant impact on the physical environment, as is true in the present case, socio-economic effects, such as effects on property values, are insufficient to trigger an agency's obligation to prepare an EIS.").[21]

Finally, Plaintiffs assert that the proposed action was controversial and that this requires an EIS.  Controversy, in the NEPA context, means commentary that "cast[s] substantial doubt on the agency's methodology and data" not merely comments that voice opposition to a project.

---

[21]     The inability of socioecomic impacts to trigger an EIS also has been held to extend to cultural resource and aesthetic impacts.  *Goodman Grp., Inc. v. Dishroom*, 679 F.2d 182, 185 (9th Cir. 1982) ("Regulations under NEPA state that 'economic or social effects are not intended by themselves to require preparation of an (EIS),' but that such matters if related to project impacts may be addressed where an EIS is otherwise being prepared. 40 C.F.R. § 1508.14 (1981).  There are sound reasons for that rule, and they apply equally to the cultural impact here. Economic, social, esthetic, or cultural effects are difficult to define in the context of NEPA. Relating project impact to effects on the physical environment, such as water, air, and ecosystems, implements the intent of Congress in enacting the statute.").

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1181 (10th Cir. 2012); *TEC v. TVA*, 2014 WL 3810740, at *14-15 (receipt of 1,199 comments did not constitute "controversy"); 40 C.F.R. § 1508.27 (b)(4).  The comments TVA received reflect the latter, not the former.  To equate controversy with mere opposition would make the NEPA "outcome . . . governed by a heckler's veto."  *North Carolina v. FAA*, 957 F.2d 1125, 1133-34 (4th Cir.1992) (citation omitted) (internal quotation marks omitted).

## CONCLUSION

TVA conducted a searching inquiry into the potential impacts of its decision to replace coal-fired units at Paradise with natural gas generation, determined that it would have no significant impact on the environment, and amply supported that determination in a lengthy EA and voluminous Administrative Record, which tiered from TVA's 2011 IRP EIS.  Plaintiffs' challenge to this decision under the TVA Act must be dismissed because the manner in which TVA implements and applies the goals of its least-cost planning program is a decision that is committed to agency discretion and not subject to judicial review.  And in any event, TVA's reasoned employment of the 2011 IRP to the instant decision was neither arbitrary nor capricious.

Pursuant to NEPA, TVA took the requisite "hard look" at Plaintiffs' preferred alternative of installing emission controls and continuing to operate Paradise's two coal units and decided instead to retire them and replace them with natural gas generation.  That TVA's decision is not the one that Plaintiffs wanted is not the appropriate test.  NEPA is not a means to force agencies to adopt a plaintiff's preferred option.  *See Pure Waters, Inc. v. Mich. Dep't of Natural Res.*, 82 F.3d 418, 1996 WL 180178, at *2 (6th Cir. Apr. 15, 1996) (per curiam) (affirming dismissal of NEPA challenge because "plaintiff's real complaint seems to be that the city commission failed to adopt what [the plaintiff] sees as the better alternative").  Rather, TVA's decision can

only be set aside if it was "arbitrary or capricious."  It is not.  Accordingly, TVA's Motion for

Judgment on the Administrative Record should be granted.

Respectfully submitted,

*s/Maria V. Gillen*
Edwin W. Small, Deputy General Counsel
Maria V. Gillen, Senior Attorney
Frances Regina Koho, Attorney
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7741

Attorneys for Tennessee Valley Authority

19434428

## CERTIFICATE OF SERVICE

On September 19, 2014, I electronically filed TVA's Brief in Support of Motion for

Judgment on the Administrative Record through the Court's ECF system on the date shown in

the document's ECF footer.  The ECF system will send a notice of this electronic filing to:

Courtney Ross Sanford, Esq.
Gregory Brian F. Wells, Esq.
Wyatt, Tarrant & Combs LLP
250 W. Main Street, Suite 1600
Lexington, KY 40507-1746
csamford@wyattfirm.com
bwells@wyattfirm.com


Donald J. Kelly, Esq.
Lisa Catherine DeJaco, Esq.
Wyatt, Tarrant & Combs LLP
500 West Jefferson Street, Suite 2800
Louisville, KY 40202-2898
dkelly@wyattfirm.com
ldejaco@wyattfirm.com


*Attorneys for Plaintiffs*




*s/Maria V. Gillen*
Attorney for Tennessee Valley Authority