UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

KENTUCKY COAL ASSOCIATION, INC.,
JAMES ROGERS, III, J.L. ROGERS FAMILY,
LLC, TALMAGE ROGERS, TALMAR OF FL,
LLC, PAT EARLY, KIRSTINE EARLY,
BUCKINGHAM HOLLOW, LLC, KEVIN
LAWRENCE AND BIG BUCKS, LLC,
Plaintiffs,

       v.                              No. 4:14-cv-00073-JHM-HBB

TENNESSEE VALLEY AUTHORITY,
Defendant.

---

**TENNESSEE VALLEY AUTHORITY'S REPLY BRIEF IN FURTHER SUPPORT OF
ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD
AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT**

---

Edwin W. Small, Deputy General Counsel
Maria V. Gillen, Senior Attorney
Frances Regina Koho, Attorney
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7741

Attorneys for Tennessee Valley Authority

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................1

ARGUMENT ..........................................................................................................2

    I.      STANDARD OF REVIEW .........................................................................2

           A.     Plaintiffs' Extra-Record Reports Are Not Properly Before the Court.........3

           B.     Judicial Review Under NEPA Does Not Include the Ability to Order
                 the Agency to Implement a Substantive Result. ...........................................5

    II.     INTEGRATED RESOURCE PLAN .......................................................7

           A.     TVA's Least-Cost Planning Activities Are Not Subject to Judicial
                 Review Because 16 U.S.C. § 831m-1 Does Not Provide This Court
                 with Judicially Manageable Standards for Evaluating Them. ....................7

           B.     Plaintiffs Misinterpret the Least-Cost Planning Requirements of the
                 TVA Act......................................................................................................12

           C.     TVA's Decision to Replace Paradise Units 1 and 2 with Gas
                 Generation is Fully Supported by the 2011 IRP. .......................................15

               1.     Idling of coal-fired capacity..........................................................15

               2.     Finance, Rates, and Portfolio Committee Meeting excerpt —
                     Administrative Record Document 12 (AR Doc. 12). ...................18

    III.   NEPA ...........................................................................................................21

           A.     TVA Used the Correct No Action Alternative. .........................................21

            B.     TVA's Decision to Prepare an EA for the Paradise Gas Plant Was
                 Correct Under TVA's NEPA Procedures and Consistent with TVA's
                 Prior Practice..............................................................................................22

           C.     TVA Did Not Improperly Segment Its NEPA Review.............................26

                1.     Historic and cultural properties.....................................................29

                2.     Floodplains and wetlands...............................................................30

                3.     Threatened/endangered species .....................................................34

                4.     Greenhouse gas emissions .............................................................35

D.      TVA's Mitigation Measures Are Incorporated Into Its NEPA
        Procedures and the Licenses and Permits Under Which It Operates.........36

CONCLUSION.......................................................................................................................39

# INTRODUCTION

It is entirely appropriate for citizens to hold their government to account.  This is especially true under environmental statutes, like the National Environmental Policy Act (NEPA), that encourage concerned citizens to share diverse viewpoints and information in order to assist the government in making sound decisions.  TVA welcomes such constructive and instructive participation from citizens.  It is not appropriate, however, for citizens to withhold substantial comments on a proposed action and to raise them belatedly in litigation in order to play "gotcha" with the agency.  Nor is it appropriate for the citizen-plaintiff to presume that a Federal government agency has acted in bad faith and to pepper their litigation filings with ad hominem attacks on the agency's integrity.  Plaintiffs have done both here.

TVA has established a comprehensive least-cost planning program in accordance with the Energy Policy Act that is documented in its 2011 Integrated Resource Plan (IRP).  It examined appropriately the decision to substitute gas-fired generation for two units at its Paradise Fossil Plant in a site-specific Environmental Assessment (EA) that tiered off of the Environmental Impact Statement that TVA prepared and issued with its 2011 IRP.  Plaintiffs' arguments about the inadequacy of TVA's analyses are factually and legally incorrect.  Their oft-repeated allegations of malfeasance in support of their Motion for Judgment (e.g., TVA "short-changed the statutory process," "bypassed its obligations," "swept potential problems under the rug," engaged in "a charade") have no support.  Repetition does not make these incorrect allegations true.[1]

---

[1]    *See e.g.*, *Larson v. Abbott Labs.*, No. ELH-13-00554, 2013 WL 5937824, at *9 (D. Md. Nov. 5, 2013) (rejecting defendants' repeated incorrect characterizations of complaint's allegations because "[s]aying it repeatedly does not make it so. *Cf.* Lewis Carroll, *The Hunting of the Snark* 3 (1876) ('I have said it thrice:  What I tell you three times is true.')").

## ARGUMENT

Before addressing the merits of Plaintiffs' arguments, TVA needs to clarify the appropriate framework for the Court's analysis of this case, which is a review of agency action under the Administrative Procedure Act (APA).

## I.      STANDARD OF REVIEW

Plaintiffs recite the correct standard of review for agency action under the APA and NEPA, but invite the Court to misapply that standard.  Under the APA, courts assess only whether the agency action is arbitrary and capricious, that is, whether the action has *no rational basis*.  *See, e.g.*, *Coal. for the Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 576 F. App'x 477, 485-86 (6th Cir. 2014).  Even if an agency action is found to be arbitrary and capricious, a court may not order a substantive result, but must remand to the agency to provide a reasoned explanation for its decision.  *See, e.g.*, *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 19 (2d Cir. 1997).  This review has been described as being governed by the "rule of reason" under which courts are not to "flyspeck" an agency's analysis.  *See Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 186 (4th Cir. 2005) (cautioning that a court adjudging an agency's NEPA review must "take a holistic view of what the agency has done to assess environmental impact"); *see also Minisink Residents for Envt. Pres. & Safety v. FERC*, 762 F.3d 97, 111-12 (D.C. Cir. 2014) (declining petitioners' invitation to "flyspeck" FERC's Environmental Assessment of natural gas compressor station and concluding that the Commission took the "'hard look' NEPA requires"); *Cape Hatteras Access Pres. Alliance v. Jewell*, __ F. Supp. 2d ___, 2014 WL 2805024, at *12 (E.D.N.C. June 20, 2014) (using a "holistic analysis" to conclude that the National Park Service's issuance of rule limiting off-road vehicle use in national seashore was "careful and detailed" and "was not preordained or a fait accompli"); *Karst Envtl. Educ. & Prot., Inc. v. Fed. Highway Admin.*, No. 1:10-cv-0154-R, 2011 WL 5301589, at *27 (W.D. Ky. Nov. 2,

2011) ("*KEEP v. FHWA*") (finding plaintiffs' objections to FHWA's NEPA review of project were flyspecks that were "not reason enough to begin the [NEPA] process anew").  As TVA shows below, Plaintiffs' laundry list of objections to TVA's NEPA reviews are not only incorrect, but amount to mere flyspecks that do not undermine TVA's "hard look" at its proposed action.

This Court's task is not to determine if there are issues of material fact as Plaintiffs suggest throughout their brief, but rather to sit as an appellate court reviewing the entire case as a question of law.  *See Sierra Club v. U.S. Army Corps of Eng'rs*, __ F. Supp. 2d. __, 2014 WL 4066256, *8 (D.D.C. Aug. 18, 2014) (citations and internal quotation marks omitted) ("[I]n reviewing the administrative record to evaluate whether an agency has complied with the APA, the typical summary judgment standards are not applicable [because] the district judge sits as an appellate tribunal and the entire case on review is a question of law.").  Therefore, Plaintiffs' invocation of Federal Rule of Civil Procedure 56's "issue of material fact" standard of review (Pls.' Br., Doc. 47 at 12, 15, 21 n.6) is incorrect.

> [I]n the case of a district court reviewing final agency action, the rules governing summary judgments do not apply because of the limited role of a court in reviewing the administrative record.  When reviewing administrative agency decisions, the function of the district court is to determine whether or not as a matter of law, evidence in the administrative record permitted the agency to make the decision it did[.]

*Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 963 F. Supp. 2d 670, 677-78 (W.D. Ky. 2013) (citations and internal quotation marks omitted), *aff'd*, 746 F.3d 698 (6th Cir. 2014).

### A.   Plaintiffs' Extra-Record Reports Are Not Properly Before the Court.

As TVA argued previously, Plaintiffs waived certain of the issues they raise in litigation (e.g., cumulative impacts, predetermination, segmentation) because neither they nor any other

commenter raised these issues with sufficient clarity during the public comment period on the Paradise EA. (*See* TVA Br., Doc. 32-1 at PageID 308-09.) The extra-record reports upon which Plaintiffs rely to support their arguments on these waived issues are also not appropriately before the Court. They were submitted too late to allow TVA to give them "meaningful consideration" during the NEPA decision-making process; thus, they are not part of the administrative record. *See Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764 (2004); *Quincy Commerce Ctr., LLC v. Maritime Admin.*, 451 F.3d 1, 7 (1st Cir. 2006); *Glass Packaging Inst. v. Regan*, 737 F.2d 1083, 1094 (D.C. Cir. 1984); *KEEP v. FHWA*, 2011 WL 5301589, at *21 n.11 ("[Plaintiff] did not raise this issue during the administrative process; therefore, the argument is untimely."). (*See also* TVA Opp'n to Pls.' Mot. for Prelim. Inj., Doc. 33 at PageID 334-38.)[2]

Plaintiffs argue that these reports are properly before the Court as public comments on TVA's reopened Finding of No Significant Impact (FONSI). (Pls.' Br., Doc. 47 at 18-21.) This is incorrect. Although issuance of the FONSI was procedurally correct, TVA opened it for the narrow purpose of receiving comments on the potential significance of environmental impacts (the determination that is documented in the FONSI) out of an abundance of caution. Plaintiffs chose not to avail themselves of the opportunity to submit these reports for the NEPA record.

