## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## OWENSBORO DIVISION

**CIVIL ACTION NO. 4:14CV-00073-JHM**

**KENTUCKY COAL ASSOCIATION, INC, ET AL.**                        **PLAINTIFFS**

**VS.**

**TENNESSEE VALLEY AUTHORITY**                                **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Plaintiffs' motion for preliminary injunction seeking to preliminarily enjoin Tennessee Valley Authority ("TVA") from carrying out any activities that will implement its decision to retire Paradise Units 1 and 2 and construct a new gas-powered generating facility and accompanying gas transport infrastructure. [DN 17] The Court held a preliminary injunction hearing. Fully briefed and argued, this matter is ripe for decision.

### I.  BACKGROUND

On February 16, 2012, the EPA issued regulations known as the Mercury and Air Toxics Standards (MATS) requiring operators of coal-fired power plants, including TVA, to reduce hazardous pollutants emitted from their plants by April 16, 2015, or by April 16, 2016, if an extension was granted.  In August of 2012, TVA Board of Directors approved a budget that included the funding to upgrade the existing emission controls at Paradise Units 1 and 2 by installing pulse jet fabric filter systems to comply with MATS emission mandates.  In April of 2013, TVA again indicated its intent to upgrade Paradise Units 1 and 2.

In August of 2013, in an effort to comply with MATS, TVA announced a change in its position regarding Paradise Units 1 and 2.  TVA released a Draft Environmental Assessment

("EA") that proposed the following alternatives: (1) the No Action Alternative, under which TVA would allow the facility to operate out of compliance with the governing laws and regulations (Alternative A); (2) construction and operation of pulse jet fabric filter systems for emission control on Paradise Units 1 and 2 (Alternative B); and (3) retirement of Paradise Units 1 and 2 and construction and operation of a new natural gas-fueled power generating CT/CC plant (Alternative C).  Unit 3 at Paradise would remain operational.  According to the Draft EA, TVA also considered six other emission reduction alternatives, but eliminated them from detailed analysis because they were determined not to be technically or economically practical or feasible.  TVA offered a 30-day comment period, which TVA notes was not required.  TVA received 304 comments on the draft EA and most of those comments supported the second alternative.

In November of 2013, TVA issued a 153-page Final EA determining that Alternative C, the proposed action of retiring Paradise Units 1 and 2 and replacing them with a natural gas fueled power plant, was the preferred alternative.  TVA determined that the proposed action would not significantly impact the environment and issued a Finding of No Significant Impact ("FONSI") in accordance with the National Environmental Policy Act ("NEPA"), the Council on Environmental Quality ("CEQ") regulations, and TVA's procedures.  TVA represents that the Paradise EA builds on or tiers from Environmental Impact Statements ("EIS") that TVA issued for its 1995 and 2011 Integrated Resource Plan ("IRP").  According to TVA, an IRP is the culmination of a comprehensive utility planning process that evaluates the merits of using different kinds of energy resources to meet forecasted future demand for electricity with the goal of meeting demand reliably and cost effectively.  According to TVA, tiering permits an agency to go from a broader NEPA review to a more site-specific NEPA review without readdressing

issues or repeating information.  TVA states that its decision to replace two coal-fired units with natural gas generation at its Paradise Plant is supported by two linked environmental reviews—the 2011 IRP and the Paradise Final EA.

On July 10, 2014, the Plaintiffs, Kentucky Coal Association, Inc., James Rogers III, J.L. Rogers Family, LLC, Talmage Rogers, Talmar of FL., LLC, Pat Early, Kirstine Early, Buckingham Hollow, LLC, Kevin Lawrence, and Big Bucks, LLC, filed an eight-count complaint seeking a declaration that Defendant, Tennessee Valley Authority, violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, the Administrative Procedures Act, 5 U.S.C. § 555 et seq, and the TVA Act, 16 U.S.C. § 831n-4(f), by conducting a faulty Environmental Assessment, improperly issuing a FONSI, and failing to prepare and issue an EIS concerning the project.  On August 27, 2014, the Plaintiffs filed this motion seeking a preliminary injunction enjoining TVA and its representatives from any activities that will implement TVA's November 13, 2013, decision to retire Paradise Units 1 and 2 and construct a new gas-powered generating facility and accompanying gas transport infrastructure.

Plaintiffs allege that TVA has failed to undertake required environmental analysis under NEPA and failed to engage in least-cost planning under the TVA Act in connection with its decision to proceed with Alternative C.  Plaintiffs argue that rather than conducting an EIS for this project which is required by NEPA, regulations of CEQ, and TVA's own NEPA implementing regulations, TVA conducted only a more limited EA.  To avoid the required EIS, TVA characterized the construction of a new 1,025 MW gas-fueled facility and its related infrastructure as an "upgrade" or "maintenance" of the existing coal-fueled facilities when in fact the existing coal-fueled units will be decommissioned, demolished, and replaced by a separate

and distinct gas-fueled facility.   Plaintiffs claim that without a preliminary injunction, the declaratory and permanent injunctive relief Plaintiffs are pursuing will be a pyrrhic victory.