Opening the draft EA for public comment, which is not required under NEPA, provided a "more meaningful and direct basis for commenting on TVA's proposed findings of insignificance than commenting on the short, summary FONSI [because the EA is] the analytical basis for [the] FONSI." (AR Doc. 7 at 322.) Courts are in agreement. *See Sierra Club v. Wagner*, 555 F.3d 21, 31 (1st Cir. 2009) (rejecting Sierra Club's argument that Forest Service

---

[2]     The case on which Plaintiffs rely primarily to refute this waiver principle, *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368 (2d Cir. 1977), predates the Supreme Court's holding in *Public Citizen*.

4

violated NEPA by not making draft FONSI available for public review and comment where Service had circulated draft EA and solicited comments before FONSI was adopted and observing:  "Why this does not satisfy the purpose of the thirty day [public comment] rule Sierra Club does not explain."); *cf. Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006) (applying the harmless error rule where agency "engaged in significant environmental analysis" but "failed to comply precisely with NEPA procedures").

TVA's notice that announced the opening of the FONSI expressly provided that comments could be submitted to Charles P. Nicholson in TVA's NEPA Compliance office.  (AR Doc. 7 at 322.)  Plaintiff Kentucky Coal Association asserts that it "participated extensively" in the comment process on the draft EA by "coordinating 59 comments regarding the impacts of the preferred alternative and expressing support for Alternative B."  (Compl., Doc. 1 at PageID 6, ¶ 20.)  So it understands the process for participating in a NEPA review and how to submit information for the NEPA record.  It nonetheless chose not to participate when TVA opened the FONSI for comment.  Rather, Plaintiffs now insist that the reports they submitted to this Court as exhibits in support of their motion for a preliminary injunction should have been accepted as comments on the FONSI, an entirely separate process.[3]

### B.    Judicial Review Under NEPA Does Not Include the Ability to Order the Agency to Implement a Substantive Result.

Plaintiffs also have argued that TVA could still institute the alternative they prefer— installation of pollution controls—and meet the MATS deadline.  (Pls.' Reply in Supp. of Mot.

---

[3]      Despite Plaintiffs' waiver of certain issues and untimely submission of comments, TVA has addressed previously the substance of these extra-record critiques.  (*See* TVA Opp'n to Pls.' Mot. for Prelim. Inj., Doc. 33 at PageID 337-38.)  TVA continues that approach here, refuting all of Plaintiffs' arguments, including those for which they cite these extra-record reports for support.

for Prelim. Inj., Doc. 38 at PageID 381-82.)  This is incorrect both legally under the APA and NEPA, and is incorrect factually.

NEPA's "mandate . . . is essentially procedural," *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978), and "does not mandate particular results," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  If an agency's NEPA review is found insufficient, the proper judicial remedy is to remand to the agency to perform a NEPA-compliant analysis.  *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 33 (2008) (holding there was no basis to enjoin Navy's sonar testing "[g]iven that the ultimate legal claim is that the Navy must prepare an EIS"); *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d at 19 ("NEPA is a procedural statute and an agency's substantive decisions are intended to be largely insulated from judicial review. . . .  [A] remand . . . recognize[s] the agency's independent decisionmaking power regarding the substantive issues before it.").  Thus, Plaintiffs are wrong to suggest, even subtly, that the Court could order TVA to implement the EA's Proposed Alternative B:  the installation of emission controls on Paradise Units 1 and 2.

Plaintiffs' argument is also wrong factually.  Plaintiffs rely on Administrative Record Document 12, an excerpt from a presentation made to the Finance, Rates, and Portfolio Committee of the TVA Board of Directors in Fall 2013.  Plaintiffs point to the presentation's "Pros and Cons Summary" (AR Doc. 12 at 345) to conclude that "the Administrative Record reveals that TVA's original plan to install filters at the existing coal-fueled units could still be accomplished in the time currently allotted for MATS compliance."  (Pls.' Reply in Supp. of Mot. for Prelim. Inj., Doc. 38 at PageID 381.)  That conclusion ignores the fact that a year has passed since the creation of the "Pros and Cons Summary" and that it would take at least six months of additional time, at a minimum, to contract with a manufacturer of the emissions controls, obtain the TVA Board of Directors' approval for the emissions controls option, and

complete the permitting process for the additional controls.  Even if this change were put in effect today, it could not be completed until December 2017, twenty months after the extended MATS compliance dates that States can allow (April 2016) and eight months after April 2017, the second extension year compliance date that is possibly obtainable from EPA in an enforcement order if the April 2016 compliance date is violated.

## II.     INTEGRATED RESOURCE PLAN

### A.     TVA's Least-Cost Planning Activities Are Not Subject to Judicial Review Because 16 U.S.C. § 831m-1 Does Not Provide This Court with Judicially Manageable Standards for Evaluating Them.

Plaintiffs contend that TVA must meet a "high standard"—the "clear and convincing" standard—"to exclude its actions from judicial review."  (Pls.' Br., Doc. 47 at 4.)  This is not the traditional "clear and convincing" standard used in other areas of the law.  The United States Supreme Court has specifically stated that "the presumption favoring judicial review is not to be applied in the 'strict evidentiary sense,' but may be 'overcom[e] whenever the congressional intent to preclude review is 'fairly discernible in the statutory scheme.'"  *United States v. Fausto*, 484 U.S. 439, 452 (1988) (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984)).[4] The Court has also observed that the presumption of judicial reviewability under the APA "is *'just'* a presumption . . . , and under [5 U.S.C.] § 701(a)(2) agency action is not subject to judicial review 'to the extent that' such action is committed to agency discretion by law.'"  *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (emphasis added).  TVA has clearly rebutted the presumption

---

[4]     The Sixth Circuit has read *Fausto* to call into question the viability of the "clear and convincing" standard.  *See Owens v. Brock*, 860 F.2d 1363, 1367-68 (6th Cir. 1988) ("At least some doubt . . . has been cast upon this standard by the Supreme Court's . . . opinion in *United States v. Fausto*, 484 U.S. 439 (1988).").  The Sixth Circuit observed that *Fausto*'s statement that that "[t]he . . . evidence of congressional intent to preclude review . . . need only be 'fairly discernible' as opposed to clear and convincing does . . . suggest some greater flexibility in applying the pre-existing standard."  *Owens*, 860 F.2d at 1367-68.

here by demonstrating that congressional intent to preclude review is "fairly discernible" in the TVA Act's least-cost planning provision, 16 U.S.C. § 831m-1.

The key question this Court must answer in determining whether TVA's least-cost planning activities are subject to judicial review is "whether the applicable statutes and regulations are drawn so that a court would have [a] meaningful standard against which to judge the agency's exercise of discretion." *Nat'l Fed'n of Fed. Emps. v. United States*, 905 F.2d 400, 405 (D.C. Cir. 1990) (alteration in original) (internal quotation marks omitted).  In other words, "'if no *judicially manageable standards* are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" *Id.* (quoting *Heckler v. Chaney*, 470 U.S. 82, 830 (1985)).

"Here the problem is not that the [least-cost planning provision] is devoid of criteria[.] . . . Rather, the rub is that the subject matter of those criteria is not 'judicially manageable.'" *Nat'l Fed'n of Fed. Emps. v. United States*, 905 F.2d at 405.  The only thing that a court could clearly discern is whether a least-cost planning program has or has not been conducted.  But there is no standard by which a court could determine the propriety of the manner in which it is implemented.  For instance, how is a court to determine whether TVA has examined "the full range of existing and incremental resources" that will "provide adequate and reliable service to electric customers of the Tennessee Valley Authority at the lowest system cost"?  16 U.S.C. § 831m-1(b)(1).  *Cf. Matthews v. Town of Greeneville*, 932 F.2d 968, 1991 WL 71414, at *4 (6th Cir. 1991) (table decision) (noting that the TVA Act's "vague admonition to maintain 'the lowest possible rates' does not come close to providing the sort of guidelines which would permit meaningful judicial review").  Similarly, how is a court to fashion a "judicially manageable" standard for determining whether TVA has "take[n] into account necessary features for system operation, including diversity, reliability, dispatchability, and other factors of risk"?  *Id.* § 831m-

8

1(b)(2).  Moreover, how should a court determine what these "other factors of risk" are?

Plaintiffs' unsupported statements do not explain how these, as well as the other subsections

within § 831m-1, provide the Court with manageable standards to apply.[5]

In fact, Plaintiffs essentially admit in section I.B. of their brief that TVA's least-cost

planning program—which is the IRP—is not the type of agency action that is amenable to

judicial review.  They explicitly state that "[t]he 2011 IRP was the product of an extensive and

complex analysis of a great number of factors that influence current and future energy demand,

generation costs, and utilization of then-current and potential new generating resources."  (Pls.'

Br., Doc. 47 at 9.)  And as courts have noted, "[a] decision is more likely to be committed to an

agency's discretion when it requires a complicated balancing of a number of factors which are

peculiarly within its expertise; for example, questions of whether agency action is likely to be

successful or whether a particular action best fits the agency's overall policies."  *Almond Bros.*

*Lumber Co. v. United States*, 721 F.3d 1320, 1326 (Fed. Cir. 2013) (internal quotation marks

omitted); *see also Ctr. for Policy Analysis on Trade & Health (CPATH) v. Office of U.S. Trade*

*Representative*, 540 F.3d 940, 944 (9th Cir. 2008) (alteration in original) (stating that judicial

review is precluded when "'the agency's action requires a complicated balancing of a number of

factors which are peculiarly within [the agency's] expertise, including the prioritization of

agency resources, likelihood of success in fulfilling the agency's statutory mandate, and

compatibility with the agency's overall policies.'" (quoting *Newman v. Apfel*, 223 F.3d 937, 943

(9th Cir. 2000))).  Clearly, the determination of how best to provide reliable energy to the

---

[5]      Although Plaintiffs contend that § 831m-1(c) demonstrates that TVA's least-cost
planning activities are subject to judicial review, there is absolutely no authority supporting the
assertion that input from distributors indicates congressional intent to subject an agency decision
to judicial review.  And as explained in section II.B., the "public review and comment"
provision, § 831m-1(d), applies to site-specific NEPA reviews, which is an agency action subject
to judicial review, *not* to the broader least-cost planning program.

residents of the Tennessee Valley region at the lowest system cost over a number of years is a matter within TVA's particular area of expertise and thus best left to its discretion.