## II. PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is an extraordinary remedy that is generally used to preserve the status quo between the parties pending a final determination of the merits of the action. In determining whether to issue a preliminary injunction, the Court considers four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007) (quoting Tumblebus Inc. v. Cranmer, 399 F.3d 754, 760 (6th Cir. 2005)). It is unnecessary for the Court to make findings regarding each factor if "fewer are dispositive of the issue." In re DeLorean Motor Co., 755 F.2d 1223, 1228 (6th Cir. 1985) (citing United States v. School Dist. of Ferndale, Mich., 577 F.2d 1339, 1352 (6th Cir. 1978)).

## III.  DISCUSSION

### A. Likelihood of Success on the Merits

The Court must first consider whether the Plaintiff has demonstrated a strong likelihood of success on the merits. Tenke, 511 F.3d at 543.

The National Environmental Protection Act "is 'our basic national charter for protection of the environment,' 40 C.F.R. § 1500.1(a), and is designed to 'declare a national policy which will encourage productive and enjoyable harmony between man and his environment[, and] to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man.' 42 U.S.C. § 4321." Tennessee Environmental Council

4

v. Tennessee Valley Authority, 2014 WL 3810740, *3 (E.D. Tenn. Aug. 1, 2014).   NEPA requires federal agencies to take a "hard look" at the environmental consequences of their projects before taking action. Id. (citing Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 374 (1989); 42 U.S.C. § 4332(2)(C)). "NEPA also requires that federal agencies follow the necessary process in assessing the environmental effects of projects; it does not, however, mandate a specific result." Id. (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989)); see also Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227–28 (1980). "In other words, NEPA's mandate is essentially procedural." Id.

"A primary provision of NEPA is the requirement that all federal agencies prepare an EIS for 'major [f]ederal actions significantly affecting the quality of the human environment.'" Id. at *4 (citing 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1508.15; Southwest Williamson Cnty. Ass'n, Inc. v. Slater, 243 F.3d 270, 274 n. 3 (6th Cir. 2001)). "Major" has no meaning independent of "significantly," and "actions" include "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals." 40 C.F.R. § 1508.18.  An EIS is the most detailed and comprehensive level of review under NEPA regulations. Tennessee Environmental Council, 2014 WL 3810740, *4 (citing 40 C.F.R. § 1508.11; 40 C.F.R. Part 1502); Heartwood, Inc. v. Agpaoa, 628 F.3d 261, 264 (6th Cir. 2010).

"Prior to preparing an EIS, the agency may, however, prepare an EA as a preliminary step in determining whether the environmental impact of the proposed action is sufficiently significant to warrant an EIS." Tennessee Environmental Council, 2014 WL 3810740, *4; 40 C.F.R. § 1508.9(a)(1). "The EA is to be a 'concise public document' that '[b]riefly provide[s]

sufficient evidence and analysis for determining whether to prepare an [EIS].'" Id. (quoting

Department of Transp. v. Public Citizen, 541 U.S. 752, 757 (2004) (alterations in original)

(quoting 40 C.F.R. § 1508.9(a)).  If, pursuant to an EA, "an agency determines that an EIS is not

required under applicable [regulations issued by the Council on Environmental Quality ("CEQ")

], it must issue a '[FONSI]' which briefly presents the reasons why proposed agency action will

not have a significant impact on the human environment.'" Id. (citing 40 C.F.R. §§ 1501.4(e),

1508.13).

Federal courts have jurisdiction to review NEPA claims pursuant to the Administrative

Procedure Act (the "APA"), 5 U.S.C. § 704. Sierra Club v. Slater, 120 F.3d 623, 630–31 (6th

Cir. 1997).  "It is well settled that a reviewing court grants substantial deference to an agency's

determination under NEPA, including decisions regarding what level of environmental review is

needed. Such a determination will be upheld so long as the determination was not arbitrary,

capricious, or an abuse of discretion." Tennessee Environmental Council, 2014 WL 3810740, *4

(citing Kelley v. Selin, 42 F.3d 1501, 1518 (6th Cir. 1995); Kleppe v. Sierra Club, 427 U.S. 390,

410 n. 21, 412 (1976); Marsh, 490 U.S. at 376).   Thus, "an agency's decision must be

'reasonable under the circumstances' when reviewed 'in the light of the mandatory requirements

and the standard set by (NEPA).'" Tennessee Environmental Council, 2014 WL 3810740, *4

(quoting Kelley, 42 F.3d at 1519).  "'When it is possible to offer a reasoned explanation, based

on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'" Id.

(quoting Davis v. Ky. Fin. Cos. Ret. Plan, 887 F.2d 689, 693 (6th Cir.1989) (citation omitted)).

In engaging in its review, "a court cannot 'substitute [its] judgment of the environmental

impact for the judgment of the agency, once the agency has adequately studied the issue.'"

Tennessee Environmental Council, 2014 WL 3810740, *5 (quoting Kelley, 42 F.3d at 1518).  "A

court must, however, 'determine whether the agency has, in fact, adequately studied the issue and taken a hard look at the environmental consequences of its decision.'" Id. (citation omitted). Ultimately, the review is a "narrow one." Id.