Plaintiffs contend, however, that the presence of mandatory language—"shall"—and the absence of certain discretionary language—such as "may determine to be necessary" or "as necessary," (*see* Pls.' Br., Doc. 47 at 4-6)—equals judicial review.  Plaintiffs are incorrect.  The fact that a statute uses a particular type of language (mandatory or discretionary) is only one factor courts analyze in determining whether an action is subject to judicial review, but it is not determinative.  Instead, a court must "'consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action.'"  *Sierra Club v. Jackson*, 648 F.3d 848, 855 (D.C. Cir. 2011) (quoting *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006)).

The TVA Act's rate-making provision, 16 U.S.C. § 831n-4(f), illustrates the point. Section 831n-4(f) specifically provides that TVA "*shall* charge rates for power" that will achieve certain ends, such as "provid[ing] funds for operation, maintenance, and administration of its power system"; tax-equivalent payments; debt service and payment to the Treasury; and additional margins for investment, "having due regard for the primary objectives of the chapter, *including the objective that power shall be sold at rates as low as are feasible*." (Emphasis added.)  How to set the rates; what the rates should be; and how to balance debt, investment, and operation expenses, however, is undefined.  Accordingly, courts have long held that TVA's rate-making activities are not subject to judicial review (*see* TVA Br., Doc. 32-1 at PageID 299-301), due to the nature of the administrative action.**6**

---

**6**      Plaintiffs contend that TVA's rate-making activity is committed to agency discretion because it "was intended to protect the interests of TVA itself," whereas least-cost planning activities "safeguard the interests of TVA's customers and, accordingly, [are] subject to judicial

Similarly, the least-cost planning provision states that TVA "*shall* conduct a least-cost planning program," 16 U.S.C. § 831m-1(a), and "*shall* employ and implement a planning and selection process for new energy resources" that encompasses certain broad considerations, *id.* § 831m-1(b)(1) (emphases added), but the specifics of these considerations, how TVA should go about weighing and evaluating these considerations, and the ultimate outcome is undefined. Therefore, much like the rate-making provision, the least-cost planning provision, despite the presence of mandatory language, "involves the clearest sort of commitment to agency discretion." *Mobil Oil Corp. v. TVA*, 387 F. Supp. 498, 506 (N.D. Ala. 1974).

Moreover, Plaintiffs fail to recognize that 16 U.S.C. § 831n-4(f) and 16 U.S.C. § 831m-1 amount to the same thing; indeed, they are integral to each other. Both provisions allow TVA to effectuate one of its main statutory objectives—to sell power "at rates as low as are feasible," 16 U.S.C. § 831n-4(f), or, stated another way, to "provide adequate and reliable service to electric customers of the Tennessee Valley Authority at the lowest system cost," 16 U.S.C. § 831m-1(b)(1). Courts have consistently held that Congress granted TVA broad discretion in carrying

---

(. . . continued)

review." (Pls.' Br., Doc. 47 at 7.) They cite *Gatter v. Nimmo* in support of this assertion. *See* 672 F.2d 343, 345 (3d Cir. 1982) (noting that "the fact that a specific statute was enacted primarily to safeguard interests of the government rather than those of some protected class is significant evidence that the agency's exercise of discretion was intended to be unreviewable"). As an initial matter, none of the cases cited in *Gatter* for this proposition actually makes this statement in the context of determining whether an action is committed to agency discretion. The *Gatter* court derives this statement from the two decisions' discussion of standing. *See Local 2855, AFGE (AFL-CIO) v. United States*, 602 F.2d 574, 582 n.28 (3d Cir. 1979) (discussing standing under the APA and its requirement that the claimant allege that their injury "was an interest arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question" (internal quotation marks omitted)); *Merriam v. Kunzig*, 476 F.2d 1233, 1241-42 (3d Cir. 1973) (rejecting government's argument that disappointed bidder on government contract did not fall "within the zone of protected interest . . . . because all of the statutes or regulations with respect to government procurement are intended solely for the protection of the Government"). Moreover, not a single court has cited *Gatter* for this particular proposition in the specific context of determining whether an action is committed to agency discretion.

out its statutory mission.  *See, e.g.*, *Gold Point Marina, Inc. v. TVA*, 635 F. Supp. 39, 42

(E.D. Tenn. 1986) ("Review of the TVA Act and the legislative history underlying it reveals that

TVA has been granted broad discretion to carry out the purposes of the TVA Act.").

Because "the nature of the administrative action at issue" is one that "requires a

complicated balancing of a number of factors which are peculiarly within its expertise," *Almond*

*Bros. Lumber Co.*, 721 F.3d at 1326 (internal quotation marks omitted), and requires TVA to

determine which "action is likely to be successful or whether a particular action best fits the

agency's overall policies," *id.*, it is one that is committed to agency discretion and not subject to

judicial review.

### B.   Plaintiffs Misinterpret the Least-Cost Planning Requirements of the TVA Act.

Plaintiffs argue that TVA has not complied with the least-cost planning provision of the

TVA Act because "the IRP did not contemplate retiring Paradise Units 1 and 2" and the AR

"does not evidence any project-specific examination of costs."  (Pls.' Br., Doc. 47 at 15.)

Plaintiffs' arguments, however, proceed from the fundamental misapprehension that TVA's

compliance with 16 U.S.C. § 831m-1 requires an IRP that considers site-specific projects and/or

a separate least-cost planning analysis for individual energy resource projects.

A least-cost planning program, or IRP, need not encompass or address site-specific,

discrete energy-resource decisions.  "An IRP is simply a plan which broadly identifies the

actions which a utility anticipates taking to meet demands for electric service and to achieve its

long-term goals and objectives."  Notice, Integrated Resource Plan, Issuance of Record of

Decision, 61 Fed. Reg. 7572-02, 7573 (Feb. 28, 1996); *accord* Inara Scott, *Teaching an Old Dog*

*New Tricks: Adapting Public Utility Commissions to Meet Twenty-First Century Climate*

*Challenges*, 38 Harv. Envtl. L. Rev. 371, 409 (2014) ("In an integrated resource plan ('IRP'), a

utility evaluates available resources and forecasted demand over an extended period of time to

determine the optimal mix of resources to reliably meet customer load requirements at the lowest

reasonable cost.").  Obviously, a system-wide planning process of this kind cannot encompass

every individual decision TVA may implement in furtherance of the IRP's goals or objectives at

some future date over the 20-year period of the IRP.  (*Accord* AR Doc. 22 at 2092 (noting, in

evaluating environmental impacts of supply-side resource options for 2011 IRP, that "[b]ecause

the locations of most of the future generating facilities are not known, this impact assessment

focuses on impact areas that are generally not location-specific").)

 TVA's duty to engage in least-cost planning is satisfied by implementation of its IRP, or

its least-cost planning *program*.  TVA's IRP is the broad-based analysis of TVA's resources and

future needs on a system-wide basis.  This process is governed by what TVA interprets as the

first "component" of 16 U.S.C. § 831m-1, subsections (a) through (c).  As demonstrated by the

language used in these subsections, the least-cost planning provisions guide TVA in

implementing a program that sets generalized goals for TVA on a system-wide basis.  *See*

16 U.S.C. § 831(a) (generally requiring TVA to "conduct a least-cost planning program");

*id.* § 831(b)(1) (outlining the process for least-cost planning "under subsection (a)");

*id.* § 831(b)(2) (outlining the planning and selection process referenced in subsection (b)(1));

*id.* § 831(b)(3) (defining "system cost" as used in subsection (b)(1)); *id.* § 831(c) (addressing

participation by distributors during process of devising least-cost planning program "under

subsection (a)").

 Because the IRP only articulates broad, system-wide goals, rather than site-specific

decisions, implementation is then accomplished through the selection of specific energy

resources that comport with the stated goals in the IRP.  Such selections rely on (tier from) the

least-cost planning analyses in the IRP and *do not* require a separate least-cost planning analysis.

Site-specific projects are addressed in the second component of § 831m-1, subsection (d), which provides:  "Before the selection and addition of *a major new energy resource* on the Tennessee Valley Authority system, [TVA] shall provide an opportunity for public review and comment . . . ." (Emphasis added).  This language contrasts with subsection (b)(1), which uses the plural phrase "new energy *resources*."  (Emphasis added.)  Therefore, public review and comment is required only for the selection of "a major new energy resource," a single, discrete addition to the system, and not to TVA's least-cost planning program.[7]  TVA considers subsection (d) to be satisfied once public review and comment is provided, which TVA effectuates through the project's NEPA review.  *See* 61 Fed. Reg. 7572-02, 7573 (explaining that "TVA prepares project-specific environmental reviews for proposed energy resource decisions").[8]  The public is free to comment during the review process for the selection of specific energy resources that such selection does not properly implement TVA's IRP and explain why.  Plaintiffs chose not to do so here.

Plaintiffs complain that "TVA did no more least-cost planning beyond the IRP" (Pls.' Br., Doc. 47 at 11), but this is all the least-cost planning that TVA is *required* to perform under § 831m-1.  Plaintiffs' arguments to the contrary are incorrect as a matter of law.  The 2011 IRP did not need to specifically consider any decisions related to Paradise Units 1 and 2, nor did the Paradise EA require a separate least-cost planning analysis.  Hence, Plaintiffs' arguments that the IRP and/or the EA do not comply with § 831m-1 fail.