### 1.  Violation of TVA's NEPA Procedures

Plaintiffs maintain that TVA violated its own NEPA procedures by failing to prepare and issue an EIS concerning the project.  TVA's NEPA procedures identify the types of actions that "normally require an environmental impact statement" to include (a) actions involving "[m]ajor power generating facilities;" (b) "any major action, the environmental impact of which is expected to be highly controversial;" (c) "any other major action which will have a significant effect on the quality of the human environment." See Tenn. Valley Auth., Procedures for Compliance with NEPA.

First, Plaintiffs argue that because TVA's preferred alternative is the construction and operation of a new 1,025 MW CT/CC gas plant, with its associated high-pressure gas pipeline system and its backup fuel oil system[1], the appropriate level of NEPA review under TVA's own procedures is an EIS, not an EA.  Plaintiffs cite numerous cases in which TVA conducted Environmental Impact Statements for the construction and operation of new power generating facilities.  Plaintiffs maintain that TVA's failure to conduct an EIS in light of its own procedures raises a serious and substantial question on the merits supporting the entry of a preliminary injunction pending the Court's full investigation.

Defendant concedes its procedures list "major power generating facilities" as one of the "actions [that] normally will require an EIS."  However, Defendant argues that "normally" does not mean that an EIS is always required for major power generating facilities where the agency determines that an action will have no major environmental impacts.  Defendant states that such

---

[1] Counsel for TVA represented that the backup fuel oil system is no longer being considered by TVA.

is the situation at Paradise.  The Court agrees.  TVA has discretion to determine whether the "normal" preparation of an EIS is warranted under NEPA.  As noted by the Tenth Circuit, "actions which an agency determines will normally require an EIS, do not always require an EIS."  Committee to Preserve Boomer Lake Park v. Department of Transp., 4 F.3d 1543, 1555 (10th Cir. 1993).  In the present case, TVA determined that the action would have no major environmental impacts and would actually have important environmental benefits, and therefore, determined that no EIS was necessary.  Despite Defendant's own procedures to normally conduct an EIS in actions involving major power generating facilities, TVA's decision to prepare an EA in the present case, as opposed to EIS, does not automatically warrant a finding that the review conducted by TVA was deficient.  Instead, the Court will analyze TVA's decision under the appropriate CEQ regulations.   Furthermore, the cases relied upon by Plaintiffs for the position that an EIS is required for the construction and operation of a new power generating facility are distinguishable in that the construction of the power generating facilities in those cases were to occur on a green field site, as opposed to an existing power generating facility.

Second, Plaintiffs contend that an EIS was required pursuant to TVA's own NEPA procedures because Alternative C is highly controversial.  Plaintiffs maintain that the decision by TVA to abandon highly efficient and low cost coal-fueled units, which are able to supply their coal needs cheaply, is sure to be controversial among TVA ratepayers and property owners who enjoy low energy costs and among those employed at Paradise Units 1 and 2 and other related businesses.  In support of its position, Plaintiffs note that the majority of the 304 public comments received opposed Alternative C, and Kentucky's federal legislative delegation signed a letter to TVA encouraging the adoption of Alternative B.

Contrary to the argument by Plaintiffs, "[c]ontroversy in this context does not mean opposition to a project, but rather 'a substantial dispute as to the size, nature, or effect of the action.'" Hillsdale Environmental Loss Prevention, Inc. v. U.S. Army Corps of Engineers 702 F.3d 1156, 1181 (10th Cir. 2012) (citation omitted). "A finding of controversy requires that the comments cast 'substantial doubt on the agency's methodology and data.'" Tennessee Environmental Council, 2014 WL 3810740, * 14.  The record indicates that Defendant addressed the concerns raised during the public comment period when it issued its Final EA.  Further, while Plaintiffs are correct that the majority of the comments favored Alternative B, these comments did not cast substantial doubt on the adequacy of defendant's methodology and data.  See id; Hillsdale, 702 F.3d at 1181.

## 2. Significant Impact

"A primary provision of NEPA is the requirement that all federal agencies prepare an EIS for 'major [f]ederal actions significantly affecting the quality of the human environment.'" Id. at Tennessee Environmental Council, 2014 WL 3810740, *4 (citing 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1508.15).  The Council on Environmental Quality ("CEQ") "has issued regulations prescribing the considerations agencies must take into account when performing EAs and determining that the proposed agency action would not 'significantly affect [ ] the quality of the human environment,' 42 U.S.C. § 4332(2)(C), so as to obviate the need for an EIS." Anglers of the AU Sable v. U.S. Forest Service, 402 F. Supp. 2d 826, 831-832 (ED. Mich. 2005)(quoting Friends of Fiery Gizzard v. Farmers Home Admin., 61 F.3d 501, 504 (6th Cir. 1995) (noting that an EA was a "rough-cut, low-budget environmental impact statement [that] serves, among other things, to aid an agency's compliance with NEPA when no environmental impact statement is necessary [and] . . . is a highly significant 'first step' that determines whether the next step will

or will not be the preparation of a fully polished, high-budget environmental impact statement")
(internal quotes and citations omitted)). Both parties agree that the project constitutes a "major
Federal action" within the meaning of NEPA.  The dispute in the present case centers on TVA's
determination that the project does not "significantly" affect environmental quality.