---

[7]    Notably, § 831m-1(c) requires only that TVA provide the distributors of TVA electricity the opportunity to participate in its IRP processes, not the general public.  TVA *does* provide the public such opportunities, however, as part of the associated NEPA processes.  (*See* TVA Br., Doc. 32-1 at PageID 316-17.)

[8]    Because this constitutes TVA's interpretation of its governing statute, it is "entitled to substantial deference."  *E.g.*, *Chem. Mfrs. Ass'n v. EPA*, 673 F.2d 507, 511 (D.C. Cir. 1982).

**C.**    **TVA's Decision to Replace Paradise Units 1 and 2 with Gas Generation is Fully Supported by the 2011 IRP.**

Plaintiffs' remaining arguments regarding least-cost planning are that:  (1) the 2011 IRP does not support the decision to retire Paradise Units 1 and 2 because the idling of these coal-fired units, when added to coal units already idled, exceeds (on a megawatt basis) that which was considered in the IRP; and (2) only Administrative Record Document 12 "suggests TVA analyzed the financial impacts of retiring Paradise Units 1 and 2 and building 1,025 MW of gas-fired CT/CC generating units" and is "woefully deficient."  (Pls.' Br., Doc. 47 at 11-12.)[9]

Plaintiffs' arguments are irrelevant to the question of whether TVA has complied with 16 U.S.C. § 831m-1 because, as explained above, TVA is not obligated under § 831m-1 to perform least-cost analyses at the level of specificity assumed by Plaintiffs.  Moreover, Plaintiffs' arguments are factually inaccurate and in no way undermine TVA's decision to replace Paradise Units 1 and 2's coal-fired generation with natural gas because this decision fully comports with, and is in furtherance of, the goals articulated in the 2011 IRP.

**1.**    **Idling of coal-fired capacity**

In essence, Plaintiffs argue that TVA is bound by the "preferred level" of idled coal-fired capacity identified in the IRP's "Recommended Planning Direction."  (Pls.' Br., Doc. 47 at 9-11) (claiming that 4,700 MW was the "greatest level TVA thought appropriate to consider in its final analysis of the costs and risks posed by different resource portfolios," citing AR Doc. 21 at 1828).)  Plaintiffs are wrong for several reasons.

---

[9]    As discussed in more detail in section I of this brief, Plaintiffs' arguments are based almost entirely on substantive material that was not presented to TVA either during its 2011 IRP process or the Paradise EA comment period.  Because this material is not in the AR, it is not properly before this Court.

First, the TVA Board exercised its discretion by approving an IRP with substantial flexibility.  This is perhaps most easily demonstrated by the nature of the IRP itself, which outlines broad goals and a generalized direction for meeting the energy needs of the Tennessee Valley region over a 20-year period, but provides TVA the ability to adapt its implementation of the plan to the conditions presented in the years following the IRP's completion.[10]

The IRP states that although it "will help guide TVA in making important decisions in the years to come, [it] does not dictate a specific series of actions."  (AR Doc. 21 at 1845.)  It clarifies that the IRP *does* "[a]rticulate a 20-year planning direction," but *does not* "[f]inalize specific asset decisions"[11] or "[s]erve as a substitute for the 'fine-tuning' of the annual planning and budgeting processes."  (AR Doc. 21 at 1845.)  The IRP *does* "[p]resent recommended strategy alternatives," but *does not* "discard analyses done for alternative strategies."  (*Id.*)  The IRP *does* "[d]escribe guideline ranges for key components of the Recommended Planning Direction (i.e., EEDR, idling of coal-fired units, etc.)," but *does not* "[m]ake specific commitments for key components of the Recommended Planning Direction."  (*Id.*)

As an additional illustration of the flexibility inherent in the IRP, the TVA Board's resolution approving the IRP specifically states that "th[e] IRP provides TVA [a] planning direction and the flexibility to make sound choices in a dynamic, ever-changing regulatory and

---

[10]   Plaintiffs also contend briefly that TVA erred in its site-specific Paradise EA by not performing "any 'detailed optimization analyses to determine both the optimization level of idling and the best units for idling after accounting for risks, uncertainty and all known costs'" as called for in the IRP.  (Pls.' Br., Doc. 47 at 11 (quoting AR Doc. 21 at 1846).)  The analysis recommended in the IRP is contained in AR Doc. 12.

[11]   Hence, Plaintiffs' claim that the IRP "specifically contemplated the continued operation of Paradise Units 1 and 2" (Pls.' Br., Doc. 47 at 11) is incorrect.

economic environment by providing guideline ranges for the primary components of the IRP."[12] The IRP and the megawatt reduction of coal-fired generation in it is a guide, *not* a mandate.

Second, and perhaps more importantly, the Planning Direction specifically directed TVA staff to "[c]onsider increasing [the] amount of coal-fired capacity [to be] idled" and to "[u]tilize natural gas as an intermediate supply source."  (AR Doc. 21 at 1692; *see also* AR Doc. 24 at 2354 (listing, in the Issuance of Record Decision for the 2011 IRP, the recommended idled coal-fired capacity between 2,400 and 4,700 MW "with consideration for increasing the amount of coal capacity idled" and recommending natural gas additions between 900 and 9,300 MW).) Subsequent decisions to exceed the specific upper range identified in the IRP are fully consistent with these qualitative directions to staff and appropriately implement TVA's least-cost planning program analyses.

Third, the retirement (idling) of up to 7,000 megawatts of coal-fired generation was clearly considered and evaluated in the 2011 IRP process. (*See* AR Doc. 21 at 1774 (describing various strategies, including Strategy D, which considers "7,000 MW total fleet reductions [of coal-fired capacity] by 2017"); AR Doc. 21 at 1812 (describing characteristics of "sensitivity cases," including Strategy E1, which assumes 7000 MW of coal-fired idling); AR Doc. 24 at 2354 (noting that Strategy D includes the largest amount of idled coal capacity (7,000 MWs).)[13]

Fourth, Plaintiffs are incorrect when they claim that the amount of coal capacity that TVA has decided to idle now totals 7,632 MW, exceeding the 7,000 MW upper limit of TVA's

---

[12]    Minutes of TVA Bd. Meeting at 6, Apr. 14, 2011, *available at* http://www.tva.gov/abouttva/board/pdf/4-14-2011_minutes_chattanooga_tn.pdf.

[13]    The IRP specifically provides that the Recommended Planning Direction categorically *does not* "discard analyses done for alternative strategies."  (AR Doc. 21 at 1845.)

17

analyses.  (Pls.' Br., Doc. 47 at 11.)  The megawatts Plaintiffs use to derive this estimate are based on the "nameplate capacity" of the units.  TVA uses net-dependable capacities in the IRP and expressly indicated this when it set out the specific range for coal-unit idling.  (AR Doc. 21 at 1692 n.3 ("MW values based on maximum net dependable capacity.").)

Nameplate capacities refer to the manufacturer's upper limit of generation *assuming* that everything is working perfectly.  It would be an unusual case in which a unit's actual capacity was synonymous with the capacity listed on its nameplate, particularly for aging units such as Paradise Units 1 and 2, which began generating electricity in 1963.  (Hope Decl., Doc. 33-1, PageID 353, ¶ 7.)  Hence, TVA uses the "net dependable" capacity[14] of units in its least-cost planning modeling and forecasting, a realistic measure of a unit's dependable generation.  The 7,000 MW number is a net-dependable capacity number.  With the subsequent decision in 2014 to idle/retire TVA's Allen Fossil Plant, the total amount of coal capacity idled or retired on the TVA system, considering the units retired under the EPA Clean Air Act Agreements and subsequent Board decisions, including its Paradise decision, totals 6,319 MW.  This is well-within the 7,000 MW considered in the IRP.

> ## 2.     Finance, Rates, and Portfolio Committee Meeting excerpt — Administrative Record Document 12 (AR Doc. 12).

The second component of Plaintiffs' least-cost planning argument focuses largely on Administrative Document 12, which Plaintiffs complain has "too little information to judge the merits of the analysis" (Pls.' Br., Doc. 47 at 12), meaning that this Court should either rule in

---

[14]     Normally, net dependable figures are taken from summertime operations, which is typically when the most power is being generated; therefore, "net dependable" is sometimes referred to as "summer net capability."  *See, e.g.*, TVA, 2013 Annual Report on Form 10-K, *available at* http://www.snl.com/Cache/20876667.pdf?IID=4063363&FID=20876667&O=3&OSID=9.  Net dependable capacities are the amount of generation that TVA can depend on when a unit is called upon to operate.

their favor or conclude that "there are significant and genuine issues of material fact that preclude judgment on the Administrative Record in favor of TVA."  (Pls.' Br., Doc. 47 at 15.) Plaintiffs' contentions are legally and factually meritless.

First, as already explained in section I, "material issues of disputed or unsupported facts" cannot be created in a record-review case under the APA, and Plaintiffs are not entitled to discovery in order to "learn the assumptions" relied on by TVA in creating various documents. (Pls.' Br., Doc. 47 at 12.)  The only inquiry in a record-review case is whether the AR, *as a whole*, supports the decision made by the agency.  For purposes of the least-cost planning program outlined in 16 U.S.C. § 831m-1, the pertinent record is the 2011 IRP, *not* the Paradise EA.  As already discussed in great detail, TVA does not have to perform a separate least-cost planning analysis for each site-specific project that is distinct from the system-wide analysis in the IRP.

Second, Plaintiffs' conjectural arguments regarding TVA's supposed failure to analyze "costs associated with replacing th[e] generating capacity [from Paradise Units 1 and 2] within TVA's system" (Pls.' Br., Doc. 47 at 13), are issues that are examined during the IRP process, which is currently being updated.  Any generation deficiencies TVA *might* face in the future will be addressed during the current IRP process; such inquiries are thus not ripe for this Court's consideration.

And even assuming that the materials upon which Plaintiffs base their arguments were properly before this Court and their substantive arguments were based on an accurate interpretation of the law, they ignore a critical fact.