"The Federal Regulations direct agencies to consider both 'context' and 'intensity' when
determining whether environmental quality will be 'significantly' affected." Anglers of the AU
Sable, 402 F. Supp. 2d at 832. "Context 'means that the significance of an action must be
analyzed in several contexts such as society as a whole (human, national), the affected region,
the affected interests, and the locality.'" Id. (quoting 40 C.F.R. § 1508.27(a)).  "Intensity 'refers
to the severity of impact.'" Id. (quoting 40 C.F.R. § 1508.27(b)). Included  in the regulation are
ten intensity factors such as "[t]he degree to which the proposed action affects public health or
safety[;]" "[u]nique characteristics of the geographic area such as proximity to historic or
cultural resources, . . . wetlands, . . . or ecologically critical areas[;]" "[t]he degree to which the
effects on the quality of the human environment are likely to be highly controversial[;]" [t]he
degree to which the action may establish a precedent for future actions with significant effects or
represents a decision in principle about a future consideration[;] "[w]hether the action is related
to other actions with individually insignificant but cumulatively significant impacts[;]" and
"[t]he degree to which the action may adversely affect an endangered or threatened species or its
habitat that has been determined to be critical under the Endangered Species Act of 1973." 40
C.F.R. § 1508.27(b)(2), (3), (4), (6), (7) & (9).  An action is not necessarily "significant," thus
requiring an EIS, whenever one of the ten intensity factors is met. To the contrary, as noted by
the Sixth Circuit, "[w]hile the ten [intensity] factors may show that the [agency] could have
prepared an [EIS], they do not show that the [agency] acted arbitrarily and capriciously in not

10

completing one." <u>Klein v. U.S. Dep't of Energy</u>, 753 F.3d 576, 584 (6th Cir. 2014) (emphasis in original).   In addition to their argument regarding the "highly controversial" factor which the Court has previously addressed, Plaintiffs contend that TVA failed to analyze other intensity factors properly in its decision that the project would have no significant impact.

First, Plaintiffs maintain that TVA's evaluation of the pipeline corridors did not sufficiently address the terrestrial and aquatic species, the wetlands, historic and cultural resources, floodplain management, and a complete listing of required permits regarding wetlands compliance.   These arguments relate to the connected activity of the construction and maintenance of the natural gas pipeline which the Court considers in section III(A)(3). Similarly, the Court addresses the "cumulative impact" factor in section III(A)(3) as well.

Second, Plaintiffs argue that TVA ignored the importance of the availability of an adequate supply of electricity at a reasonable price.  Plaintiffs contend that Alternative C will result in more expensive electricity for TVA rate-payers which will disparately impact the poor. Furthermore, Plaintiffs maintain that the Final EA does not address the potential negative effects of increasing demand for natural gas and the potential for brown-outs and black-outs during peak load periods should natural gas be unavailable in sufficient quantities to meet the demand.

The record reveals that the 2011 IRP addressed the system cost, reliability, and socio-economic considerations of the demand for electricity from the TVA system for the next 20 years, including utilization of nuclear and natural gas generation along with coal-fired units to achieve a more balanced and diversified portfolio.  TVA represents that its conclusions with regard to energy prices are consistent with the finding of the EPA in support of MATS. (2011 IRP at AR 1892-2173, 2187, 2248-2249.) As to the reliability concerns, TVA's action with respect to the Paradise facility is an effort to comply with MATS while maintaining the required

11

generating capacity.  In contrast to Plaintiffs' argument, experts with TVA have articulated that the switch to natural gas generation would reinforce reliability of the system and reduce the risks of power outages.

Third, Plaintiffs also argue that TVA did not take into account the significant job losses at the Paradise facility itself and in other related industries like trucking, engineering, and surveying if TVA stops burning coal in Paradise Units 1 and 2. Further, Plaintiffs contend that local owners of coal-producing property, such as some of the Plaintiffs, will lose revenue from the loss of coal sales.   The record reflects that the EA did examine the employment impacts on the labor market in Muhlenberg County and adjacent counties.  In fact, TVA concluded that there would be adverse impacts to employment under Alternative C from the reduction of positions at the Paradise facility and from the decreased demand for coal mined in western Kentucky.  TVA also concluded that its tax equivalent payments to the state would increase because the value of the CC/CT units would be higher than the coal-fired units. (AR at 268.) While TVA recognized that there would be adverse impacts to employment under Alternative C, "economic or social effects are not intended by themselves to require preparation of an environmental impact statement."  40 C.F.R. § 1508.14.