Plaintiffs argue that replacing Paradise Units 1 and 2 with gas will result in "a huge shift of power generation to other units in its system."  (Pls.' Br., Doc. 47 at 14.)  This is wrong.  The EA specifically analyzed how much generation TVA needed if it retired Paradise Units 1 and 2.

19

TVA determined that 800 MW of generation was needed.  (*See* Resp. to Comment 16, AR Doc. 4 at 298.)  The net dependable capacity of the new gas plant is approximately 1,025 MW.  (*See* AR Doc. 5 at 317.)  This more than meets the generation need.

Moreover, this "generation shift" argument fails to consider the *type* of generation TVA needs to modernize its fleet.  TVA chose to add gas generation because it can easily meet the energy-use "swings" that occur on a day-to-day basis.  As an example, the difference between daytime and nighttime energy use can easily "swing" between 13,000 and 26,000 megawatts in a particular area.  (*See* AR Doc. 21 at 1746 (illustrating energy-use peaks that can occur throughout the day and the types of energy resources that best respond); *see also* AR Doc. 22 at 1945.)  Gas generation is particularly suited to meet "swing" energy needs because it can easily provide more or less power as needed.  (*See, e.g.*, AR Doc. 21 at 1747.)  Paradise Units 1 and 2, due to their age and size, cannot.  Those units are most efficient once they are generating at capacity, but they cannot easily adapt to energy-use fluctuations—either increased or decreased—in an efficient manner.  Their operation is more akin to nuclear generation—the units are most efficient when generating at capacity without frequent changes.

Finally, Plaintiffs' criticisms of the costs related to replacing Paradise Units 1 and 2 with gas generation are inaccurate because they fail to consider key costs inherent in the retention of aging coal-fired units.  For example, Plaintiffs' experts do not discuss EPA's proposed regulation of carbon dioxide emissions, water, and coal ash at coal plants, all factors that TVA must consider in its calculus.  In addition, the average fuel costs presented by Plaintiffs' experts do not consider the cost of reagents, such as limestone, needed to control pollution from coal generation or wear-and-tear maintenance costs that will necessarily be incurred in order to keep these aging units running.

III.   **NEPA**

   A.   **TVA Used the Correct No Action Alternative.**

Plaintiffs have argued that TVA's no action alternative constituted "'a useless academic exercise.'"  (Pls.' Br. in Supp. of Mot. for Prelim. Inj., Doc. 17-1 at PageID 96-97.)  Plaintiffs assert that TVA should have used a no action baseline that assumes MATS-compliant emission controls had already been installed, rather than starting from a baseline of current operations.

To support this argument, Plaintiffs cite to an inapplicable section of the Council on Environmental Quality's (CEQ) "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations."  This CEQ guidance states that "there are two distinct interpretations of 'no action' that must be considered, depending on the nature of the proposal being evaluated."  46 Fed. Reg. 18026, 18027 (Mar. 23, 1981).  The first interpretation is the one to which Plaintiffs refer:

> [It] might involve an action such as updating a land management plan where ongoing programs initiated under existing legislation and regulations will continue, even as new plans are developed.  In these cases "no action" is "no change" from current management direction or level of management intensity.  To construct an alternative that is based on no management at all would be a useless academic exercise.  Therefore, the "no action" alternative may be thought of in terms of continuing with the present course of action until that action is changed.  Consequently, projected impacts of alternative management schemes would be compared in the EIS to those impacts projected for the existing plan.  In this case, alternatives would include management plans of both greater and lesser intensity, especially greater and lesser levels of resource development.

*Id*.  This first interpretation is applicable to TVA's IRP—an existing long-range plan that will continue "even as new [IRPs] are developed."

However, this is not the proper interpretation for a site-specific project such as the Paradise project.  That type of discrete project is properly analyzed under CEQ's second interpretation:

> The second interpretation of "no action" is illustrated in instances involving federal decisions on proposals for projects. "No action" in such cases would mean the proposed activity would not take place, and the resulting environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward.
>
> . . . .
>
> . . . [T]he regulations require the analysis of the no action alternative even if the agency is under a court order or legislative command to act. This analysis provides a benchmark, enabling decisionmakers to compare the magnitude of environmental effects of the action alternatives.

*Id.* This is the interpretation TVA used here, and the interpretation that has been affirmed by courts assessing similar scenarios. (*See* TVA Br., Doc. 32-1 at PageID 310-11.)

**B.    TVA's Decision to Prepare an EA for the Paradise Gas Plant Was Correct Under TVA's NEPA Procedures and Consistent with TVA's Prior Practice.**

Plaintiffs fault TVA's use of an EA for the Paradise project because TVA's procedures list "major new power-generating facilit[ies]" as one of the actions that "normally" will require an EIS and, they argue, because TVA has previously prepared EISs for the building of CC/CT plants at other locations. (Pls.' Br., Doc. 47 at 21-24.)

It is well established that an agency's decision to prepare an EA rather than an EIS is entitled to deference because choosing the appropriate level of review is a factual decision that implicates an agency's expertise. *See, e.g.*, *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1274 (10th Cir. 2004); *Providence Rd. Cmty. Ass'n v. EPA*, 683 F.2d 80, 82 (4th Cir. 1982). TVA determined that this was not a case that would "normally" require an EIS because: (1) gas units would be *substituted for* coal-fired units; thus, there would be no increase in environmental effects; (2) the gas units would be built on the existing Paradise reservation, which has been an industrial power-generating site since 1963; and (3) the project would yield

22

substantial environmental benefits including a reduction in air emissions, water withdrawals and

waste water discharges, and coal combustion waste.[15]  (AR Doc. 4 at 189-90.)

TVA's determination that an EIS was not required for the construction of a replacement

natural gas plant is consistent with TVA's past practice.  If gas generation is proposed to be

constructed on a greenfield site or if generation from gas will be added to an existing TVA

facility, then TVA has prepared an EIS to support those activities.  Those actions would have

resulted in net environmental impacts rather than net environmental benefits.  This is not the case

here.  (*See* TVA Br., Doc. 32-1 at PageID 325-26 ("Rather than a negative loss to the

environment that normally would result from the construction of a new power generating facility

divorced from the retirement of existing generating facilities, TVA's action would improve the

---

[15]     Plaintiffs suggest impropriety in TVA's offering of several reasons for its decision to issue an EA for the alternative Paradise projects.  Because the decision to issue an EA rather than an EIS is a factual decision implicating an agency's expertise, it is logical that several reasons support that decision.  There is nothing inconsistent between TVA's statements on this issue in the EA and the additional reasons—greenfield vs. industrial site, environmental benefits vs. environmental impacts—that TVA has elaborated here.

Because much of the Paradise plant reservation, including the powerhouse, the wastewater pond system, the switch yard and the coal handling facilities, would "continu[e to] operate" under either proposed alternative, this statement in the EA was correct.  (AR Doc. 4 at 283.)  Plaintiffs focus on TVA's response in the EA to a comment made by several environmental advocacy groups regarding Alternative B (the installation of emission controls on the two coal units).  The environmental groups commented that because Paradise was a "major generating facility" under the Clean Air Act, installing controls on the two coal units required an EIS under TVA's NEPA Procedures.  (AR Doc. 155 at 10074.)  In responding to the environmental groups, TVA stated that while the Paradise coal plant was a "major emitting facility" in Clean Air Act terminology, this did not equate automatically with its being a "major power generating facility" under TVA's NEPA procedures because TVA interprets this provision of its NEPA Procedures to "apply[] to construction of a new major power generating facility, and not to maintenance and upgrades of existing major power generating facilities."  (AR Doc. 4 at 303.)  The environmental groups' comment and TVA's response were in the context of upgrading the two coal units, not replacing their generation with natural gas.  Because neither Plaintiffs nor any other commenter asked during the EA's public comment period whether replacing the two coal-fired units should be considered an action that "normally" requires an EIS, TVA had no occasion to address the question.

environment.  This distinguishes the Paradise situation from the normal proposal to construct a

new power plant on a green field site.").)

All of the examples which Plaintiffs cite (Pls.' Br., Doc. 47 at 24) align with TVA's

historical practice:

- **Johnsonville, Gallatin, Colbert**.  *See* Notice, EIS for Addition of Electric Generation Peaking Capacity, 63 Fed. Reg. 43226-01, 43226 (Aug. 12, 1998) (scoping the NEPA review for a proposal to *add* "[u]p to eight natural gas-fired combustion turbines . . . at one, two or three existing TVA power plant sites.").

- **Lagoon Creek.**  *See* Scoping Notice, EIS for Addition of Electric Generation Peaking and Baseload Capacity at Greenfield Sites, Haywood County, Tennessee, 64 Fed. Reg. 29935-02, 29935 (June 3, 1999) and Notice of Record of Decision, Addition of Electric Generation Peaking Capacity, 65 Fed. Reg. 30469-02, 30470 (May 11, 2000) (noticing TVA's decision to *add* up to 1,400 MW by constructing simple-cycle combustion turbines at the *greenfield site*, Lagoon Creek).

- **Tullahoma, Tennessee.**  *See* Notice of Intent, EIS for Addition of Electric Generation Baseload in Tennessee, 66 Fed. Reg. 14975-02 (Mar. 14, 2001); Notice of Availability, EIS No. 010328, TVA, Tennessee, Addition of Electric Generation Baseload Capacity, Proposa[al] to Construct a Natural Gas Fired Combined Cycle Power Plant, Franklin County, Tennessee, 66 Fed. Reg. 45984-01 (Aug. 31, 2001); Executive Summary, Final EIS for Addition of Electric Generation Baseload Capacity in Franklin County, Tennessee, Attach. 1[16] (TVA "proposes to construct a natural gas fired combined cycle power plant [to] provide 510 megawatts (MWs) of *new* capacity . . . at one of two sites [which] are currently *undeveloped* for industrial purposes and are either forested or in pasture.") (emphasis added).