Fourth, Plaintiffs contend that the selection of Alternative C by TVA without the preparation of an EIS will have a significant effect on future TVA decisions if it is allowed to stand as precedent because (1) TVA has inappropriately elevated carbon dioxide emissions and related air quality issues above all other environmental impacts which has no legal basis under NEPA or its implementing regulations and (2) TVA improperly relied on portfolio diversity as a basis for its decision to adopt Alternative C, rather than on measuring the environmental impacts of the particular alternatives.  Plaintiffs argue that TVA improperly utilized the outcome of the

Gallatin Plant (TN) NEPA process where it decided to install controls to justify its decision not

to install the same controls in the present NEPA process.  Specifically, TVA in the Final EA

stated "[h]aving preserved coal-fired generation capacity at Gallatin, TVA now has greater

latitude to shift from coal to gas at [Paradise] in the interest of maintaining a diverse portfolio."

(AR at 190.)

A review of the EA reveals that TVA considered the intensity factors and determined that

the natural gas alternative would not have a significant adverse effect on the human environment,

but would produce significant benefits to regional air quality, result in significant reduction in

carbon dioxide emissions, greatly reduce water withdrawal and heated discharge into the Green

River, and reduce the production of coal combustion waste. With respect to the use of the

Gallatin Plant NEPA process, TVA correctly points out that 16 U.S.C. § 831m-1 requires TVA

to consider energy resource diversity in its least-cost energy resource planning process.

Additionally, with respect to considering the carbon dioxide emissions, TVA is required to

consider "other factors of risk" under 16 U.S.C. § 831m-1(b)(2)(A) as well as environmental

compliance, § 831m-1(b)(3).

For these reasons, the Court finds that Plaintiffs have not demonstrated a likelihood of

success on the merits of their claim that TVA's determination that the project does not

"significantly" affect environmental quality was arbitrary and capricious.

### 3.  Improper Segmentation of Project Components.

"An agency impermissibly 'segments' NEPA review when it divides connected,

cumulative, or similar federal actions into separate projects and thereby fails to address the true

scope and impact of the activities that should be under consideration." Delaware Riverkeeper

Network v. F.E.R.C., 753 F.3d 1304, 1313 (D.C. Cir. 2014).  Regulations promulgated by the

13

CEQ dictate the appropriate scope of a NEPA document. The regulations state, in relevant part, that:

> To determine the scope of environmental impact statements, agencies shall consider 3 types of actions. . . . They include:
>    (a) Actions (other than unconnected single actions) which may be:
>    (1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they: (i) Automatically trigger other actions which may require environmental impact statements; (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; [or] (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.").
>    (2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.
>    (3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. . . .

40 C.F.R. § 1508.25.   Cumulative effects are defined by the CEQ as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.   Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.   Thus, when determining the contents of an EA or an EIS, an agency must consider all "connected actions," "cumulative actions," and "similar actions." 40 C.F.R. § 1508.25(a).

The justification for the rule against segmentation is obvious: it "'prevent[s] agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'" Delaware

Riverkeeper Network, 753 F.3d at 1314 (citing NRDC v. Hodel, 865 F.2d 288, 297 (D.C. Cir. 1988)). "The doctrine of improper segmentation is limited, however, to proposed actions; NEPA does not require an agency to consider the possible environmental impacts of less imminent actions." Bullwinkel v. U.S. Dept. of Energy, 899 F. Supp. 2d 712, 729 (W.D. Tenn. 2012) (internal quotation marks omitted) (quoting Anglers of the Au Sable v. U.S. Forest Serv., 565 F. Supp. 2d 812, 831 (E.D. Mich. 2008)); Tennessee Environmental Council, 2014 WL 3810740, * 10.

Plaintiffs argue that, in the NEPA review of Alternative C, TVA was required to assess the reasonably foreseeable connected or cumulative actions and resulting environmental impacts associated with the significant impacts of the decommissioning and demolition of Paradise Fossil Units 1 and 2, the construction and operation of two new 161-kV transmission lines and a substation, and the impact from the connected action of construction of the new natural gas pipeline.  For example, Plaintiffs contend that because these actions were improperly segmented, TVA failed to consider the natural gas pipeline's impact on the wetlands, endangered species, biological vegetation, and historic and cultural properties as required by 40 C.F.R. § 1508.27.

First, Plaintiffs argue that TVA did not address the significance of the retirement of Units 1 and 2.  TVA stated in the Final EA that "[l]ong-term actions related to retirement, such as potential demolition of the units, are outside the scope of this EA and will be addressed by TVA in the future should Alternative C be implemented."  (EA § 2.1.3, AR 173.)  TVA concluded that the potential effects of decommissioning and demolition of Units 1 and 2 were too speculative and would be examined in the future by TVA when the decision to decommission and demolish the units were proposed. TVA presented evidence the decision by TVA to decommission or demolish coal units had been made in some cases over 10 to 20 years after the unit was retired.