- **Kemper, Mississippi.**  *See* Notice of Intent, EIS for Addition of Electric Generating Peaking Capacity at Greenfield Sites, Mississippi, 65 Fed. Reg. 47817-01 (Aug. 3, 2000); Record of Decision, 66 Fed. Reg. 21189-01 (Apr. 27, 2001) (noticing TVA's plan to construct a *new* simple-cycle, natural gas plant "on a previously *undeveloped, greenfield* site") (emphasis added).

On the other hand, for projects that involve *substituting* gas generation for coal

generation at existing industrial sites, such as the situation here, TVA has prepared EAs:

---

[16]    Because the Federal Register notice for the Tullahoma, Tennessee, project does not contain sufficient descriptive information and because the EIS for this project is not available electronically, TVA has submitted a portion of the EIS's Executive Summary as an attachment to this brief.  This attachment is not part of the administrative record for the Paradise EA.

- **John Sevier.** *See, e.g.*, EA for John Sevier Fossil Plant, Addition of Gas-Fired Combustion Turbine/Combined-Cycle Generating Capacity and Associated Gas Pipeline, AR Doc. 29 at 2726 (proposing to construct a new combined cycle facility at TVA's John Sevier fossil facility to comply with a court order in *North Carolina ex rel. Cooper v. TVA*, 593 F. Supp. 2d. 812, 832 (W.D.N.C. 2009), *rev'd and remanded*, 615 F.3d 291 (4th Cir. 2010), and a consent decree filed in a related case, *Alabama v TVA*, No. 3:11-cv-170, Doc. 15 (E.D. Tenn. June 30, 2011), which required the John Sevier fossil units to be *retired* by December 31, 2012).

- **Lagoon Creek.** FONSI and SEA for the Potential Upgrade of the Tenaska Site for Establishing a Simple-Cycle or Combined-Cycle Electric Generating Facility, Haywood County, Tennessee, *available at* http://www.tva.gov/environment/reports/lagoon_creek/2007-29_lagoon_creek_fonsi.pdf (FONSI issued for constructing a new gas-fired CC/CT plant at an *existing* generating site adjacent to TVA's Lagoon Creek facility near Brownsville, Tennessee).

Plaintiffs also fault TVA for making "no reference to potential negative impacts to the human environment resulting from its preferred alternative." (Pls.' Br., Doc. 47 at 22-23.) Plaintiffs argue that "[h]istoric volatility in natural gas pricing and supply has the potential to jeopardize access to electricity for thousands of TVA's most vulnerable customers." (Pls.' Br., Doc. 47 at 22.) This is speculation.

As discussed earlier and in TVA's opening brief (Doc. 32-1 at PageID 301-06), TVA's 2011 IRP process considered cost, financial risk, and many other factors, including historic fuel price volatility and supply on a system-wide basis, to identify a least-cost planning direction that consisted of a portfolio of energy sources from which TVA could select to respond to future demands on its power system. (*Id.*; AR Doc. 21 at 1737, 1739, 1768-70, 1776, 1816, 1826, 1889; AR Doc. 22 at 1927, 1939-41, 1948-49; AR Doc. 23 at 2187, 2189.) From the standpoint of costs to the TVA system and financial risks, TVA's comprehensive analyses showed that the Board-approved planning direction achieved the best balance. (AR Doc. 21 at 1835.) TVA's selection of energy resources following the issuance of its 2011 IRP, which includes the decision

to replace the two small coal units at Paradise with natural gas, is consistent with and falls within the least-cost planning direction.[17]

And, for the site-specific decision at Paradise, TVA examined potential effects of the proposed action on the human environment by looking at coal mining jobs in counties throughout Kentucky, as well as employment and personal income statistics.  (AR Docs. 121-25.)  The EA did acknowledge some potential negative impacts, but concluded that they were insufficiently significant to warrant the preparation of an EIS.  (AR Doc. 4 at 262-69, 296-97.)

### C.     TVA Did Not Improperly Segment Its NEPA Review.

Most of Plaintiffs' segmentation criticisms reiterate their allegation that TVA failed to sufficiently analyze effects on various resources (wetlands, threatened/endangered species, vegetation and wildlife, historic and cultural properties, and floodplains) within the specific pipeline route.[18]  TVA demonstrated in its initial brief that its analysis of the potential impacts of the natural gas pipeline did not constitute impermissible segmentation, but was a permissible preliminary analysis that would be further refined by the federal agency designated by Congress as having primary jurisdiction over the transportation of natural gas.  (TVA Br., Doc. 32-1 at PageID 321-23.)  TVA's EA contains analyses of potential pipeline impacts along the two alternative pipeline routes which were under consideration at the time of the EA's preparation in

---

[17]     Plaintiffs' speculation about the dire impacts on employment and electric supply that will result from switching two units at Paradise from coal to gas generation also ignores the fact that the largest Paradise unit, Unit 3, will continue to burn coal and generate electricity.

[18]     Plaintiffs also allege that TVA failed to examine the impacts from the above-ground fuel oil storage tanks.  TVA demonstrated in its opening brief that this claim was incorrect.  (*See* TVA Br., Doc. 32-1 at PageID 318 n.15.)  In any case, it has been decided that the fuel storage tanks, which were only under consideration as emergency back up at the time the EA was prepared (*see* AR Doc. 4 at 231), are not needed and will not be built.

each of the various affected environment sections.  (AR Doc. 4 at 168, 173, 180-82, 186, 194-95, 196, 199, 201-03, 204-05, 209, 212, 214, 217, 218, 219, 221, 229-30, 236, 238, 243, 249, 261.)

This type of preliminary analysis is entirely appropriate when the exact contours of a proposed project are not yet defined.  *See, e.g.*, *KEEP v. FHWA*, 2011 WL 5301589, at *26 (affirming FHWA's analysis of Transpark project despite failure to evaluate potential air emissions from the second phase of the project because "it was unclear how the land will be zoned if and when purchased, what type of industry will be attracted to the space when it is made available, and the types of emissions those industries will produce when they are in place").  In doing its analysis of potential pipeline impacts, TVA did not *avoid* NEPA review, which is the hallmark of impermissible segmentation, *see Hirt v. Richardson*, 127 F. Supp. 2d. 833, 842 (W.D. Mich. 1999), but conducted a first level of NEPA review that will be further refined by a second federal agency, the Federal Energy Regulatory Commission (FERC).  This is procedurally proper.

Texas Gas Transmission, LLC, the company in charge of constructing the lateral pipeline, is currently conducting property surveys, civil engineering assessments, as well as environmental, cultural, and biological reviews in order to file an application with FERC for a Certificate of Public Convenience and Necessity.  (S*ee* Stephens Decl., Doc. 33-2 at PageID 354-55.)  FERC has jurisdiction over the transportation or sale of natural gas in interstate commerce and the construction, acquisition, operation, and abandonment of facilities to transport natural gas in interstate commerce.  15 U.S.C. § 717f.  And, by virtue of amendments made to the Natural Gas Act by the Energy Policy Act of 2005, FERC "shall act as the lead agency for the purposes of coordinating all applicable Federal authorizations and for the purpose of complying with [NEPA]."  15 U.S.C. § 717n; *see also* Guidance for Federal and State Agencies for the Processing of Federal Authorizations in Cooperation with the FERC, *available at*

27

http://www.ferc.gov/industries/gas/enviro/epact-gas-guidance.pdf  (FERC is required "to coordinate the environmental review and the processing of all federal authorizations relating to proposals for natural gas infrastructure under the FERC's jurisdiction (pipelines, storage fields, compressor stations, liquefied natural gas facilities, etc.).").  Thus, for the NEPA review of the pipeline, FERC serves as the "lead agency," whereas TVA is a "cooperating agency."  *See* 40 C.F.R. §§ 1501.5, 1501.6.

FERC's NEPA reviews are comprehensive and include mitigation measures to ensure that projects under consideration will not have a significant impact on the environment.  *See, e.g.*, *Minisink Compressor Project Environmental Assessment*, Section D: Conclusions and Recommendations, Dkt. No. CP11-515-000 (FERC Office of Energy Projects Mar. 2012), *available at* http://www.ferc.gov/industries/gas/enviro/eis.asp; *Ruby Pipeline Project Environmental Impact Statement* § 5.2, Dkt. No. CP09-54-000 (FERC Office of Energy Projects Jan. 8, 2010), *available at* http://www.ferc.gov/industries/gas/enviro/eis/2010/01-08-10.asp. Those reviews are guided by numerous environmental guidelines and best management practices, including ones for erosion control, *Upland Erosion Control, Revegetation, and Maintenance Plan* (FERC Office of Energy Projects May 2013), *available at* http://www.ferc.gov/industries/gas/enviro/plan.pdf; wetland and waterbody mitigation, *Wetland and Waterbody Construction and Mitigation Procedures* (FERC Office of Energy Projects May 2013), *available at* http://www.ferc.gov/industries/gas/enviro/procedures.pdf; and cultural investigations, *Guidelines for Reporting on Cultural Resources Investigations for Pipeline Projects*, (FERC Office of Energy Projects May 2002), *available at* http://www.ferc.gov/industries/gas/enviro/culresor.pdf.

In light of this comprehensive regulatory scheme and FERC's thorough environmental reviews, it is incorrect and inappropriate for Plaintiffs to suggest (Pls.' Br., Doc. 47 at 30) that

FERC, an independent government agency, will not fulfill its statutory duties appropriately.  *See U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of Government agencies[.]"); *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.").

In addition to the general argument that TVA failed to analyze effects on various resources within the specific pipeline route addressed above,[19] Plaintiffs' other arguments concerning segmentation are addressed below.