15

The Court agrees with TVA that the possibility is too speculative at present. The evidence at this stage of the proceeding reflects that TVA's decision to retire Paradise Units 1 and 2 does not automatically trigger the decommissioning and demolition of Units 1 and 2. Because the timing and manner of the decommissioning of the coal units are indefinite, it was proper for TVA to analyze retirement of the units separately from their possible decommission in the future.  Furthermore, the construction of the gas generation plant is not dependent upon the demolition of the fossil units.  See Coalition on West Valley Nuclear Waste v. Chu, 592 F.3d 306, 311 (2d Cir. 2009); Coal v. Bodman, 625 F. Supp. 2d 109, 118-119 (W.D.N.Y. 2007).  "As the Supreme Court observed in Kleppe v. Sierra Club, NEPA 'speaks solely in terms of Proposed actions; it does not require an agency to consider the possible environmental impacts of less imminent actions.'"  City of Riverview v. Surface Transp. Bd., 398 F.3d 434, 442 (6th Cir. 2005)(citing Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 20 (1976)); Bullwinkel, 899 F. Supp. 2d at 729; Anglers of the Au Sable, 565 F. Supp. 2d at 831; Tennessee Environmental Council, 2014 WL 3810740, * 10.  TVA's decision to decommission and demolish the units is not a proposed action, but rather a less imminent action that may or may not occur.  Therefore, based on the evidence currently before the Court, it was entirely appropriate for TVA to defer analysis of the potential environmental impacts associated with decommissioning and demolition of Paradise Fossil Units 1 and 2.

Second, Plaintiffs argue that TVA improperly segmented the analysis of the construction and operation of the new natural gas pipeline.  NEPA requires an EIS to include "[c]onnected actions," which are actions that (1) automatically trigger other actions that may require environmental impact statements; (2) cannot or will not proceed unless other actions are taken previously or simultaneously; and (3) are interdependent parts of a larger action and depend on

16

the larger action for their justification. 40 C.F.R. § 1508.25(a)(1).  See Hirt v. Richardson, 127 F. Supp. 2d 833, 842 (W.D. Mich. 1999).  TVA considered the construction and operation of the new natural gas pipeline a connected activity.  TVA analyzed, to the extent possible, the potential impacts of constructing and operating the pipeline along two alternative pipeline routes. TVA's analysis of the pipeline impact can be found throughout the EA in various pertinent environment sections.  For example, TVA acknowledged that federally protected terrestrial and aquatic species, wetlands, and historical and cultural resources could be implicated.  TVA represented that its analysis is preliminary because Texas Gas Transmission, LLC, ("Texas Gas"), the natural gas supplier for the facility, will determine the final pipeline route and additional environmental review of those impacts would be considered by the Federal Energy Regulatory Commission ("FERC") before it certified the pipeline. TVA noted that it would serve as a cooperating agency under the FERC EA or EIS.  Furthermore, at the hearing, TVA represented to the Court that the proposed natural gas pipeline route has already changed from the routes initially proposed in the EA.  The Court finds that it is proper for an agency to defer analysis where it cannot practically assess the environmental effects of actions whose details are not yet certain.  Coalition for Advancement of Regional Transp. v. Federal Highway Administration, 576 Fed. Appx. 477, 491 (6th Cir. 2014).

In Coalition for Advancement of Regional Transp., the Federal Highway Administration in a supplemental final EIS discussed the potential impacts related to tunnel spoil in relation to a bridge project.  However, the EIS provided that because "excess material sites for disposal of construction spoil have not been determined at this time," those sites will be investigated later when a determination is made regarding construction phasing.  Id.  The Sixth Circuit held that "defendants rationally deferred a consideration of the environment impacts until the precise spoil

17

locations would be identified." Id. (citing Envtl. Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d 1005, 1014 (9th Cir. 2006) (if not enough information is available to permit a meaningful consideration of possible environmental impacts, NEPA does not require the government to do the impractical)).  Similarly, in Envtl. Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d 1005 (9th Cir. 2006), the Court noted that the agency did sufficiently analyze the effect of a related projected "based on the information known about the proposed project *at that time*." Id. at 1014 (emphasis added).  In the present case based on the above case law, TVA included "a reasonably complete discussion of the [natural gas pipeline] based on the project parameters that were known at that point in time." Id. at 1015.

Third, Plaintiffs contend that Alternative C requires the construction and operation of two new 161-kV transmission lines, a substation, and a new 500-kV transmission line.  According to Plaintiffs, the construction of these items are reasonably foreseeable, connected or cumulative actions as defined in 40 C.F.R. § 1508.25(a) that would result in impacts that must be considered in the same NEPA document to adequately assess the full range of impacts.  While noting that TVA would conduct any additional environmental review necessary after the final routes for the transmission lines are evaluated, the Final EA reflects that the two transmission lines and the substation would be located entirely on the Paradise plant site and were addressed throughout the EA. (AR at 182, 199, 204, 212, 216, 221, 229.)  Additionally, with respect to the construction of the 500-kV transmission line, TVA stated in the Final EA that North American Electric Reliability Corporation ("NERC") "standards also require the maintenance of transmission system performance following the loss of bulk electric system elements . . . .  To comply with these rules, TVA plans to install a new 500-kV transmission line connecting to [the Paradise facility].   This line will be installed regardless of which alternative is selected for

implementation.  The construction and operation of this transmission line is outside the scope of this EA and will be the subject of a separate future EA or environmental impact statement." (AR 293.)  Thus, TVA determined that the line would be needed to meet North American Electric Reliability Corporation standards and that it would construct such a line in the future regardless of which alternative was chosen. (AR at 293.)  As noted above, the Sixth Circuit has recognized that defendants can rationally defer "a consideration of the environment impacts until the precise . . . locations would be identified."  Coalition for Advancement of Regional Transp., 576 Fed. Appx. at 491 (citing Envtl. Prot. Info. Ctr., 451 F.3d at 1014).