### 1.       Historic and cultural properties

Contrary to Plaintiffs' allegations (Pls.' Br., Doc. 47 at 35-36), TVA fully complied with the National Historic Preservation Act.  On October 11, 2013, TVA wrote to the Kentucky State Historic Preservation Officer (SHPO) with an update that TVA was considering a second alternative—a CC/CT plant—in addition to the original emission controls alternative (Alternative B).  (AR Doc. 77 at 6941.)  In that letter, TVA notified the SHPO that the CC/CT plant "would be associated with two related undertakings:  a transmission line . . . and one or more gas pipelines to bring natural gas to the plant" and that TVA would be using a "phased identification and evaluation process for the identification of historic properties, evaluations of effect, and resolution of adverse effects associated with these related undertaking."  (*Id.*)  This "phased identification" process is provided for in the Act's regulations.  36 C.F.R. § 800.4(b)(2).

The SHPO did not respond to TVA's October 2013 letter within thirty days; therefore, in accordance with applicable regulations, TVA's responsibilities under the Act were fulfilled.  *See*

---

[19]      Plaintiffs' arguments concerning vegetation and wildlife are limited to pipeline effects, which are discussed above.

36 C.F.R. § 800.4(d)(1)(iv)(A) ("If the Council does not respond within 30 days of receipt of the request, the agency official's responsibilities under section 106 are fulfilled.").  However, the SHPO did eventually respond to TVA's October 2013 letter on February 18, 2014.  (AR Doc. 78.)  In that letter, the SHPO acknowledged that TVA was following the "phased identification procedures" and noted that "TVA expects to submit additional detailed plans and documentation" for the transmission line and pipeline aspects of the project.  (AR Doc. 78 at 6950.)  The February 18, 2014 letter from the SHPO requested TVA to provide additional information concerning the "area of potential effect" and an Indian knoll.  (AR Doc. 78 at 6951.)  TVA provided this information to the SHPO on March 25, 2014.  (AR Doc. 79.)  The SHPO's subsequent letter of April 29, 2014, acknowledges receipt of all information concerning the assessment of impacts of the CC/CT project on historic properties.  (AR Doc. 80.)  Thus, consistent with Section 106 of the National Historic Preservation Act and its implementing regulations, TVA afforded the SHPO an opportunity to comment on the impacts of the CC/CT project on historic properties.  The Act requires nothing more.

## 2.      Floodplains and wetlands

Plaintiffs claim that TVA's assessment of impacts to floodplains and wetlands was insufficient for myriad reasons, including not consulting with the Army Corps of Engineers (Corps) about potential impacts to wetlands on the pipeline route and intake structures, not stating specifically that Alternative B was not a "practicable alternative," not defining "repetitive action," and not discussing construction activities that "would potentially be occurring within the 100-year floodplain during pipeline construction."  (Pls.' Br., Doc. 47 at 30-32, 37.)  These allegations are incorrect.

TVA's NEPA procedures incorporate Executive Order 11988 (AR Doc. 13 at 375) and define what is "practicable" for the "no practicable alternative" analysis required by the

executive order.  (AR Doc. 4 at 365.)[20]  The EA reiterates that "[a]s a federal agency, TVA is

subject to the requirements of EO 11988."  (AR Doc. 4 at 237.)  In 1979, TVA issued guidelines

for implementing EO 11988 (Floodplains) and 11990 (Wetlands).  *See* Implementation of

Executive Order Nos. 11988 & 11990, Floodplain Management & Protection of Wetlands;

Procedures & Draft Implementing Guidelines, 44 Fed. Reg. 45513 (Aug. 2, 1979).  That

guidance provides in part, "[w]hen a class of routine or recurring actions exists and the

consideration of whether to locate in a floodplain or wetland are substantially similar . . . a

floodplain or wetland evaluation of the class may be undertaken."  *Id*. at 45516.  TVA undertook

such a class evaluation in 1981 on certain repetitive actions including "[u]nderground, overhead,

or anchored utility and related lines and support structures," "[o]utfalls" and "[w]ater intake

structures" that occur "adjacent to streams or TVA reservoirs."  Class Review of Repetitive

Actions in 100-Year Floodplain, 46 Fed. Reg. 22845, 22846 (Apr. 21, 1981).[21]  TVA determined

that there is normally no practicable alternative to siting in the floodplain for these actions and

that the adverse impact of such actions could be minimized through routine criteria that are listed

in the Federal Register notice.  *Id*.  Thus, TVA's finding that there would be no significant

impact to floodplains from the outfall and water intake structures needed at Paradise or the

underground gas lines in the pipeline corridors was covered by TVA's class evaluation.  It was

---

[20]    Section 4.3 of TVA's NEPA Procedures recite that "practicable" for the Executive
Orders on Floodplains and Wetlands "refers to the capability of an action being done within
existing constraints."  (AR Doc. 13 at 365.)  "The test of what is practicable depends on the
situation involved and should include an evaluation of all pertinent factors, such as
environmental impact, economic costs, technological achievability, and public benefit."  (*Id*.)
All of these factors were evaluated in the EA for both alternatives.

[21]    The term "repetitive action" was coined by the Federal Emergency Management Agency
in their "Further Advice on Executive Order 11988," *available at*
http://www.gsa.gov/graphics/pbs/Advice_EO11988.pdf.

therefore procedurally correct and not arbitrary and capricious as Plaintiffs allege (Pls.' Br., Doc. 47 at 37), but was issued against the backdrop of comprehensive regulations issued in conformity with EO 11988.

As a general proposition, coordination with the Corps (whether for delineation of wetlands or for assessment of impacts to wetlands) is necessary when a Section 404 permit from the Corps under the Clean Water Act is sought for a concrete proposal that results in impacts to jurisdictional wetlands as a result of the discharge of dredge or fill. No such coordination is necessary at the early stage of a proposed action when the agency is conducting its NEPA review, as it can rely on its own experts for these assessments. TVA's wetland expert consulted U.S. Fish and Wildlife Service National Wetland Inventory maps, aerial photographs, and land use/land cover data to determine that the only wetlands on the Paradise site are classified as L1UBHx (Lacustrine, Limnetic, Unconsolidated Bottom, Permanently Flooded, Excavated). These wetlands are considered non-jurisdictional by the Corps because they are not hydrologically connected to a navigable water and thus fall outside the definition of "waters of the United States" in Section 404 of the Clean Water Act. (AR Doc. 4 at 215-17; *see also* AR Doc. 63.) The EA therefore concluded that "[n]o jurisdictional wetlands are known to occur within the project footprint at [Paradise]" such that "there would be no direct impacts to jurisdictional wetlands from the construction of the CT/CC plant." (AR Doc. 4 at 216.) In addition, "[w]ith the possible exception of the water intake and discharge structure, forested wetlands bordering the Green River would be avoided during plant and transmission line construction"[22] and any indirect impacts to nearby wetlands would be mitigated through

---

[22]     After the EA was issued, geotechnical studies were undertaken by TVA at the proposed location of the intake structure, which demonstrated there were no wetlands present.

Kentucky's Best Management Practices, which are included in Paradise's National Pollution Discharge Elimination System permit.  (*Id.*; AR Doc. 58 at 5553-55.)

Plaintiffs also argue that TVA did not assess impacts to wetlands in the specific pipeline route yet to be identified at the time the EA was issued.  TVA's EA assessed the two potential pipeline corridors and concluded that any impacts to wetlands that might occur in the final pipeline corridor could be mitigated in accordance with TVA's and FERC's Best Management Practices (AR Doc. 142 at 8889-93; *Wetland and Waterbody Construction and Mitigation Procedures* (FERC Office of Energy Projects May 2013), *available at* http://www.ferc.gov/industries/gas/enviro/procedures.pdf.)   To the extent permanent impacts to wetlands in the pipeline route could not be avoided, appropriate "mitigation banking" under Section 404 of the Clean Water Act[23] would be implemented.  (AR Doc. 4 at 217.)

Finally, Plaintiffs argue that TVA failed to state explicitly in the EA that installing emission controls was not a "practicable alternative" to installing gas-fired units.  (Pls.' Br., Doc. 47 at 32.)  This "flyspeck" is form over substance.  The factors that are the foundation for a no practicable alternative determination (e.g., environmental impacts, economic costs, technological achievability, and public benefit) are addressed throughout the EA and are summarized in the "Alternatives" chapter of the EA.  (*See, e.g.*, AR Doc. 4 at 187-90.)  The assessment that Alternative B was not a "practicable alternative" is necessarily embodied in TVA's discussion of its Preferred Alternative, which lists the important considerations that led to the choice of Alternative C combined with the findings that there would be no direct impacts to jurisdictional

---

[23]     "Mitigation banking has been defined as wetland restoration, creation, enhancement, and in exceptional circumstances, preservation undertaken expressly for the purpose of compensating for unavoidable wetland losses in advance of development actions, when such compensation cannot be achieved at the development site or would not be as environmentally beneficial."  *See* Federal Guidance for the Establishment, Use and Operation of Mitigation Banks, 60 Fed. Reg. 58605, 58606 (Nov. 28, 1995).

wetlands from the construction of the CC/CT plant.  The selection of Alternative C rather than Alternative B as the preferred alternative was based on factors prescribed in the definition of "practicable" in TVA's NEPA Procedures.  (AR Doc. 13 at 365.)