Therefore, in light of the case law, the Court finds that Plaintiffs have not demonstrated a likelihood of success on the merits of their claim that TVA improperly segmented the NEPA review of the proposed action.

### 4. No Action Alternative

Plaintiffs argue that TVA failed to consider the proper No Action Alternative.  Plaintiffs contend that TVA used a materially flawed starting point by delineating the status quo of continued operation of Units 1 and 2 without measures to control emissions of particulate matter as the benchmark No Action Alternative.

"NEPA requires an agency to 'present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public.'" Tennessee Environmental Council, 2014 WL 3810740, *7 (quoting 40 C.F.R. § 1502.14).  As part of this analysis, agencies are required to include the alternative of no action. § 1504.14(d).  "'In requiring consideration of a no-action alternative, the Council on Environmental Quality intended that agencies compare the potential impacts of the proposed major federal action to the known impacts of maintaining the

19

status quo. In other words, the current level of activity is used as a benchmark.'" Tennessee Environmental Council, 2014 WL 3810740, *7 (quoting Custer Cnty. Action Ass'n v. Garvey, 256 F.3d 1024, 1040 (10th Cir. 2001) (internal citations omitted)). In fact, the CEQ regulations "require the analysis of the no action alternative even if the agency is under a court order or legislative command to act." Tennessee Environmental Council, 2014 WL 3810740, *7-*8 (citing Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026 (Mar. 23, 1981)). After a review of the EA in light of the appropriate case law, the Court finds that the No Action Alternative utilized by TVA in the EA conforms to CEQ requirement reflecting the *current* status quo.  Id.

### 5. TVA Act Claim

Plaintiffs argue that they have demonstrated a likelihood of success on the merits of their claim under the TVA Act by raising substantial questions as to whether TVA's decision to abandon Paradise Units 1 and 2 for a newly constructed natural gas CC/CT facility demonstrates the least-cost planning that is required by statute. According to Plaintiffs, under the TVA ACT, TVA is obliged to provide adequate and reliable service at the lowest system cost to its customers. Plaintiffs contend that retiring Units 1 and 2 will increase the costs for TVA customers by $174 million over the next 10 years, at approximately $19.33 per year for each TVA electric customer. Additionally, Plaintiffs maintain that the average cost of natural gas is forecast to rise much more quickly than the average cost of coal over the next decade. Further, Plaintiffs argue that Paradise Units 1 and 2 are more economically suited to emission controls than to retirement.

The Energy Policy Act of 1992[2] "was designed to create a 'comprehensive national energy policy that gradually and steadily increases U.S. energy security in cost-effective and environmentally beneficial ways.'" <u>Center For Biological Diversity v. Abraham</u>, 218 F. Supp. 2d 1143, 1149 (N.D. Cal. 2002).  Section 113 of the Act requires TVA to conduct a least-cost planning program "which evaluates the full range of existing and incremental resources (including new power supplies, energy conservation and efficiency, and renewable energy resources) in order to provide adequate and reliable service to electric customers of the Tennessee Valley Authority at the lowest system cost."  16 U.S.C. § 831m-1(b)(1).  TVA is directed to take into account "necessary features for system operation, including diversity, reliability, dispatchability, and other factors of risk."  <u>Id.</u> at § 831m-1(b)(2). "System cost" is defined as "all direct and quantifiable net costs for an energy resource over its available life, including the cost of production, transportation, utilization, waste management, environmental compliance, and, in the case of imported energy resources, maintaining access to foreign sources of supply."

The Final EA indicates that it tiers from EISs issued by TVA for its 1995 and 2011 IRP. TVA's IRP process evaluated the effects of resource options on TVA's environment and its economy utilizing models that link electricity sales to the price of electricity and natural gas, economic growth, and other factors that impact demand.  TVA then employed the results of its 2011 IRP process in the decision-making process leading to the decision to replace the Paradise units with natural gas.  In an effort to comply with the directives of the IRP, and considering a recent TVA decision to preserve the Gallatin coal-fired unit, TVA concluded that the selection of Alternative C would provide the lowest system-wide cost over the life of the units.  Based on the

---

[2] Plaintiffs define this claim as arising under the TVA Act; however, the statute cited was promulgated under the Energy Policy Act of 1992.

information presented by the parties on the motion for preliminary injunction, TVA's reliance on

TVA's IRP in an effort to satisfy the directives concerning least-cost planning under 16 U.S.C. §

831m-1 does not appear to be arbitrary or capricious.