### 3.  Threatened/endangered species

Plaintiffs make three arguments regarding TVA's analysis of impacts to threatened or endangered species:  (1) "there is no evidence of further consultation with USFWS (or FERC) relating to Section 7 consultation . . . for the gas pipeline"; (2) TVA did not take the required "hard look" at potential impacts to species from the gas pipeline; and (3) the EA does not explain how mitigation measures, such as clearing outside the Indiana bat nesting season or contributing to the Indiana Bat Conservation Fund, "will [ensure] that impacts will not be significant."  (Pls.' Br., Doc. 47 at 32-34.)[24]

First, further consultation with the U.S. Fish and Wildlife Service will take place after Texas Gas has submitted its application for a Certificate of Public Necessity to FERC when the exact pipeline route has been identified.  Second, in light of this further future consultation, TVA took the requisite, but necessarily preliminary "hard look" at potential impacts to threatened and endangered species as a result of pipeline construction in the EA.  (AR Doc. 4 at 212-13.)  Third, the U.S. Fish and Wildlife Service's practice of ensuring that there will be no adverse impact on listed species through certain mitigation measures, such as seasonal limitations on clearing and payment into the Indiana Bat Conservation Fund, is well-established in Kentucky.  *See generally Working with Indiana Bats in Kentucky*, USFWS, Ky. Ecological Services Field Station, *available at* http://www.fws.gov/frankfort/indiana_bat_procedures.html; Revised Indiana Bat Mitigation

---

[24]     TVA determined that neither alternative would impact any species listed under the Endangered Species Act and this determination was coordinated with the U.S. Fish and Wildlife Service, who concurred with TVA's determination.  (AR Doc. 4 at 297-98; AR Doc. 158.)

Guidance for the Commonwealth of Kentucky, *available at*

http://www.fws.gov/frankfort/pdf/Jan2011%20Indiana%20bat%20Mitigation%20Guidance.pdf;

Final Revised Biological Opinion: The Service's Continued Participation In and Approval of

Conservation Memoranda of Agreement for the Indiana Bat (*Myotis sodalist*), USFWS, Ky. Field

Office (Jan. 3, 2011), *available at*

http://www.fws.gov/frankfort/pdf/Final%20Revised%20BO%20MOA%20for%20I-Bat.PDF.

###     4.     Greenhouse gas emissions

Plaintiffs fault TVA's analysis of the life cycle of greenhouse gas emissions because,

they argue, it was limited to assessment of $CO_2$ and did not look at methane ($CH_4$), nitrous oxide

($N_2O$), or sulfur hexafluoride ($SF_6$).  (Pls.' Br., Doc. 47 at 37-38.)  This is incorrect.  The EA

explicitly states that "[m]ost of the observed increase in globally averaged temperatures since the

mid-20th century is very likely because of the observed increases in concentrations of carbon

dioxide ($CO_2$) *and other greenhouse gases (GHG) including methane (CH_4) and nitrous oxide

(NOx).*"  (AR Doc. 4 at 197 (emphasis added).)  In addition, the AR documents concerning

climate change address methane, nitrous oxide and sulfur hexafluoride.  (*See, e.g.*, AR Doc. 115

at 7970, 7978, 8016, 8051; AR Doc. 116 at 8083; AR Doc. 117 at 8097-98.)

Plaintiffs also argue that TVA failed to look at "the most current research" on the subject,

but fail to identify this research further.  (Pls.' Br., Doc. 47 at 38.)  All but two of the research

documents TVA cited were published in 2012, the year TVA was conducting its NEPA analysis

before the EA's issuance in 2013.  NEPA does not require an agency to endlessly update its

analysis to consider ever-evolving research because "[t]o require otherwise would render agency

decisionmaking intractable, always awaiting updated information only to find the new

information outdated by the time a decision is made."  *Marsh v. Or. Natural Res. Council*,

490 U.S. 360, 373 (1989).

**D.    TVA's Mitigation Measures Are Incorporated Into Its NEPA Procedures and the Licenses and Permits Under Which It Operates.**

Plaintiffs repeatedly accuse TVA of "swe[eping] potential problems under the rug by improperly relying on amorphous and undefined future mitigation measures." (Pls.' Br., Doc. 47 at 2, 20, 25-38.) As they have done elsewhere, Plaintiffs turn the presumption of regularity in government action, *see U.S. Postal Serv. v. Gregory*, 534 U.S. at 10; *United States v. Chem. Found., Inc.*, 272 U.S. at 14-15, on its head by presuming not merely government *irregularity*, but deliberate malfeasance. Many of the mitigation measures that Plaintiffs call speculative or undefined are either fully explained in the permits or licenses referenced in the EA (*see e.g.*, AR Doc. 4 at 168-69, 190-94, 221-27, 245-46, 275, 305; AR Docs. 36, 58) or explained in detail in TVA's Best Management Practices, which are incorporated throughout the EA (*see e.g.*, AR Doc. 4 at 169, 188, 190, 197, 201, 203, 213-17, 219-21, 223-24, 228-30, 233, 236, 238), and which are included in the Administrative Record. (AR Docs. 61, 132, 142-44.) TVA's responsibility to implement mitigation measures is found in its NEPA Procedures for identifying, auditing, and reporting the mitigation commitments made in its NEPA reviews. (AR Doc. 13 at 373-74.)[25]

**E.    TVA Did Not Predetermine Its Decision.**

Plaintiffs again accuse TVA of predetermining its decision to replace two coal-fired units at Paradise with gas-fired generation. Plaintiffs' accusation is not supported by fact, but by speculation that assumes bad faith on TVA's part, rather than appropriate government action taken in accordance with law. Indeed, the facts Plaintiffs include in order to suggest that TVA inappropriately predetermined the outcome of its review actually support the conclusion that

---

[25]    Moreover, "[a] proposed mitigation plan does not need to be laid out to the finest detail . . . to be NEPA-compliant." *KEEP v. FHWA*, 2011 WL 5301589, at *20 (internal quotation marks omitted).

TVA engaged in a thorough and ongoing analysis of various options to implement a MATS compliant option at Paradise that would also fulfill the Energy Policy Act's least-cost system wide mandate.

Plaintiffs argue that "[a]fter more than a year of planning to comply with MATS at Paradise, by installing jet-pulse fabric filters [baghouses] on the coal-[fired] Units 1 and 2, TVA suddenly re-opened the question of MATS [c]ompliance." (Pls.' Br., Doc. 47 at 39.)  There was nothing "sudden" about TVA's consideration of either of the two alternatives.  Plaintiffs continue to ignore that when the TVA Board of Directors approved the budget for the emissions controls project at Paradise in August 2012, it did so conditioned on completion of necessary environmental reviews.  (AR Doc. 9 at 324, 326, 330.)  The Paradise EA and its associated analyses under the Endangered Species Act and the National Historic Preservation Act are those environmental reviews.  In 2012, the emissions controls appeared to be the better alternative to comply with EPA's MATS rule, but after these additional, extensive analyses, TVA concluded that replacing the two coal units with natural gas was the better course of action.  This is not arbitrary and capricious behavior.

Nor is Plaintiffs' selective quotation from TVA's opening brief's citation to *Friends of Fiery Gizzard v. Farmers Home Administration*, 61 F.3d 501, 504 (6th Cir. 1995) (*compare* TVA Br., Doc. 32-1 at PageID 324, *with* Pls.' Br., Doc. 47 at 40), evidence that TVA was motivated to prepare an EA for the Paradise decision because "the duration and cost of [an] EIS may have an impact on its ability to achieve its preferred alternative by the MATS deadline." (Pls.' Br., Doc. 47 at 40.)  TVA's analysis of potential environmental effects of the project, together with appropriate mitigation measures, demonstrated that it would not have "significant" effects as defined by NEPA at 40 C.F.R. § 1508.27(a), (b) so as to make the preparation of an EIS necessary.  (TVA Br., Doc. 32-1 at PageID 324.)  The Sixth Circuit's observation in *Fiery*

*Gizzard* is a useful reminder that an EA is "a screening device that allows agencies with limited resources to focus on truly important federal actions," *Friends of Fiery Gizzard*, 61 F.3d at 504, and should not be judged by standards applicable to an EIS.  TVA cited to *Fiery Gizzard*, *Klein v. United States Department of Energy*, 753 F.3d 576 (6th Cir. 2014), and *Delaware Audubon Society v. Salazar*, 829 F. Supp. 2d 273 (D. Del. 2011) to underscore the point that "[p]resence of enumerated intensity factors does not mandate a finding of significance," *Del. Audubon Soc'y*, 829 F. Supp. 2d. at 284, and that an EIS need not be prepared for "every major Federal action that might conceivably have a significant effect on the human environment," *Friends of Fiery Gizzard*, 61 F.3d at 504.

TVA found, after lengthy analysis and re-analysis, that the effects of the replacement of the two smaller coal units at its Paradise Fossil Plant with natural gas would not have a significant effect on the human environment and appropriately issued an EA and FONSI to that effect.

## CONCLUSION

For the reasons stated and upon the authorities cited here and in TVA's Brief in Support of Its Motion for Judgment on the Administrative Record and TVA's Opposition to Plaintiffs' Motion for a Preliminary Injunction, and on the basis of the Administrative Record filed with the Court, TVA's Motion for Judgment on the Administrative Record should be granted and Plaintiffs' Cross-Motion for Judgment should be denied.

Respectfully submitted,

*s/Maria V. Gillen*
Edwin W. Small, Deputy General Counsel
Maria V. Gillen, Senior Attorney
Frances Regina Koho, Attorney
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1401
Telephone 865.632.7741

Attorneys for Tennessee Valley Authority

19434428

## CERTIFICATE OF SERVICE

On December 15, 2014, I electronically filed TVA's Brief in Support of Motion for

Judgment on the Administrative Record through the Court's ECF system on the date shown in

the document's ECF footer.  The ECF system will send a notice of this electronic filing to:

> Donald J. Kelly, Esq.
> Lisa Catherine DeJaco, Esq.
> Wyatt, Tarrant & Combs LLP
> 500 West Jefferson Street, Suite 2800
> Louisville, KY 40202-2898
> dkelly@wyattfirm.com
> ldejaco@wyattfirm.com
>
> Courtney Ross Sanford, Esq.
> Gregory Brian F. Wells, Esq.
> Wyatt, Tarrant & Combs LLP
> 250 W. Main Street, Suite 1600
> Lexington, KY 40507-1746
> csamford@wyattfirm.com
> bwells@wyattfirm.com
>
> *Attorneys for Plaintiffs*

<u>s/Maria V. Gillen</u>
Attorney for Tennessee Valley Authority

2804231