### B. Irreparable Harm

The next factor the Court must consider in deciding whether to grant a preliminary

injunction is whether Plaintiffs will suffer irreparable injury absent the injunction. Tenke, 511

F.3d at 550.  In Amoco Production Co. v. Village of Gambell, 480 U.S. 531 (1987), the Supreme

Court explained the unique nature of irreparable injury inquiry presented in an environmental

case:

> Environmental injury, by its nature, can seldom be
> adequately remedied by money damages and is often permanent or
> at least of long duration, i.e., irreparable. If such injury is
> sufficiently likely, therefore, the balance of harms will usually
> favor the issuance of an injunction to protect the environment.

Id. at 545. Stated otherwise, "[i]n the NEPA context, irreparable injury flows from the failure to

evaluate the environmental impact of a major federal action.... [T]he presence of strong NEPA

claims gives rise to more liberal standards for granting an injunction. If environmental injury is

sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect

the environment." High Sierra Hikers Assn v. Blackwell, 390 F.3d 630, 642 (9th Cir. 2004)

(citations omitted).  See also Anglers, 402 F. Supp. 2d at 837.

In support of their request for a preliminary injunction, Plaintiffs set forth three alleged

irreparable harms that will result from TVA's decision in the Final EA.  First, Plaintiffs allege

that TVA's decision to switch from burning coal to natural gas will cause a significant rise in

electric prices that will harm consumers, businesses, and counties already suffering from poverty

and may result in brown-outs or blackouts.  Second, Plaintiffs contend that if TVA is permitted

to continue with its proposed course of action without evaluating the effects on the environment of the lateral natural gas pipeline, the individual Plaintiffs could lose their venues to hike, fish, hunt, and experience the beauty of the countryside; Plaintiffs Buckingham Hollow, LLC and Big Bucks, LLC will experience irrevocable damage to wildlife habitats which is critical component to use of property; and the Rogers family will see pipelines constructed on land designated for mining coal which could rob them of the value of their coal reserves.  Finally, Plaintiffs contend that because of the approval of Alternative C, Kentucky coal industry and associated industries will suffer significant job losses.  Plaintiffs further maintain that if the preliminary injunctive relief is not granted, the Plaintiffs will not have an opportunity to argue the case on the merits because the alleged harm will have already occurred.

Initially, the Court would note that much of the alleged irreparable harm cited by Plaintiffs stems from the construction and operation of the CC/CT plant.  However, for purposes of this motion for preliminary injunction, the question is whether irreparable harm will occur to the Plaintiffs prior to a final decision on the Administrative Record.  With respect to construction activities at the Paradise facility, the record reflects that project activities through the end of 2014 include engineering, design work, procurement of equipment, and preparatory construction work for the completion of the project, such as installing concrete ground elements and foundation installations for the gas turbines and heat recovery steam generators.  (Robert Hope Affidavit at ¶ 7.)  Significantly, the construction activity will occur on the Paradise Plant facility and not on the Plaintiffs' property.  Additionally, with both Units 1 and 2 still operational, the local economy is not being adversely impacted.  Thus, at present, Plaintiffs can point to no harm from this activity.

With respect to the natural gas pipeline, the record indicates that no construction may begin until FERC issues a certificate of approval to Texas Gas. (J. Kyle Stephens Affidavit at ¶

23

4.)  Texas Gas will submit its application to FERC by approximately December 16, 2014, and the certification process will take up to a year.  Thus, any invasive pipeline construction which has the potential to cause harm to the environment or to Plaintiffs' property will not occur until late 2015.  Id. at ¶¶ 4, 6.  These assessments are essential to FERC's NEPA review of the pipeline project.  Id. at ¶¶ 6-7.  While these activities may require Texas Gas to access a particular property for a few days and cause minor soil disturbances, these activities do not warrant the extraordinary remedy of a preliminary injunction.  Interestingly, any "harm" from environmental assessments related to the proposed natural gas pipeline route would be the same whether conducted by TVA or FERC.  Therefore, the Court finds that Plaintiffs have not put forth sufficient evidence that they will suffer irreparable harm absent a preliminary injunction.

### C. Substantial Harm to Others and Public Interest

The third and fourth injunction factors -- whether the injunction would cause substantial harm to others and whether the public interest would be served by issuance of the injunction – also counsel against granting Plaintiffs' motion for preliminary injunction in light of the Court's decisions with respect to the other factors.  The preliminary injunction requested by Plaintiffs would delay the natural gas pipeline application to FERC, delay the related environmental assessments of the proposed pipeline route, and significantly affect the project's June 2017 implementation date.  The Court finds that the minor harm to the environmental interests that may occur while awaiting a decision on the administrative record is outweighed by the harm caused by the potential delay of the project, including the delay of the environmental assessments of the natural gas pipeline.  Further, because Plaintiffs have failed to demonstrate a likelihood of success on the merits regarding whether TVA fully complied with NEPA and the Energy Policy Act, any preliminary injunction would not be in the public interest.

Upon consideration of all of the relevant factors, the Court concludes that Plaintiffs have not met their heavy burden to show that preliminary injunction should be granted.

## IV.  CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Plaintiffs' motion for preliminary injunction pursuant to Fed. R. Civ. P. 65 [DN 17] is **DENIED**.

cc: counsel of record

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

December 18, 2014

25